## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| TNA Entertainment, LLC,       ) <br>       ) <br>    Plaintiff,       ) <br>       ) <br> v.       ) <br>       ) <br> Charles "Carlos" Ashenoff,       ) <br>       ) <br>    Defendant,       ) <br>       ) <br> v.       ) <br>       ) <br> Jeffrey L. Jarrett, Dixie Carter, Paul W.     ) <br> Taylor III (p/k/a Terry Taylor), and     ) <br> Wayne Cowan (p/k/a Dutch Mantel),     ) <br>       ) <br>    Counterclaim Defendants.       ) | **CIVIL ACTION NO.: 808CV-522-B** <br><br> **JURY TRIAL DEMANDED** |

## ANSWER AND COUNTERCLAIMS

Pursuant to Rules 12, 13(h) and 19 of the Federal Rules of Civil Procedure, Defendant Charles Ashenoff hereby files his Answer and Counterclaims against original Plaintiff TNA Entertainment, LLC ("TNA") and new Counterclaim Defendants Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor (p/k/a Terry Taylor), and Wayne Cowan (p/k/a Dutch Mantel), respectfully showing the Court as follows:

### I.     ANSWER

### FIRST DEFENSE

Mr. Ashenoff hereby responds to the specific allegations in TNA's Original Complaint and Request for Declaratory Judgment ("Complaint"):

## ANSWERING THE SECTION ENTITLED "PARTIES"

### 1.

Mr. Ashenoff is without sufficient information to admit or deny the allegations in paragraph 1.

### 2.

Except for the contact information listed for Mr. Ashenoff's attorney, Mr. Ashenoff admits the allegations in paragraph 2. Mr. Ashenoff's attorney's contact information is as follows: Cary Ichter, Adorno & Yoss, LLC, Two Midtown Plaza, Suite 1500, 1349 West Peachtree Street, Atlanta, Georgia 30309; telephone number: 404-347-8486.

## ANSWERING THE SECTION ENTITLED "JURISDICTION AND VENUE"

### 3.

Mr. Ashenoff denies the allegations in paragraph 3.

### 4.

Mr. Ashenoff denies the allegations in paragraph 4.

### 5.

Mr. Ashenoff denies the allegations in paragraph 5.

## ANSWERING THE SECTION ENTITLED "INTRODUCTION AND BACKGROUND FACTS"

### 6.

Mr. Ashenoff admits the allegations in the first sentence of paragraph 6. Mr. Ashenoff is without sufficient information to admit or deny the remaining allegations in paragraph 6.

### 7.

Mr. Ashenoff admits the allegations in paragraph 7.

{A0225355_1}

2

8.

Mr. Ashenoff admits the allegations in the first sentence of paragraph 8.  Mr. Ashenoff denies the remaining allegations in paragraph 8.

## ANSWERING THE SECTION ENTITLED "THE PARTIES' INDEPENDENT CONTRACTOR AGREEMENTS"

9.

Mr. Ashenoff admits that in or about January 2004, he entered into an Independent Contractor Agreement with TNA.  Regarding the remaining allegations in paragraph 9, Mr. Ashenoff responds that the Independent Contract Agreement referenced therein is a written document that speaks for itself.

10.

Mr. Ashenoff admits the allegations in paragraph 10.

11.

Mr. Ashenoff admits that he voluntarily entered into the Independent Contractor Agreements.  Mr. Ashenoff denies the remaining allegations in paragraph 11.

12.

Regarding the allegations in paragraph 12, Mr. Ashenoff responds that the Independent Contractor Agreements referenced therein are written documents that speak for themselves.

13.

Regarding the allegations in paragraph 13, Mr. Ashenoff responds that the Addendums referenced therein are written documents that speak for themselves.  Furthermore, Mr. Ashenoff denies that TNA has accurately quoted the Addendums in paragraph 13.

{A0225355_1}

14.

Regarding the allegations in paragraph 14, Mr. Ashenoff responds that the Independent Contractor Agreements referenced therein are written documents that speak for themselves.

## ANSWERING THE SECTION ENTITLED "DEFENDANT'S CLAIMS AND THREATENED SUIT"

15.

Mr. Ashenoff admits the allegations in paragraph 15.

16.

Regarding the allegations in paragraph 16, Mr. Ashenoff responds that the demand letter and draft lawsuit complaint referenced therein are written documents that speak for themselves. Furthermore, Mr. Ashenoff denies the allegations in paragraph 16 to the extent they characterize or portray Mr. Ashenoff's demand letter or draft lawsuit complaint as factually inaccurate.

17.

Regarding the allegations in paragraph 17, Mr. Ashenoff responds that the demand letter and draft lawsuit complaint referenced therein are written documents that speak for themselves.

18.

Mr. Ashenoff denies the allegations in paragraph 18.

19.

Mr. Ashenoff denies the allegations in paragraph 19.

{A0225355_1}

20.

Mr. Ashenoff is without sufficient information to admit or deny the allegations in paragraph 20.

### ANSWERING THE SECTION ENTITLED "COUNT 1: BREACH OF CONTRACT"

21.

Mr. Ashenoff incorporates his responses to paragraphs 1-20 as if fully set forth herein.

22.

Mr. Ashenoff admits the allegations in paragraph 22.

23.

Mr. Ashenoff is without sufficient information to admit or deny the allegations in paragraph 23.

24.

Regarding the allegations in paragraph 24, Mr. Ashenoff responds that the Independent Contractor Agreements referenced therein are written documents that speak for themselves.  To the extent footnote 1 requires a response, Mr. Ashenoff denies the allegations and legal conclusions set forth in footnote 1.

25.

Regarding the allegations in paragraph 25, Mr. Ashenoff responds that the Independent Contractor Agreements referenced therein are written documents that speak for themselves.

26.

Regarding the allegations in paragraph 26, Mr. Ashenoff responds that the Independent Contractor Agreements referenced therein are written documents that speak for themselves.

{A0225355_1}

27.

Mr. Ashenoff denies the allegations in paragraph 27.

28.

Mr. Ashenoff denies the allegations in paragraph 28.

29.

Mr. Ashenoff denies the allegations in paragraph 29.

## ANSWERING THE SECTION ENTITLED "COUNT TWO [sic]: ACTION FOR DECLARATORY JUDGMENT"

30.

Mr. Ashenoff incorporates his responses to paragraphs 1-29 as if fully set forth herein.

31.

Mr. Ashenoff denies the allegations in paragraph 31.

32.

Regarding the allegations in paragraph 32, Mr. Ashenoff denies that the Independent Contractor Agreements have the effect of limiting his ability to bring certain causes of action against TNA and that, with the exception of paragraph 32(b), TNA is not entitled to any of the declarations set forth therein.

## ANSWERING THE SECTION ENTITLED "ATTORNEYS' FEES"

33.

Regarding the allegations in paragraph 33, Mr. Ashenoff denies that TNA is entitled to any of the relief sought therein.

## ANSWERING THE SECTION ENTITLED "II.[sic] PRAYER"

34.

Regarding the section of TNA's Complaint entitled "II.[sic] Prayer," with the exception of the relief sought in paragraph (d)(ii), Mr. Ashenoff denies that TNA is entitled to any of the relief sought therein.

35.

Any allegation not specifically admitted herein is hereby denied.

### SECOND DEFENSE

TNA's Complaint fails to state a claim for which relief can be granted.

### THIRD DEFENSE

TNA failed to satisfy one or more conditions precedent set forth in the Independent Contractor Agreements referenced in its Complaint.

### FOURTH DEFENSE

TNA's claims are barred by its own illegal conduct.

### FIFTH DEFENSE

The waiver of claims referred to in TNA's Complaint is void and unenforceable.

### SIXTH DEFENSE

The waiver of the right to jury trial referred to in TNA's Complaint is void and unenforceable.

### SEVENTH DEFENSE

The choice of law provision referenced in TNA's Complaint is void and unenforceable.

## EIGHTH DEFENSE

The forum selection provision referenced in TNA's Complaint is void and unenforceable, and this Court lacks jurisdiction over Mr. Ashenoff.

## II.   COUNTERCLAIMS

### PARTIES AND JURISDICTION

1.

This Court has jurisdiction over TNA by virtue of TNA having filed this action in this Court.

2.

Counterclaim Defendant Jeffrey L. Jarrett is a resident of the State of Tennessee and may be served at his residence, 144 Island Drive, Hendersonville, TN 37075-4507.   Counterclaim Defendant Jarrett is the Vice-President of TNA and subject to the jurisdiction of this Court.

3.

Counterclaim Defendant Dixie Carter is a resident of the State of Tennessee and may be served at her residence, 9243 Prestmoor Place, Brentwood, TN 37027-2403.   Counterclaim Defendant Dixie Carter is the President of TNA and is subject to the jurisdiction of this Court.

4.

Counterclaim Defendant Paul W. Taylor III (p/k/a and referred to herein as Terry Taylor) is a resident of the State of Tennessee and may be served at his residence, 1603 Lantana Drive, Thompsons Station, TN 37179-9768.   Counterclaim Defendant Taylor is subject to the jurisdiction of this Court.

{A0225355_1}

5.

Counterclaim Defendant Wayne Cowan (p/k/a and referred to herein as Dutch Mantel) is a resident of the State of Florida and may be served at his residence, 262 Woodbury Pines Circle, Orlando, FL 32828-9079.  Counterclaim Defendant Mantel is subject to the jurisdiction of this Court.

## BACKGROUND FACTS

### TNA Unlawfully Discriminates Against Minority Wrestlers

6.

TNA is engaged in the business of producing, arranging, staging, conducting and promoting professional wrestling events and programs throughout the world.

7.

In conducting wrestling events, TNA principally uses Caucasian wrestlers, writers, bookers and administrative personnel.  Out of the nearly fifty (50) wrestlers on TNA's roster at any given time, on the average only four or five are African-American and fewer still are Hispanic.

8.

Professional wrestling matches are staged events in which the outcomes are predetermined and the wrestlers are required to follow various scripts and story lines in their matches.

9.

TNA is solely responsible for determining the outcome of matches and developing the story lines to be performed by the wrestlers.

{A0225355_1}

10.

TNA has never had a minority represented as a booker or member of its management team.  TNA has never had a Hispanic or African-American booker or executive at any level.

11.

TNA historically has exploited racial and national origin animus in its story lines.  For example, certain wrestlers are adorned in stereotypical ethnic garb, directed to act according to negative ethnic stereotypes associated with the particular ethnicity, and story lines are developed to provoke "negative" fan reaction toward the particular wrestler and ethnic group.  For example, Mr. Ashenoff was instructed by TNA to play the role of a Hispanic street thug or gang member and to use racially charged and offensive terms in referring to Caucasians.

12.

At one time, Mr. Ashenoff was directed to strike another wrestler with a tequila bottle, suggesting that Hispanics always have a bottle of tequila readily available.

13.

Similarly, another Hispanic TNA wrestler is known as "Homicide," a name which is intended to evoke a connection between Hispanics and violent criminal activity.  Homicide, like Mr. Ashenoff, was directed to play the role of a gang member and street thug.  In short, minority characters created by TNA personify racial and ethnic slurs.

14.

The individuals at TNA responsible for booking matches and writing the story lines for wrestling shows and events, including Counterclaim Defendant Jarrett, commonly refer to African-Americans as "niggers," "uppity Negroes," and other racially hostile terms.

{A0225355_1}

15.

Members of TNA's management group have frequently referred to Hispanic wrestlers using similarly derogatory language, such as "brownies," "drunk Puerto Ricans," and generally referring to all Hispanics as "Mexicans" or "illegal aliens." TNA bookers and writers overtly and blatantly discriminate against Hispanics and African Americans.

## Charles Ashenoff's Relationship with TNA

16.

On or about January 21, 2004, TNA entered into an agreement with Mr. Ashenoff governing the relationship between the parties (the "2004 Agreement"). A true and correct copy of the 2004 Agreement is attached hereto as Exhibit "A."

17.

On or about August 5, 2005, TNA entered into a second agreement with Mr. Ashenoff governing the relationship between the parties, which was substantially similar to the 2004 Agreement (the "2005 Agreement") (collectively with the 2004 Agreement, the "Ashenoff Agreement"). A true and correct copy of the 2005 Agreement is attached hereto as Exhibit "B."

18.

The provisions in the Ashenoff Agreement, other than compensation and term, are substantially similar to those TNA enters into with virtually all of its wrestlers and performers.

19.

Under the terms of the Ashenoff Agreement, Mr. Ashenoff is classified as an independent contractor, and the Ashenoff Agreement specifically provides that Mr. Ashenoff was not an employee. See Ashenoff Agreement, ¶ 11.

{A0225355_1}

20.

Under the terms of the Ashenoff Agreement, Mr. Ashenoff was to provide services related to performing as a professional wrestler at TNA events.  In so doing, Mr. Ashenoff was contractually "subject to TNA's direction and control" and was governed by "rules and regulations set out by TNA."  See Ashenoff Agreement, ¶ 1.

**Racism at TNA**

21.

TNA required Mr. Ashenoff to perform under the name Konnan.  The character Konnan is an amalgamation of Hispanic stereotypes.  As Konnan, TNA directed Mr. Ashenoff to speak in Spanish slang or with a Spanish accent, and to adopt stereotypical characteristics of members of Latino street gangs.

22.

TNA further required Mr. Ashenoff to use racially charged language in referring to and addressing Caucasian wrestlers.  In short, TNA used the Konnan character to personify racial and ethnic slurs against Hispanics, in general, and Mexicans, in particular.

23.

Mr. Ashenoff objected to the ethnic and racial themes and the degrading stereotypes that TNA used on a regular basis.  Mr. Ashenoff's objections and concerns were completely ignored by TNA.

{A0225355_1}

24.

Additionally, TNA paid Mr. Ashenoff substantially less than other similarly situated non-minority performers, and TNA paid all or virtually all minority wrestlers less than the average amount paid to Caucasian wrestlers.

25.

Throughout Mr. Ashenoff's tenure with TNA, TNA's management personnel, bookers and agents routinely made derogatory racial and ethnic jokes and remarks in the work environment.

26.

TNA's management referred to all Hispanics as Mexicans, and used other derogatory terms like "brownies," "drunken Puerto Ricans," and "wetbacks" to describe Hispanics.

27.

TNA's management referred to African-Americans as "niggers" and, whenever they stood up for themselves, "uppity negroes."

28.

TNA has taken no steps to ensure that its management team is free of racism and racists. Further, TNA has not exercised reasonable care to prevent and correct illegal harassment.

29.

Counterclaim Defendant Jarrett is the Vice President of TNA. Counterclaim Defendant Jarrett formerly worked with a wrestling entity known as World Championship Wrestling or WCW.

{A0225355_1}

30.

WCW was sued by over a dozen minority wrestlers from 2000 through 2003 (the "WCW Litigation").

31.

During the WCW Litigation, two WCW bookers, Vince Russo and Counterclaim Defendant Taylor, were identified by multiple witnesses as racists who frequently used racially offensive language, such as the word "nigger," and who regularly displayed hostility to members of minority groups.

32.

In or about September 1999, Vince Russo, then a booker and writer for the Worldwide Wrestling Federation ("WWF"), made the following comments regarding Japanese, Mexican and other "non-American" wrestlers in an interview published over the Internet:

> I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this-it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

A true and correct copy of a printed version of said interview is attached hereto as Exhibit "C".

33.

Had TNA investigated Counterclaim Defendant Taylor or Vince Russo's background and public declarations, it would have easily discovered their conspicuous animus toward members of minority groups.

34.

Despite Counterclaim Defendant Taylor and Vince Russo's racist comments, TNA hired them as bookers for TNA events.  In that capacity, they decided which wrestlers would receive television exposure and which ones would not.

35.

TNA knew, or in the exercise of reasonable care should have known, of Counterclaim Defendant Taylor and Vince Russo's racist pasts and charges of racism that had been leveled against them.

36.

During the waning days of his relationship with TNA, Mr. Ashenoff began to complain more vigorously about the rampant racism he experienced at TNA.  Ultimately, the conditions and environment became so intolerable, Mr. Ashenoff asked for his release.

37.

On or about June 21, 2007, Mr. Ashenoff received an e-mail from TNA management advising him that TNA was terminating his contract.  A true and correct copy of said e-mail is attached hereto as Exhibit "D."

38.

On or about July 11, 2007, and in retaliation for his complaints of racial and ethnic discrimination, rather than give him his release, the management at TNA decided to indefinitely suspend Mr. Ashenoff so that he would continue to be bound by the terms of his agreement, particularly the non-competition provisions, while he was getting no work from TNA.  A true and correct copy of the suspension letter is attached hereto as Exhibit "E."

39.

On July 31, 2007, Mr. Ashenoff advised TNA management of his intention to file a racial discrimination lawsuit against TNA.

40.

The decision to terminate, and later to suspend, Mr. Ashenoff was made by Counterclaim Defendant Jarrett in his capacity as an agent of TNA.  Counterclaim Defendant Jarrett suspended Mr. Ashenoff in retaliation for Mr. Ashenoff's protected conduct, including his complaints about the rampant racism and discrimination at TNA.

41.

Mr. Ashenoff performed his duties as a TNA personality and wrestler in a manner consistent with TNA's expectations, and TNA never criticized Mr. Ashenoff's performance.

42.

In fact, on or about August 26, 2006, Counterclaim Defendant Carter, the President of TNA, wrote the following to Mr. Ashenoff in an e-mail: "THANK YOU for your great work, attitude and patience in us getting here…You are doing a great job, you always have, but you

{A0225355_1}

16

seem to have hit a stride."  A true and correct copy of said e-mail is attached hereto as Exhibit "F."

43.

After Mr. Ashenoff received notice of his suspension, Mr. Ashenoff wrote an e-mail to Counterclaim Defendant Carter to advise her of the hostile racial environment and the rampant discrimination at TNA.  A true and correct copy of said e-mail is attached hereto as Exhibit "G."  In that e-mail, Mr. Ashenoff made it plain to Counterclaim Defendant Carter that he "want[ed] to retire at TNA" but felt he could not stay because of the pervasive racial hostility in the company.

**The TNA Drug Culture**

44.

Notwithstanding the staged nature of wrestling events, professional wrestlers endure considerable wear and tear on their bodies.  This wear and tear is aggravated by the nature of the wrestling business.  Specifically, there is no off season in wrestling that affords wrestlers time to obtain medical attention, to heal, or to otherwise recover from injuries.  Additionally, wrestling organizations can have multiple events in a single week, leaving little time for even minor injuries to heal.

45.

As a consequence of the wrestling industry's scheduling challenges and the physical injuries, major and minor, that are a part of a wrestler's job, wrestling organizations often make un-prescribed pain killers and muscle relaxants, as well as other prescription drugs, available to wrestlers.

{A0225355_1}

46.

Wrestlers presented with illicit drugs, including un-prescribed pain killers, have few options. Wrestling organizations in general, and TNA in particular, provide no health insurance to their wrestlers. Therefore, wrestlers at the lower end of the compensation scale cannot afford doctor visits or prescription medicines from retail sources. On the other hand, without medication, they often cannot work because of nagging injuries.

47.

When Mr. Ashenoff came to work at TNA, he had a chronic hip injury that caused him pain and physical distress whenever he wrestled.

48.

To facilitate his ability to perform despite his hip injury, agents of TNA, including Counterclaim Defendant Taylor, provided un-prescribed pain killers and muscle relaxants to Mr. Ashenoff.

49.

Ultimately, Mr. Ashenoff was required to undergo hip replacement surgery.

50.

Representatives of TNA promised Mr. Ashenoff that TNA would assist him by paying for his hip replacement surgery. TNA reneged on that promise.

51.

Following his hip replacement surgery, while still in a wheelchair, and later on crutches, TNA's bookers insisted that Mr. Ashenoff perform at TNA events. Again, to facilitate his participation in the events, TNA bookers supplied un-prescribed pain killers to Mr. Ashenoff.

{A0225355_1}

52.

Agents of TNA provided un-prescribed prescription drugs, including pain killers and muscle relaxants, to various TNA performers, knowing that those drugs would be shared among the community of performers at TNA.  Mr. Ashenoff also received pain killers from other TNA performers as well.

53.

Ultimately, as a consequence of the use of un-prescribed pain killers supplied to him by TNA agents and performers, one of Mr. Ashenoff's kidneys failed and had to be replaced.  Mr. Ashenoff underwent a kidney transplant in July of 2007.

54.

Drug abuse is rampant at TNA.  Members of management, including Counterclaim Defendant Jarrett, and members of the booking committee, regularly indulge in the use of cocaine while on the job and share, or offer to share, illegal drugs with TNA wrestlers and employees.

**Copyright and Trademark Infringement**

55.

In or around August 2005, Mr. Ashenoff created a brand to identify himself and a group of fellow Latino wrestlers:  "LAX," which is an abbreviation of "Latin American Xchange." ("LAX").  LAX was conceived solely by Mr. Ashenoff, who also created the LAX logo (the "LAX Logo"), catch-phrases, and identifying characteristics.  The members of LAX were all Latino, and LAX members regularly and publicly addressed matters of racism in wrestling and society.

{A0225355_1}

56.

Mr. Ashenoff has applied for a copyright to the LAX Logo.

57.

LAX appeared in numerous nationwide broadcasts through SpikeTV, as well as in Mexico and Puerto Rico.  LAX appeared in TNA promoted events.  Because of its growing popularity, TNA began producing T-shirts, DVDs, and other promotional and branded products bearing or containing the LAX name and logo.

58.

TNA has never paid Mr. Ashenoff any money to obtain the right to use the LAX name, the LAX logo, or any LAX-related branding on any TNA merchandise or promotions.

59.

TNA continues to use the LAX brand and the LAX Logo without the permission of Mr. Ashenoff, despite demands that TNA cease and desist from same.

60.

Most or all of the events described in Mr. Ashenoff's Counterclaim occurred in the state of Florida.

61.

None of the events described in Mr. Ashenoff's Counterclaim occurred in the state of Texas.

## COUNT I

### Discrimination in Violation of § 1981

62.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 61 as if fully stated herein.

63.

TNA and the Counterclaim Defendants' conduct as described herein constitutes unlawful, intentional discrimination and retaliation against Mr. Ashenoff because of his race.  By engaging in the unlawful conduct described herein, TNA and the Counterclaim Defendants' acted intentionally, willfully and with malice or reckless indifference to Mr. Ashenoff's federally protected civil rights.

64.

TNA and the Counterclaim Defendants' have continually refused and failed to engage in good faith efforts to comply with federal law.

65.

In violation of 42 U.S.C. § 1981, because of his race, TNA and the Counterclaim Defendants' intentionally refused to provide Mr. Ashenoff with opportunities for advancement commensurate with the opportunities TNA and the Counterclaim Defendants' provided to similarly situated Caucasian wrestlers.

{A0225355_1}

21

66.

In violation of 42 U.S.C. § 1981, TNA and the Counterclaim Defendants' fostered and encouraged a hostile work environment wherein Mr. Ashenoff and other minorities suffered severe and pervasive hostility in the form of racial slurs, jokes and other sanctioned debasement.

67.

As a direct and proximate result of TNA and the Counterclaim Defendants' intentional discrimination in the performance, proposed modification, termination and the enjoyment of all benefits, privileges, terms and conditions of Mr. Ashenoff's contractual relationship with TNA and the Counterclaim Defendants', Mr. Ashenoff has suffered and is continuing to suffer serious injury, including, but not limited to, economic losses, humiliation, embarrassment, emotional distress and deprivation of his statutorily protected civil rights.

68.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from TNA and the Counterclaim Defendants.

## COUNT II

### Retaliation in Violation of § 1981

69.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 68 as if fully stated herein.

70.

During the waning days of his relationship with TNA, Mr. Ashenoff began to complain more vigorously about the rampant racism he experienced at TNA.

71.

Mr. Ashenoff's complaints of discrimination and racism are statutorily protected forms of expression.

72.

In violation of 42 U.S.C. § 1981 and in retaliation for his complaints of discrimination and racism, TNA and the Counterclaim Defendants' initially decided to terminate, but ultimately decided to indefinitely suspend Mr. Ashenoff so he would continue to be bound by the terms of his agreement, particularly the non-competition provisions, while he was getting no work from TNA.  A true and correct copy of the suspension letter is attached hereto as Exhibit "E."

73.

As a direct and proximate result of TNA and the Counterclaim Defendants' retaliation, Mr. Ashenoff has suffered and is continuing to suffer serious injury, including, but not limited to, economic losses, humiliation, embarrassment, emotional distress and deprivation of his statutorily protected civil rights.

74.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from TNA and the Counterclaim Defendants.

## COUNT III

### Intentional Infliction of Emotional Distress

75.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 74 as if fully stated herein.

76.

TNA and the Counterclaim Defendants' conduct described herein occurred within the context of a special relationship between TNA and the Counterclaim Defendants' and Mr. Ashenoff wherein they exercised significant control over Mr. Ashenoff. In the context of that special relationship, TNA and the Counterclaim Defendants' conduct was intentional or reckless, extreme and outrageous, and such conduct directly and proximately caused Mr. Ashenoff humiliation, embarrassment, worry, and emotional distress that no reasonable person should be expected to endure.

77.

Accordingly, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from TNA and the Counterclaim Defendants.

## COUNT IV

### Negligent Hiring, Training and/or Supervision

78.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 77 as if fully stated herein.

{A0225355_1}

79.

TNA and the Counterclaim Defendants' had a duty to provide Mr. Ashenoff with a working environment free from discrimination and harassment.

80.

Based on their history and reputations within the wrestling industry, TNA and the Counterclaim Defendants knew, or in the exercise of ordinary care should have known, that hiring Counterclaim Defendant Jarrett, Counterclaim Defendant Taylor and Vince Russo created a real risk of harassment and discrimination at TNA.

81.

In hiring Counterclaim Defendant Jarrett, Counterclaim Defendant Taylor and Vince Russo and failing to supervise them, TNA and the Counterclaim Defendants breached their duty to Mr. Ashenoff.

82.

As a direct result of hiring Counterclaim Defendant Jarrett, Counterclaim Defendant Taylor and Vince Russo and failing to supervise them, Mr. Ashenoff and other wrestlers were subjected to a harassing and discriminating environment in violation of 42 U.S.C. § 1981.

83.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from TNA and the Counterclaim Defendants.

## COUNT V

## Prospective Relief

84.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 83 as if fully stated herein.

85.

The conduct of TNA and the Counterclaim Defendants as set forth herein is illegal, improper and in violation of Mr. Ashenoff's federally protected statutory civil rights.

86.

The continuation of TNA and the Counterclaim Defendants' conduct as set forth herein shall cause Mr. Ashenoff and other minorities irreparable harm.

87.

Unless TNA and the Counterclaim Defendants' discriminatory policies and practices are stopped, Mr. Ashenoff and other minorities will continue to suffer serious and grievous harm for which Mr. Ashenoff has no plain or adequate remedy at law. Therefore, Mr. Ashenoff requests equitable relief as described below in his Prayer for Relief.

## COUNT VI

## Bodily Injury

88.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 87 as if fully stated herein.

89.

Counterclaim Defendants Taylor and Mantel, acting in their capacity as agents of TNA, illegally provided un-prescribed medications, including pain killers and muscle relaxants, to Mr. Ashenoff to facilitate his participation in TNA events.

90.

As a consequence of his consumption of said un-prescribed medications, Mr. Ashenoff suffered from kidney failure and was required to undergo a kidney transplant.

91.

Mr. Ashenoff's kidney failure and subsequent transplant was directly and proximately caused by the consumption of un-prescribed pain killers provided by TNA management.

92.

Due to his kidney transplant, Mr. Ashenoff has a reduced life expectancy, has sustained a permanent, partial disability, will be required to take various expensive pharmaceuticals for the rest of his life, will always be faced with the possibility of latent organ rejection, and has and will have a diminished quality of life.

93.

Consequently, Mr. Ashenoff is entitled to actual, compensatory, and punitive damages from TNA and the Counterclaim Defendants.

{A0225355_1}

## COUNT VII

## Negligent Hiring, Training and/or Supervision

### 94.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 93 as if fully stated herein.

### 95.

TNA and the Counterclaim Defendants had a duty to provide Mr. Ashenoff with a safe working environment, including properly supervising their employees and independent contractors.

### 96.

Based on the rampant distribution and use of prescription medications and illegal substances, TNA and the Counterclaim Defendants knew, or in the exercise of ordinary care should have known, that drug use was rampant at TNA.

### 97.

By failing to properly supervise their employees and fostering a climate of illegal drug use, TNA and the Counterclaim Defendants breached their duty to Mr. Ashenoff.

### 98.

As a direct result of the illegal drug use at TNA, Mr. Ashenoff suffered bodily harm.

### 99.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from TNA and the Counterclaim Defendants.

{A0225355_1}

28

## COUNT VIII:

## Liability Under the Drug Dealer Liability Act

100.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 99 as if fully stated herein.

101.

Large quantities of the un-prescribed pain killers delivered to Mr. Ashenoff by TNA and the Counterclaim Defendants were delivered to Mr. Ashenoff in the State of Florida.

102.

TNA and the Counterclaim Defendants' conduct in providing un-prescribed pain killers to Mr. Ashenoff constituted a violation of Fla. Stat. § 893.135(1)(c).

103.

Mr. Ashenoff sustained serious bodily injuries as a consequence of TNA and the Counterclaim Defendants' violations of Fla. Stat. § 893.135(1)(c).

104.

Pursuant to the Drug Dealer Liability Act, Fla. Stat. § 772.12(2), TNA and the Counterclaim Defendants are liable to Mr. Ashenoff for "threefold the actual damages sustained" as a consequence of said injuries and said violations of the law.

105.

Pursuant to the Drug Dealer Liability Act, Fla. Stat. § 772.12(5), TNA and the Counterclaim Defendants are liable to Mr. Ashenoff for his reasonable attorney's fees and court costs.

{A0225355_1}

## COUNT IX:

## Liability Under the Civil Remedies for Criminal Practices Act ("CRCPA")

106.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 105 as if fully stated herein.

107.

A large quantity of the un-prescribed pain killers sold and distributed to Mr. Ashenoff and other wrestlers by TNA and the Counterclaim Defendants were delivered to Mr. Ashenoff in the State of Florida.

108.

In addition to providing pain killers to Mr. Ashenoff, TNA and the Counterclaim Defendants regularly sold and distributed un-prescribed pain killers to performers who worked for TNA.

109.

TNA and the Counterclaim Defendants conduct in providing un-prescribed pain killers to Mr. Ashenoff constituted a violation of Fla. Stat. § 893.135(1)(c).

110.

By providing un-prescribed pain killers to Mr. Ashenoff on repeated occasions, TNA and the Counterclaim Defendants engaged in a pattern of racketeering activity, as that term is defined in Fla. Stat. Ann. § 895.02(4).

{A0225355_1}

111.

TNA and the Counterclaim Defendants engaged and participated in said pattern of racketeering activity through an enterprise consisting of TNA, the individual Counterclaim Defendants, and various independent contractors with whom TNA had or has contractual relationships.

112.

In addition to Counterclaim Defendants Taylor and Mantel, certain independent contractors under contract with TNA would distribute un-prescribed pain killers and other illicit drugs to performers for TNA, in violation of Fla. Stat. Ann. § 895.03(3).

113.

Counterclaim Defendants Jarrett, Taylor, Mantel, and certain independent contractors under contract with TNA who sold and distributed the illegal drugs referred to herein constituted an "enterprise," as defined by Fla. Stat. Ann. § 895.02(3).

114.

In addition to selling and distributing un-prescribed pain killers to TNA performers, Counterclaim Defendant Jarrett regularly personally used and shared with TNA performers and managers a variety of illegal drugs, including cocaine.

115.

Mr. Ashenoff sustained serious bodily injuries as a consequence of TNA and the Counterclaim Defendants' conduct as described herein.

116.

As a consequence of TNA and the Counterclaim Defendants' conduct as described herein, TNA and the Counterclaim Defendants are subject to the following civil remedies, among others:

(a)      divestiture of any interest in or dissolution of the "enterprise";

(b)      an Order suspending or revoking any license, permit or prior approval granted by any agency of the state;

(c)      an Order requiring forfeiture of the corporate charter of any liable entity;

(d)      forfeiture of all property, real or personal, including money, used in the course of, or intended for use in the course of, a violation of Fla. Stat. Ann. § 895.01-895.05; and

(e)      threefold Mr. Ashenoff's actual damages and attorneys' fees, at the trial and appellate court levels as well as all investigation and litigation costs.

## COUNT X:

## Trademark and Copyright Infringement

117.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 116 as if fully stated herein.

118.

Mr. Ashenoff is the owner of all right, title, and interest in and to the LAX name, the LAX Logo, and the image of LAX.

{A0225355_1}

119.

TNA has no right to use the LAX name, the LAX Logo, or any use of the LAX brand in any fashion.

120.

TNA has used and continues to affix and employ the LAX name, brand and LAX Logo upon TNA marketing materials and products, thereby infringing Mr. Ashenoff's copyright and trademark rights pursuant to the United States Copyright Act of 1976 and Section 43 of the Federal Lanham Act.

121.

TNA's use of the LAX Logo is a copy of the LAX Logo owned by Mr. Ashenoff, or is so substantially similar thereto as to constitute infringement by copying under the Copyright Act.

122.

TNA's use of the LAX name, brand, and identity has caused, and continues to cause, confusion in the marketplace as to the source, origin and sponsorship of the goods and services marketed and sold by TNA, as Mr. Ashenoff, the owner of the LAX marks, does not sponsor or otherwise permit TNA's uses thereof.

123.

Mr. Ashenoff is entitled to statutory damages and his attorneys' fees for TNA's willful infringement of Mr. Ashenoff's copyright, in an amount to be determined at trial.

124.

Mr. Ashenoff has been damaged by TNA's infringement of his trademark in the LAX name, brand and indicia of identity, in an amount to be proven at trial, and is entitled to recovery of his attorneys' fees in light of TNA's willful infringement of same.

125.

Mr. Ashenoff is entitled to an injunction *pendente lite* and a permanent injunction to arrest the willful infringements of his copyright and trademark rights.

## COUNT XI:

## Attorneys' Fees

126.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in paragraphs 1 through 125 as if fully stated herein.

127.

As a result of the TNA and the Counterclaim Defendants' violation of Mr. Ashenoff's federally protected civil rights, Mr. Ashenoff is entitled to collect attorneys' fees pursuant to 42 U.S.C. § 1981 and U.S.C. § 1132 in an amount to be determined.

**WHEREFORE**, Mr. Ashenoff respectfully requests that:

A.    All new Counterclaim Defendants be served with a copy of this Answer and Counterclaims;

B.    TNA recover none of the relief sought in its Complaint and Request for Declaratory Judgment;

C.    He shall have a trial by jury on all issues herein;

{A0225355_1}

34

D.    He shall recover actual, compensatory and punitive damages stemming from Count I of his Counterclaim in an amount to be determined at trial;

E.    He shall recover actual, compensatory and punitive damages stemming from Count II of his Counterclaim in an amount to be determined at trial;

F.    He shall recover actual, compensatory and punitive damages stemming from Count III of his Counterclaim in an amount to be determined at trial;

G.    He shall recover actual, compensatory and punitive damages stemming from Count IV of his Counterclaim in an amount to be determined at trial;

H.    He shall have the following relief stemming from Count V of his Counterclaim, in addition to the relief requested throughout his Counterclaim:

   (1)    A declaratory judgment that the wrongs complained of herein violate the rights of Mr. Ashenoff as guaranteed by 42 U.S.C. §1981; and

   (2)    A permanent injunction enjoining TNA and the Counterclaim Defendants from maintaining or continuing any practices or actions which operate to discriminate on the basis of race and national origin.

I.    He shall recover actual, compensatory and punitive damages stemming from Count VI of his Counterclaim in an amount to be determined at trial;

J.    He shall recover actual, compensatory and punitive damages stemming from Count VII of his Counterclaim in an amount to be determined at trial;

K.    He shall recover "threefold the actual damages" he sustained stemming from Count VIII of his Counterclaim in an amount to be determined at trial;

L.    He shall recover attorneys' fees pursuant to Fla. Stat. § 772.12(5), as set forth in

{A0225355_1}

Count VIII of his Counterclaim in an amount to be determined at trial;

M.    As a consequence of TNA and the Counterclaim Defendants' conduct as described in Count IX, TNA is subject to the following civil remedies, among others:

    (1)    divestiture of any interest in or dissolution of the "enterprise";

    (2)    an Order suspending or revoking any license, permit or prior approval granted by any agency of the state;

    (3)    an Order requiring forfeiture of the corporate charter of any liability entity;

    (4)    forfeiture of all property, real or personal, including money, used in the course of, or intended for use in the course of, a violation of Fla. Stat. § 895.01-895.05; and

    (5)    threefold Mr. Ashenoff's actual damages and attorneys' fees, at the trial and appellate court levels, as well as all investigation and litigation costs.

N.    He shall recover his statutory damages and his attorneys' fees stemming from Count X of his Counterclaim;

O.    Mr. Ashenoff shall have an injunction *pendente lite* and permanent injunction prohibiting TNA's willful infringements of Mr. Ashenoff's' copyright and trademark rights, as set forth in Count X of his Counterclaim;

P.    He shall recover his attorneys' fees pursuant to 42 U.S.C. § 1981 and § 1132 and his costs of litigation in an amount to be determined at trial; and;

Q.    He shall recover any such other and further relief as this Court deems just and

appropriate under the circumstances.

Respectfully submitted this 16th day of June, 2008.

*/s/ Cary Ichter, Esq.*
Cary Ichter, Esq.
Georgia Bar No. 382515
Adriana Midence, Esq.
Georgia Bar No. 142298

ADORNO & YOSS, LLC
Two Midtown Plaza, Suite 1500
1349 W. Peachtree Street, N.W.
Atlanta, Georgia 30309
T: 404-347-8300
F: 404-347-8395

Kevin Wiggins, Esq.
Texas Bar No. 21441600
Tracey Wallace, Esq.
Texas Bar No. 00797617

ADORNO YOSS WHITE & WIGGINS LLP
Bank of America Plaza, Suite 6200
901 Main Street
Dallas, Texas 75202
T: 214-665-4150
F: 214-665-4160

ATTORNEYS FOR DEFENDANT
CHARLES ASHENOFF

{A0225355_1}

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, a copy of the foregoing **ANSWER AND COUNTERCLAIMS** was electronically filed with the clerk of court using the ECM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

> Richard S. Krumholz
> Texas Bar No. 00784425
> William P. Finegan
> Texas Bar No. 07008700

> */s/ Cary Ichter, Esq.*
> Cary Ichter, Esq.
> Georgia Bar No. 382515

{A0225355_1}

**TNA ENTERTAINMENT, LLC**
209 10th Avenue So.
Suite 302
Nashville, TN 37203

*612*
*739*
*6364*

January 21, 2004

Charles Ashenoff (pka Konnan)

Dear Charles:                                                          *CRO*

WHEREAS, TNA Entertainment, LLC ("TNA"), a Delaware limited liability company, is engaged in the business of producing and promoting professional wrestling exhibitions and programs throughout the world, a certain number of which shall be broadcast and distributed to the public via a pay-per-view program entitled "Total Non-Stop Action" or otherwise distributed and/or broadcast to the public (the "Program(s)"), and

WHEREAS, you and TNA desire to enter into this agreement and the addendum hereto (collectively the "Agreement") to evidence your agreement with respect to your participation in the Programs.

NOW THEREFORE, TNA and you covenant, stipulate and agree as follows:

1.    **Services.**    During the Term (as hereinafter defined) you maintain your availability for and shall render your wrestling and performing services in connection with, the rehearsal, performance and broadcast of a minimum of 26 Programs ("Performances") designated to you by TNA (which designation shall be made at least 48 hours prior to the conduct of the applicable Program).  During the Term you may request, in writing, a period or periods of leave from this availability obligation for a specified period of time (not to exceed four (4) weeks at a time).  Any such request must be made at least thirty (30) days prior to the requested leave period.  The granting of any such leave request shall be subject to the prior written approval of TNA, in its absolute and sole discretion.

Your services hereunder shall be exclusive to TNA; provided, however, that you may (only with the prior express written consent of TNA), perform third-party obligations which do not conflict in any way with the full and complete performance of your services hereunder. Notwithstanding the foregoing, you may not, at any time during the Term, render any services for the World Wrestling Entertainment, Inc., its affiliates, successors, or assigns, or any other direct or indirect competitor of TNA.  You will render your services to the best of your ability, subject to TNA's direction and control, and you shall abide by all reasonable rules and

1

**EXHIBIT "A"**

regulations set out by TNA.   You shall be responsible for providing your own costumes, wardrobe, props and make-up in the conduct of any Performance.  TNA shall have the right, in its sole discretion, to terminate this Agreement with respect to any prospective services to be rendered by you hereunder, upon thirty (30) days written notice to you (the thirtieth (30th) day from the date of TNA's written notice shall be deemed the date of termination "Effective Date"), subject only to TNA's obligation to compensate you under paragraphs 3. and 5. below, relating only to those services performed prior to the Effective Date.

2.    **Term**.   Subject to TNA's right to terminate this Agreement as set forth in paragraphs 1. and 8. hereof, the term of this Agreement shall commence as of the date first set forth hereinabove and shall continue in force for one year to and including January 21, 2005 ("Term").  The Term of this Agreement may be extended for an additional year, to and including January 21, 2006, if TNA so elects in a separate writing at least ninety (90) days prior to January 21, 2005.  Any such extension upon the election of TNA shall extend the terms and provisions of this Agreement until January 21, 2006.

3.    **Compensation**.

*C R/O*

A.    **Fee**.   In consideration of and in full and complete payment and compensation for your services and the rights granted to TNA hereunder, TNA will pay you the amount of [\$500] for each Program fully performed by you in accordance with the terms and provisions of this Agreement, payable to you at your address first noted above not later than fourteen (14) days following the date of your performance in the Program, subject only to the deduction of such taxes and withholdings as are authorized or required by law.  The compensation set forth in this paragraph 3.A. may be increased by written amendment to this Agreement signed by both you and TNA.

B.    **Video Royalty**.   In the event that your Performances are embodied in Recordings (as defined in paragraph 4. below (intended for home distribution and/or sale ("Video(s)")), TNA shall pay you a royalty ("Video Royalty") equal to your pro rata share of five percent (5%) of the Net Video Sales Price of one hundred percent (100%) Net Sales of Videos by TNA, or any of its related, affiliated or subsidiary companies.  As used herein, "Net Video Sales Price" shall be the actual proceeds received by TNA from the sale of each such Video less a twenty-five percent (25%) container deduction, less any applicable taxes paid by TNA relating thereto, less any and all costs of collection (including reasonable attorney's fees, costs and expenses), and less any and all costs and expenses incurred by TNA in the shipping, production, manufacture, distribution, promotion and sale of the Videos.  As used herein, "Net Sales" shall be the number of Videos finally sold by TNA, less returns, allowances and promotional copies distributed.  To the extent that your Performances appear on the Video together with the performances of individuals in addition to you ("Third Parties"), the Video Royalty shall be pro-rated based on a fraction, the numerator of which shall be one (1), and the denominator of which shall be one (1) plus the total number of Third Parties, such that the total Video Royalty to be paid by TNA with respect to a particular Video shall not exceed five percent (5%) of the Net Video Sales Price of one hundred percent (100%) of the Net Sales for that Video.  Notwithstanding the above, TNA may, in its sole discretion, further adjust your share of the Video Royalty, based upon, among other factors, the amount of your compensation in paragraph

2

3.A. above as compared to such similar compensation paid to Third Parties performing in the Video.

4.     **TNA's Rights.**    TNA shall have the unrestricted right to grant and sell admissions to your live performance and to film, tape, record, edit, license, broadcast, exhibit and televise the Program(s) through any form, method or device, and to reproduce, manufacture, and distribute copies of the Program(s), in any format, now known or hereinafter created ("Recordings") and to license any or all of the above rights to third parties. All Program(s) and Recordings, including all content embodied therein, shall be the sole property of TNA, free from any claims of ownership by your or any other third party. Your performance in the Program(s) and the Recordings shall be deemed a "work made for hire" for TNA, as same is defined under the United States Copyright Act, and TNA shall own all rights, results, products and proceeds in or derived from the Program(s), including but not limited to any and all incidents, dialogue, characters, actions, routines, ideas, gags, or music (including any improvisational works). If for any reason your performance in the Program(s) and the Recordings is determined at any time not to be a "work made for hire", you hereby irrevocably transfer and assign to TNA all right, title and interest therein, including all copyrights, as well as all renewals and extensions thereto. In addition, any and all costumes, accessories, props, inventions or titles created by TNA for the Program(s) shall belong exclusively to and remain the property of TNA. TNA shall own and exclusively control all of the rights outlined in this Paragraph 4 in perpetuity, including the copyrights therein and trademarks used in connection therewith ("Intellectual Property"), and shall have the exclusive right to exploit the Intellectual Property in its sole discretion and for any purpose whatsoever, including merchandising and commercial purposes. You agree to execute, acknowledge and deliver any and all documentation necessary to effectuate TNA's rights herein or implement the intent of this Agreement.

5.    _Name and Likeness._

*C R D*

A.     You grant TNA (i) during the Term of the Agreement, an exclusive, and (ii) after the Term of the Agreement, a non-exclusive: unrestricted, worldwide, perpetual license, to use and to authorize and license others to use (on terms acceptable to TNA in its sole discretion) your name, stage name, likeness, voice, actions or movements, poses and appearances, words and slogans, props or other items associated with you, and any of your biographical material in connection or not in connection with the Program(s) and the Recordings, and any associated publicity and promotional materials including you (which shall include, without limitation, television commercials, print advertisements, and radio advertisements), including, without limitation, in connection with the manufacture, distribution, promotion and sale of Program-related or non-Program related merchandise ("Merchandise"). Merchandise may include, without limitation, computer, video or arcade games in any form and on any platform, action figures or dolls, t-shirts, souvenirs or any other tangible or intangible personal or intellectual property.

B.     Merchandise Royalty.    In consideration of the license grant in Paragraph 5(A) above, TNA shall pay you a royalty equal to your prorata share of five percent (5%) of the Net Merchandise Sales Price of one hundred percent (100%) of sales of Merchandise by TNA, or any of its related, affiliates or subsidiary companies or its licensees ("Merchandise Royalty").

As used herein, "Net Merchandise Sales Price" shall mean the actual net proceeds received by TNA from the sale of Merchandise (either directly from purchasers or as royalties from licensees) less any applicable taxes paid by TNA relating thereto, less any and all costs of collection (including reasonable attorney's fees, costs and expenses), less any and all costs and expenses incurred by TNA in the shipping, production, manufacture, distribution, promotion and sale of the Merchandise and less any returns, allowances and promotional items distributed.   In the event that the Merchandise bears the name and/or likeness of individuals in addition to you ("Merchandise Third Parties"), the Merchandise Royalty shall be pro-rated based on a fraction, the numerator of which shall be one (1), and the denominator of which shall be one (1) plus the total number of Merchandise Third Parties, such that the total Merchandise Royalty to be paid by TNA with respect to a particular item of Merchandise shall not exceed five percent (5%) of the Net Merchandise Sales Price of one hundred percent (100%) of the sales for that item of Merchandise.  Notwithstanding the above, TNA may, in its sole discretion, further adjust your share of the Merchandise Royalty, based upon, among other factors, the amount of your compensation in paragraph 3.A. above as compared to such similar compensation paid to Merchandise Third Parties.

6.   **Accounting.**

A.   <u>Royalty Payments and Accounting.</u>   Video Royalties and Merchandise Royalties will be payable to you within ninety (90) days following June 30th and December 31st of each calendar year.  Royalty statements will accompany each payment and will reflect the computation of the royalties due to you on the date the accounting is rendered.  No royalty statements shall be sent to you in any period in which no royalties are payable to you.

B.   <u>Records.</u>   TNA will keep accurate records regarding the sale of Merchandise and Videos.  TNA will allow you or your authorized representatives to examine such records once during each calendar year, at TNA's place of business during regular business hours upon your written request given at least thirty (30) days prior to the date of examination, and to make copies of all or part of such records at your expense.  Each royalty statement will become conclusively binding on you one (1) year from the date each statement is rendered and any action brought by you under this paragraph must be commenced within that one (1)-year period.

7.   **Warranties and Indemnification.**   You warrant and represent that you have the full right and power to enter into this Agreement and perform your obligations hereunder, that you have secured any and all licenses or permissions necessary for the rendering of your services hereunder (including those requiring physical examination), that any creative contributions furnished by you shall be wholly original, that you shall not take any action which shall in any way limit or impair TNA's rights hereunder, and that TNA's exercise of its rights hereunder shall not infringe upon the rights of any third party.  You shall defend, protect and indemnify TNA, its parent and affiliates and all of their respective agents, officers, employees and directors and any and all licensees, assignees and authorized third parties reproducing, broadcasting or otherwise using or exploiting the Merchandise, Program(s) or Recordings and all of the foregoing's heirs, successors and assigns (collectively the "TNA Parties"), from and against any and all claims, demands, fines, suits, causes of action, damages, liabilities, costs, and expenses (including

4

reasonable attorney's fees and costs of litigation) arising out of or attributable to any breach of any of your representations and/or warranties hereunder, TNA's use of your performances, or any materials, ideas, creations and properties created, used or furnished by you in connection with the Programs, the Recordings or the Merchandise, including any improvised or ad-lib dialogue or unauthorized acts performed by you. In addition, you shall similarly defend, protect and indemnify the TNA Parties from and against any and all claims, demands, fines, suits, causes of action, damages, liabilities, costs, and expenses (including reasonable attorney's fees and costs of litigation) arising out of or attributable to any personal injury, death or damage to property caused by you in connection with the rendering of your services hereunder. You agree to take such precautions as are necessary and appropriate to avoid any unreasonable risk of injury to such persons or property, including yourself, and shall be responsible for securing your own health and disability insurance, commercial general liability insurance, workers compensation insurance, professional liability insurance, as well as any excess liability insurance necessary to insure, protect, defend, indemnify and defend the TNA Parties with respect to any and all claims arising out of your acts, transactions or conduct as provided herein. You fully acknowledge that the rendering of your services hereunder may be hazardous, you knowingly and voluntarily take on and assume the consequences of such risk and, on behalf of yourself and your heirs, successors and assigns, hereby release, waive and discharge the TNA Parties from any and all liability to you, your heirs, successors and assigns, with respect to any and all loss, damage or personal injury to you or any other person or property, including your sickness, death or disability, whether caused by you or a third party or in connection with your participation in the Programs, your Performances or otherwise. TNA's rights under paragraphs 4, 5, 6, 7, 8 and 10, specifically including all representations and warranties made by you and TNA's rights of defense, protection and indemnification hereunder, shall survive the termination of this Agreement.

8.    **Breach.**    TNA shall have the right to terminate this Agreement, its obligation to make any payments hereunder and your services hereunder in the event you (i) are found to have used illegal drugs, or are late or absent on more than two occasions, (ii) found to be physically or mentally impaired to the extent that you are incapable of performing your services hereunder to TNA's satisfaction (in its sole discretion), (iii) you have been found guilty of any felony or found guilty of any misdemeanor involving moral turpitude, (iv) you publicly denigrate TNA, its affiliates, their officers, directors, employees, licensees, assigns or your participation in any Program, (v) you fail to conduct or finish a match in accordance with TNA's direction, or (vi) you commit any act which negatively affects the reputation or performance of TNA, its affiliates, licensees, or assigns or the value or integrity of the Programs, the Videos or the Merchandise. In the event of termination of this Agreement in these circumstances, TNA shall have no further obligation to you hereunder subject only to TNA's obligation to compensate you under paragraphs 3. and 5. above for services fully performed prior to the date of termination (specifically subject to offset for any damages incurred or alleged to have been incurred by TNA as the result or consequence of such breach).

In the event you breach this agreement, TNA may recover such damages as may be established in a court of law, including attorneys fees and costs of litigation. Moreover, in the event you breach this agreement, you acknowledge and agree that you shall not work or perform in any capacity for World Wrestling Entertainment, Inc., its affiliates, successors, or

assigns, or any capacity with any other direct competitor of TNA for a period of six (6) months from the date of termination of this Agreement by TNA under this paragraph 8.

You and TNA further agree that because of the special, unique and extraordinary nature of the obligations of TNA and you which are the subject matter of this Agreement, your breach of this Agreement shall cause TNA irreparable injury which cannot be adequately measured by monetary relief. As a consequence, TNA shall also be entitled to injunctive and other equitable relief against you to prevent your breach or default hereunder without the necessity of proof of actual damage and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which TNA may be legally entitled to seek.

9. **Notices.**    Any notices to you or TNA hereunder (and any and all statements, royalties or other payments which may become due to you) shall be addressed to our respective addresses first noted above, unless we provide each other with written notice of change of address. All notices (excluding statements and/or payments) shall be sent by U.S. Certified Mail, return receipt requested, courier, or express mail with notice of transmittal, postage pre-paid, and shall be deemed sent on the date of mailing or delivery by courier.

10. **Miscellaneous.**    TNA may assign its rights hereunder in whole or in part to any person, firm, corporation or other legally recognized entity.  You acknowledge that you are an independent contractor and that nothing herein shall be construed as deeming you either an employee or partner of TNA.   This Agreement supercedes any and all prior agreements, negotiations or understandings between you and TNA, whether written or oral, with respect to the subject matter hereof. Each party to this Agreement expressly warrants and represents that, in entering into this Agreement, it is not relying on any statements, representations, promises, consideration, agreements or inducements, whether oral or written, that are not fully set forth in this Agreement.  In this regard, both you and TNA acknowledge that in entering into this Agreement, each is relying solely and exclusively on the statements and the provisions that are expressly set forth in this Agreement, and each is not relying on any statements, representations, promises, consideration, agreements or inducements of any kind, written or oral, that were made by either you or TNA, by any of their agents or representatives or by any third parties, which are not fully set forth in this Agreement. This Agreement may not be altered, modified, amended or supplemented in whole or in part, in any way, except by an instrument in writing signed by TNA and you. The waiver by either party of any breach of this Agreement or any other right granted hereunder, in any one or more instances, shall in no way be construed as a waiver of any subsequent breach of this Agreement, whether or not of a similar nature. In the event any portion of this Agreement is determined to be illegal or unenforceable, the offending portion shall be deleted herefrom and shall not affect the validity of the remaining provisions of this Agreement. **THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF TEXAS, AND ITS VALIDITY, CONSTRUCTION, AND EFFECT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLICABLE TO AGREEMENTS EXECUTED AND TO BE PERFORMED WHOLLY THEREIN, AND WITHOUT REGARD TO ANY CONFLICTS OF LAWS PROVISIONS THEREOF. YOU AND TNA IRREVOCABLY SUBMIT TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITUATED IN DALLAS COUNTY, TEXAS FOR THE RESOLUTION OF ANY DISPUTE HEREUNDER OR THE COMMENCEMENT**

OF ANY ACTION IN CONNECTION HEREWITH. YOU AND TNA SPECIFICALLY AND IRREVOCABLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER. Nothing contained in this Agreement shall be construed or deemed to create an employee-employer relationship or any partnership or joint venture of any kind between TNA and you, nor shall you have any authority to bind TNA in any respect.    Except with respect to the indemnification of the TNA Parties or otherwise specifically set forth herein, the parties hereto acknowledge and agree that nothing in this Agreement shall create any rights in or obligations to any party not a party to this Agreement. You and TNA do hereby stipulate and agree that each of them fully participated and was adequately represented by counsel in the negotiation and preparation of this Agreement and further stipulate and agree that in the event of an ambiguity or other necessity for an interpretation to be made of the content of this Agreement, this Agreement shall not be construed in favor of or against TNA or you as a consequence of one party having had a greater role in the preparation of this Agreement, but shall be construed as if the language were mutually drafted by both parties with full assistance of counsel.

    11.    **Taxes.**    YOU DO HEREBY AGREE TO PROTECT, DEFEND, INDEMNIFY AND HOLD THE TNA PARTIES HARMLESS FROM AND AGAINST ANY SUITS, LIABILITIES, CAUSES OF ACTION, CLAIMS, DEMANDS, FINES OR LEVIES OF EVERY KIND AND CHARACTER, INCLUDING COSTS OF LITIGATION AND ATTORNEY'S FEES, ARISING IN CONNECTION WITH ANY FEDERAL (INCLUDING FICA AND FEDERAL WITHHOLDING), STATE OR LOCAL TAXES THAT MAY ARISE FROM THE COMPENSATION PROVIDED FOR HEREUNDER OR ANY UNEMPLOYMENT COMPENSATION OR WORKERS' COMPENSATION WHICH MAY BE CLAIMED BY YOU.

Should the foregoing accurately reflect our agreement, please execute and return one (1) copy of this Agreement to TNA, which execution and delivery may be validly accomplished via facsimile.

Sincerely,

TNA ENTERTAINMENT, LLC

By: _____
Name: _____
Title: _____


ACCCEPTED AND AGREED:


_____
Charles Asheroff

7

## ADDENDUM TO AGREEMENT

### Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement

This Addendum to Agreement ("Addendum") is attached to and made a part of that certain Agreement dated _____, 200_, executed by and between you and TNA Entertainment, LLC (the "Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

By signing the Agreement and this Addendum with TNA, which provides me with consideration that includes the opportunity to engage in the activity of professional wrestling, I hereby acknowledge and reflect my understanding that professional wrestling is an activity that is inherently dangerous and which involves a high degree of risk of serious bodily injury and/or death, as well as property damage.

By signing this Addendum, I HEREBY WAIVE, DISCHARGE AND RELEASE ANY AND ALL CLAIMS I HAVE, MAY HAVE, OR THAT I MAY EVER HAVE IN THE FUTURE, AGAINST TNA, ITS PARENT AND AFFILIATES AND ALL OF THEIR RESPECTIVE AGENTS, OFFICERS, EMPLOYEES AND DIRECTORS AND ANY AND ALL LICENSEES, ASSIGNEES AND AUTHORIZED THIRD PARTIES REPRODUCING, BROADCASTING OR OTHERWISE USING OR EXPLOITING THE MERCHANDISE, PROGRAM(S) OR RECORDINGS AND ALL OF THE FOREGOING'S HEIRS, SUCCESSORS AND ASSIGNS (THE "TNA PARTIES") THAT ARISE FROM OR RELATE IN ANY WAY TO MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR IN ANY RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE. IN THIS REGARD, I ALSO AGREE ON MY OWN BEHALF, AS WELL AS ON BEHALF OF MY PERSONAL REPRESENTATIVES, MY ASSIGNS, MY HEIRS, AND MY NEXT OF KIN THAT I WILL NOT FILE SUIT OR ASSERT ANY DEMANDS OR CLAIMS FOR LIABILITY OR DAMAGES FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES OF ANY KIND ARISING OUT OF MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE.

I HEREBY ASSUME FULL RESPONSIBILITY FOR ANY AND ALL RISK OF PERSONAL OR BODILY INJURY, DEATH, OR PROPERTY DAMAGE, now and forever, arising out of or related to participation in the activity of professional wrestling, whether foreseen or unforeseen and whether caused by the negligence of the TNA Parties or otherwise. I HEREBY SEPARATELY AGREE to DEFEND, INDEMNIFY and SAVE and HOLD HARMLESS the TNA Parties from any and all loss, liability, damage, fees, expenses or costs that they may incur, now and forever, in connection with any personal or bodily injury to me, my death, or damage to my property that arises out of or may be attributable to my participation in the activity of professional wrestling, whether caused by the negligence of the TNA Parties or otherwise.

I HEREBY acknowledge that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT ASSISTANCE OR PROCEDURES OF THE TNA PARTIES and I further agree that this Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the TNA Parties, INCLUDING NEGLIGENCE IN PROVIDING ASSISTANCE and is intended to be as broad and inclusive as permitted by law. If any portion hereof is held invalid, it is agreed that the balance hereof shall, notwithstanding, continue in full legal force and effect.

I have read this Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement, fully understand that I have given up substantial rights by signing it. I am aware of its legal effect and consequences, and I have signed it freely and voluntarily without any inducement, assurance, or guarantee being made to me, and I intend my signature to be my complete and unconditional release of all liability to the greatest extent that is allowed by law. This Addendum shall be binding upon and shall inure to the benefit of my and the TNA Parties' heirs, successors and assigns.

Participant's Name ___Charles Ashenoff_____     Witness_____

Participant's Signature _____     Date _____

9

**TNA ENTERTAINMENT, LLC**
209 10th Avenue So.
Suite 302
Nashville, TN 37203

August 5, 2005

Charles Ashenoff (pka Konnan)

Dear Charles,

WHEREAS, TNA Entertainment, LLC ("TNA"), a Delaware limited liability company, is engaged in the business of producing, publicizing, arranging, staging, conducting and promoting professional wrestling exhibitions and programs throughout the world, a certain number of which shall be broadcast and distributed to the public via a pay-per-view program entitled "Total Non-Stop Action" or otherwise distributed and/or broadcast to the public via television programs (the "Program(s)");

WHEREAS, TNA's business operations afford you, as a professional wrestler, opportunities to wrestle and obtain public exposure which will increase the value of your wrestling services and your standing in the professional wrestling community and entertainment industry;

WHEREAS, you and TNA desire to enter into this agreement and the addendum hereto (collectively the "Agreement") to evidence your agreement with respect to your participation in the Programs.

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, TNA and you covenant, stipulate and agree as follows:

1.    **Services**.    Subject to TNA's right to terminate this Agreement, during the Term (as hereinafter defined) you agree to maintain your availability for and shall render your wrestling and performing services in connection with, the rehearsal, performance and broadcast of 26 or more Programs ("Performances") designated to you by TNA (which designation shall be made at least 48 hours prior to the conduct of the applicable Program).

Your services hereunder shall be exclusive to TNA; provided, however, that you may (only with the prior express written consent of TNA), perform third-party obligations which do not conflict in any way with the full and complete performance of your services hereunder. Notwithstanding the foregoing, you may not, at any time during the Term, render any services for the World Wrestling Entertainment, Inc., its affiliates, successors, or assigns, or any other direct or indirect competitor of TNA. You will render your services to the best of your ability, subject to TNA's direction and control, and you shall abide by all reasonable rules and regulations set out by TNA. You shall be responsible for providing your own costumes, wardrobe, props and make-up in the conduct of any Performance. TNA shall have the right, in its sole discretion, to terminate this Agreement at any time during the Term or during any extended Term with respect to any services to be rendered by you hereunder, upon thirty (30) days written notice to you (the thirtieth day from the date of TNA's written notice shall be deemed the date of

**EXHIBIT "B"**

termination: "Termination Date") and TNA shall not have any further obligation to compensate you for any remaining Programs (even if you have performed in less than 30 Programs prior to the termination), subject only to TNA's obligation to compensate you under paragraphs 3. and 5. below, relating only to those services performed prior to the Termination Date.

2.     **Term.**  Subject to TNA's right to terminate this Agreement as set forth in paragraphs 1. and 8. hereof, the term of this Agreement shall commence as of October 23, 2005 and shall continue in force for one year to and including October 23, 2006 ("Term").  At TNA's option, the Term of this Agreement (including the same terms and conditions) shall be extended two times for an additional year each time upon notice by TNA for each extension.  The first such extension would extend the Term of this Agreement to October 23, 2007 and the second extension would extend the Term to October 23, 2008.

3.     <u>Compensation.</u>

A.     <u>Fee.</u>  In consideration of and in full and complete payment and compensation for your services and the rights granted to TNA hereunder, TNA will pay you the amount of Seven Hundred Fifty Dollars ($750) from October 23, 2005 through December 31, 2005 for each iMPACT Program and beginning January 1, 2006 will pay you One Thousand Dollars ($1,000) for each iMPACT Program and beginning October 23, 2005 will pay you One Thousand Dollars ($1,000) for each pay-per-view Program all of which are fully performed by you in accordance with the terms and provisions of this Agreement, payable to you at your address first noted above not later than fourteen (14) days following the date of your performance in the Program, subject only to the deduction of such taxes and withholdings as are authorized or required by law.

B.     <u>Video Royalty.</u>  In the event that your Performances are embodied in Recordings (as defined in paragraph 4. below (intended for home distribution and/or sale ("Video(s)")), TNA shall pay you a royalty ("Video Royalty") equal to your pro rata share of five percent (5%) of the Net Video Sales Price of one hundred percent (100%) of Net Sales of Videos by TNA, or any of its related, affiliated or subsidiary companies.  As used herein, "Net Video Sales Price" shall be the actual proceeds received by TNA from the sale of each such Video less a twenty-five percent (25%) container deduction, less any applicable taxes paid by TNA relating thereto, less any and all costs of collection (including reasonable attorney's fees, costs and expenses), and less any and all costs and expenses incurred by TNA in the shipping, production, manufacture, distribution, promotion and sale of the Videos.  As used herein, "Net Sales" shall be the number of Videos finally sold by TNA, less returns, allowances and promotional copies distributed.  To the extent that your Performances appear on the Video together with the performances of individuals in addition to you ("Third Parties"), the Video Royalty shall be pro-rated based on a fraction, the numerator of which shall be one (1), and the denominator of which shall be one (1) plus the total number of Third Parties, such that the total Video Royalty to be paid by TNA with respect to a particular Video shall not exceed five percent (5%) of the Net Video Sales Price of one hundred percent (100%) of the Net Sales for that Video.  Notwithstanding the above, TNA may, in its sole discretion, further adjust your share of the Video Royalty, based upon, among other factors, the amount of your compensation in paragraph 3.A. above as compared to such similar compensation paid to Third Parties performing in the Video.

4.     <u>Works.</u>

A.     During the Term of this Agreement, TNA shall have the exclusive, unrestricted, worldwide right to (i) grant and sell admissions to your appearance, Performances, commentary, and any other work product for any or all of the Programs; (ii) produce, publish, film, tape, photograph, record, edit, license, broadcast, exhibit, televise, and otherwise use the your name, likeness, image, biographical

information, appearance, Performances, commentary, and any other work product for any or all of the Programs through any form, method or device; (iii) use, reproduce, manufacture, and distribute copies of the Program(s), in any format, now known or hereinafter created ("Recordings"); and (iv) license any or all of the above rights to third parties. All Program(s) and Recordings, including all content embodied therein, shall always be the sole property of TNA, free from any claims of ownership by you or any other third party.

B.      Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, TNA shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise in any form of television (including without limitation, free cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use via any other medium now known or hereinafter discovered, and to authorize others to do so, the Programs and Recordings, in perpetuity, in any manner or media and by any art, method or device, now known or hereinafter discovered.

C.      Your appearance, Performances, and work product in the Program(s) and the Recordings shall be deemed a "work made for hire" for TNA, as same is defined under the United States Copyright Act, and TNA shall be the author and own, in perpetuity, all rights, results, products and proceeds in or derived from the Performances, Program(s) and Recordings (including without limitation any and all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship title or other belts, and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for you in connection with appearances in the Programs(s)), and TNA may obtain copyright and/or trademark and/or other legal protection therefore, in the name of TNA and/or on behalf of TNA's designee.

D.      If TNA directs you, either singly or in conjunction with TNA, to create, design or develop any copyrightable work ("Development"), such Development shall be deemed a work for hire and TNA shall own such Development. All Performances, Programs, Recordings, and Developments referred to in this Agreement are collectively referred to as "Works."

E.      All Works and your contributions thereto shall be owned solely and exclusively by TNA in perpetuity notwithstanding any termination of this Agreement. To the extent such Works are considered (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall be owned solely and exclusively by TNA in perpetuity notwithstanding any termination of this Agreement. If for any reason the Works or your contributions thereto are deemed works other than "works made for hire," you hereby irrevocably transfer and assign to TNA all right, title and interest in and to such Works and contributions, including all copyrights, as well as all renewals and extensions thereto in the United States and worldwide. You agree to execute, acknowledge and deliver any and all documentation necessary to effectuate TNA's rights herein or implement the intent of this Agreement.

F.      All gags, costumes, or parts of costumes, accessories, crowns, inventions, championship titles or other belts, and any items of tangible property provided to you by TNA and/or containing New Intellectual Property as defined in paragraph 5(B) shall be immediately returned to TNA upon termination of the Agreement for any reason.

5.     **Intellectual Property and Merchandising.**

A.     As your legal name, nickname, ring name, likeness, personality of the date of this Agreement, all service marks, trademarks, and any and all other distinctive and identifying indicia under which you claim any rights, including without limitation, character, biographical information, caricatures, voice, signature, gags, slogans, costumes, props, gimmicks, gestures, routines and themes, which are owned by you or in which you have any rights anywhere in the world (collectively, the "Original Intellectual Property") are described and identified on *Schedule A* attached hereto and incorporated herein by reference. During the Term of this Agreement, you assign to TNA all worldwide right, title and interest in and to your Original Intellectual Property, including all corresponding goodwill, anywhere in the world. TNA shall own the sole and exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the Original Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during the Term of the Agreement and notwithstanding termination of this Agreement for any reason. Upon termination of the Agreement, rights in and to the Original Intellectual Property shall revert and be assigned to you, except that TNA, its licensees, sublicensees, and assigns may continue to exploit any and all materials, goods, merchandise and other items ("Goods") incorporating the Original Intellectual Property based upon your performances before such termination regardless of whether such Goods are made before or after your termination. It is agreed that all Programs, Recordings and Merchandise (defined in Section 5, D below) including those that contain Original Intellectual Property, shall always be the sole property of TNA, free from any claims of ownership by you.

B.     With the exception of your Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, biographical information, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, slogans, costumes or parts of costumes, accessories, crowns, inventions, championship title or other belts, and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with your performance in the business of professional wrestling or sports entertainment during the Term of this Agreement (collectively, the "New Intellectual Property") are assigned along with all corresponding goodwill to TNA and shall belong to TNA, in perpetuity, with TNA retaining all such ownership rights, in perpetuity, exclusively throughout the world notwithstanding termination of this Agreement. TNA shall own the sole and exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of the Agreement and notwithstanding termination of this Agreement for any reason.

C.     You agree to cooperate fully and in good faith with TNA for the purpose of securing and preserving TNA's rights in and to the Original Intellectual Property and New Intellectual Property. In connection therewith, you acknowledge and grant to TNA the exclusive, worldwide right during the Term of the Agreement (with respect to Original Intellectual Property) and in perpetuity (with respect to the New Intellectual Property) to apply for and obtain trademarks, service marks, copyrights, and other registrations throughout the world in TNA's name and/or on behalf of TNA's designee. At TNA's expense and request, you and TNA shall take such steps, as TNA deems necessary, for any registration or any litigation or other proceeding, to protect TNA's rights in the Original Intellectual Property and/or New Intellectual Property and/or Works.

D.     You grant TNA an exclusive, unrestricted, worldwide, perpetual right (i) during the Term of the Agreement and thereafter, as provided in this Agreement, to use and to authorize and license others to use the Original Intellectual Property, and (ii) in perpetuity to use the New Intellectual Property in

4

connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, promotion, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any materials, goods or merchandise incorporating the Original or New Intellectual Property ("Merchandise"). By way of example, Merchandise may include, without limitation, computer, video or arcade games in any form and on any platform, action figures or dolls, t-shirts, posters, photos, videotapes and DVDs, books, biographies, articles and stories, souvenirs or any other such Merchandise.

E.      You further agree that your grants and assignments of rights in this Section 5 shall also apply to all TNA Recordings, TNA Merchandise and TNA DVDs/videos in which you appeared prior to the Term of this Agreement.

F.      It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by you to TNA are exclusive to TNA even to the exclusion of you.

G.      Merchandise Royalty. In consideration of the assignment in Paragraph 5(A) above, TNA shall pay you a royalty equal to your prorata share of five percent (5%) of the Net Merchandise Sales Price of one hundred percent (100%) of sales of Merchandise by TNA, or any of its related, affiliates or subsidiary companies or its licensees ("Merchandise Royalty"). As used herein, "Net Merchandise Sales Price" shall mean the actual net proceeds received by TNA from the sale of Merchandise (either directly from purchasers or as royalties from licensees) less any applicable taxes paid by TNA relating thereto, less any and all costs of collection (including reasonable attorney's fees, costs and expenses), less any and all costs and expenses incurred by TNA in the shipping, production, manufacture, distribution, promotion and sale of the Merchandise and less any returns, allowances and promotional items distributed. In the event that the Merchandise bears the name and/or likeness of individuals in addition to you ("Merchandise Third Parties"), the Merchandise Royalty shall be pro-rated based on a fraction, the numerator of which shall be one (1), and the denominator of which shall be one (1) plus the total number of Merchandise Third Parties, such that the total Merchandise Royalty to be paid by TNA with respect to a particular item of Merchandise shall not exceed five percent (5%) of the Net Merchandise Sales Price of one hundred percent (100%) of the sales for that item of Merchandise. Notwithstanding the above, TNA may, in its sole discretion, further adjust your share of the Merchandise Royalty, based upon, among other factors, the amount of your compensation in paragraph 3.A. above as compared to such similar compensation paid to Merchandise Third Parties.

6.      **Accounting**.

A.      Royalty Payments and Accounting. Video Royalties and Merchandise Royalties will be payable to you within ninety (90) days following June 30th and December 31st of each calendar year. Royalty statements will accompany each payment and will reflect the computation of the royalties due to you on the date the accounting is rendered. No royalty statements shall be sent to you in any period in which no royalties are payable to you.

B.      Records. TNA will keep accurate records regarding the sale of Merchandise and Videos. TNA will allow you or your authorized representatives to examine such records once during each calendar year, at TNA's place of business during regular business hours upon your written request given at least thirty (30) days prior to the date of examination, and to make copies of all or part of such records at your expense. Each royalty statement will become conclusively binding on you one (1) year from the date each statement is rendered and any action brought by you under this paragraph must be commenced within that one (1)-year period.

In the event you breach this agreement, TNA may recover such damages as may be established in a court of law, including attorneys' fees and costs of litigation. Moreover, in the event you breach this agreement, you acknowledge and agree that you shall not work or perform in any capacity for World Wrestling Entertainment, Inc., its affiliates, successors, or assigns, or in any capacity with any other direct competitor of TNA for a period of six (6) months from the date of termination of this Agreement by TNA under this paragraph 8.

You and TNA further agree that because of the special, unique and extraordinary nature of the obligations of TNA and you which are the subject matter of this Agreement, your breach of this Agreement shall cause TNA irreparable injury which cannot be adequately measured by monetary relief. As a consequence, TNA shall also be entitled to injunctive and other equitable relief against you to prevent your breach or default hereunder without the necessity of proof of actual damage and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which TNA may be legally entitled to seek.

9.      **Notices.**  Any notices to you or TNA hereunder (and any and all statements, royalties or other payments which may become due to you) shall be addressed to our respective addresses first noted above, unless we provide each other with written notice of change of address. All notices (excluding statements and/or payments) shall be sent by U.S. Certified Mail, return receipt requested, courier, or express mail with notice of transmittal, postage pre-paid, and shall be deemed sent on the date of mailing or delivery by courier.

10.      **Confidentiality.**  Other than as may be required by applicable law, government order or regulations, or by order or decree of a Court, all information contained in this Agreement and obtained by you in performing services hereunder shall be held strictly confidential and shall not be divulged by you to any person or entity whatsoever at any time during the Term of or after the termination of this Agreement without TNA's express prior written permission.  If you violate this Section 10 during the Term of this Agreement, it will be considered a breach of this Agreement.

11.      **Miscellaneous.**  TNA may assign its rights hereunder in whole or in part to any person, firm, corporation or other legally recognized entity.  You acknowledge that you are an independent contractor and that nothing herein shall be construed as deeming you either an employee or partner of TNA. This Agreement supercedes any and all prior agreements, negotiations or understandings between you and TNA, whether written or oral, with respect to the subject matter hereof. Each party to this Agreement expressly warrants and represents that, in entering into this Agreement, it is not relying on any statements, representations, promises, consideration, agreements or inducements, whether oral or written, that are not fully set forth in this Agreement. In this regard, both you and TNA acknowledge that in entering into this Agreement, each is relying solely and exclusively on the statements and the provisions that are expressly set forth in this Agreement, and each is not relying on any statements, representations, promises, consideration, agreements or inducements of any kind, written or oral, that were made by either you or TNA, by any of their agents or representatives or by any third parties, which are not fully set forth in this Agreement.  This Agreement may not be altered, modified, amended or supplemented in whole or in part, in any way, except by an instrument in writing signed by TNA and you.  The waiver by either party of any breach of this Agreement or any other right granted hereunder, in any one or more instances, shall in no way be construed as a waiver of any subsequent breach of this Agreement, whether or not of a similar nature. In the event any portion of this Agreement is determined to be illegal or unenforceable, the offending portion shall be deleted herefrom and shall not affect the validity of the remaining provisions of this Agreement.  **THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF TEXAS, AND ITS VALIDITY, CONSTRUCTION, AND EFFECT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLICABLE TO AGREEMENTS EXECUTED AND TO BE PERFORMED WHOLLY THEREIN, AND**

WITHOUT REGARD TO ANY CONFLICTS OF LAWS PROVISIONS THEREOF. YOU AND TNA IRREVOCABLY SUBMIT TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITUATED IN DALLAS COUNTY, TEXAS FOR THE RESOLUTION OF ANY DISPUTE HEREUNDER OR THE COMMENCEMENT OF ANY ACTION IN CONNECTION HEREWITH. YOU AND TNA SPECIFICALLY AND IRREVOCABLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER. Nothing contained in this Agreement shall be construed or deemed to create an employee-employer relationship or any partnership or joint venture of any kind between TNA and you, nor shall you have any authority to bind TNA in any respect. Except with respect to the indemnification of the TNA Parties or otherwise specifically set forth herein, the parties hereto acknowledge and agree that nothing in this Agreement shall create any rights in or obligations to any party not a party to this Agreement. You and TNA do hereby stipulate and agree that each of them fully participated and was adequately represented by counsel in the negotiation and preparation of this Agreement and further stipulate and agree that in the event of an ambiguity or other necessity for an interpretation to be made of the content of this Agreement, this Agreement shall not be construed in favor of or against TNA or you as a consequence of one party having had a greater role in the preparation of this Agreement, but shall be construed as if the language were mutually drafted by both parties with full assistance of counsel.

12.    **Taxes.** YOU DO HEREBY AGREE TO PROTECT, DEFEND, INDEMNIFY AND HOLD THE TNA PARTIES HARMLESS FROM AND AGAINST ANY SUITS, LIABILITIES, CAUSES OF ACTION, CLAIMS, DEMANDS, FINES OR LEVIES OF EVERY KIND AND CHARACTER, INCLUDING COSTS OF LITIGATION AND ATTORNEY'S FEES, ARISING IN CONNECTION WITH ANY FEDERAL (INCLUDING FICA AND FEDERAL WITHHOLDING), STATE OR LOCAL TAXES THAT MAY ARISE FROM THE COMPENSATION PROVIDED FOR HEREUNDER OR ANY UNEMPLOYMENT COMPENSATION OR WORKERS' COMPENSATION WHICH MAY BE CLAIMED BY YOU.

Should the foregoing accurately reflect our agreement, please execute and return one (1) copy of this Agreement to TNA, which execution and delivery may be validly accomplished via facsimile.

Sincerely,

TNA ENTERTAINMENT, LLC

By: _____
Name: _____
Title: _____

ACCCEPTED AND AGREED:

_____
Name

8

## ADDENDUM TO AGREEMENT

### Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement

This Addendum to Agreement ("Addendum") is attached to and made a part of that certain Agreement dated August 5, 2005, executed by and between you and TNA Entertainment, LLC (the "Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

By signing the Agreement and this Addendum with TNA, which provides me with consideration that includes the opportunity to engage in the activity of professional wrestling, I hereby acknowledge and reflect my understanding that professional wrestling is an activity that is inherently dangerous and which involves a high degree of risk of serious bodily injury and/or death, as well as property damage.

By signing this Addendum, I HEREBY WAIVE, DISCHARGE AND RELEASE ANY AND ALL CLAIMS I HAVE MAY HAVE, OR THAT I MAY EVER HAVE IN THE FUTURE AGAINST TNA, ITS PARENT AND AFFILIATES AND ALL OF THEIR RESPECTIVE AGENTS, OFFICERS, EMPLOYEES AND DIRECTORS AND ANY AND ALL LICENSEES, ASSIGNEES AND AUTHORIZED THIRD PARTIES REPRODUCING, BROADCASTING OR OTHERWISE USING OR EXPLOITING THE MERCHANDISE, PROGRAM(S) OR RECORDINGS AND ALL OF THE FOREGOING'S HEIRS, SUCCESSORS AND ASSIGNS (THE "TNA PARTIES") THAT ARISE FROM OR RELATE IN ANY WAY TO MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR IN ANY RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE. IN THIS REGARD, I ALSO AGREE ON MY OWN BEHALF, AS WELL AS ON BEHALF OF MY PERSONAL REPRESENTATIVES, MY ASSIGNS, MY HEIRS, AND MY NEXT OF KIN THAT I WILL NOT FILE SUIT OR ASSERT ANY DEMANDS OR CLAIMS FOR LIABILITY OR DAMAGES FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES OF ANY KIND ARISING OUT OF MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE.

I HEREBY ASSUME FULL RESPONSIBILITY FOR ANY AND ALL RISK OF PERSONAL OR BODILY INJURY, DEATH, OR PROPERTY DAMAGE, now and forever, arising out of or related to participation in the activity of professional wrestling, whether foreseen or unforeseen and whether caused by the negligence of the TNA Parties or otherwise. I HEREBY SEPARATELY AGREE to DEFEND, INDEMNIFY and SAVE and HOLD HARMLESS the TNA Parties from any and all loss, liability, damage, fees, expenses or costs that they may incur, now and forever, in connection with any personal or bodily injury to me, my death, or damage to my property that arises out of or may be attributable to my participation in the activity of professional wrestling, whether caused by the negligence of the TNA Parties or otherwise.

I HEREBY acknowledge that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT ASSISTANCE OR PROCEDURES OF THE TNA PARTIES and I further agree that this Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the TNA Parties, INCLUDING NEGLIGENCE IN PROVIDING ASSISTANCE and is intended to be as broad and inclusive as permitted by law. If any portion hereof is held invalid, it is agreed that the balance hereof shall, notwithstanding, continue in full legal force and effect.

I have read this Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement and fully understand that I have given up substantial rights by signing it. I am aware of its legal effect and consequences, and I have signed it freely and voluntarily without any inducement, assurance, or guarantee being made to me, and I intend my signature to be my complete and unconditional release of all liability to the greatest extent that is allowed by law. This Addendum shall be binding upon and shall inure to the benefit of my and the TNA Parties' heirs, successors and assigns.

Participant's Name:  Charles Ashenoff

Participant's Signature _____

Witness_____

Date _____

9

Case 3:08-cv-00522-B    Document 9    Filed 06/16/2008    Page 55 of 69
Case 3:08-cv-00522-B    Document 19-3    Filed 07/22/08    Page 55 of 69    PageID 241

WrestleMani.. .. - WrestleLine is your Professio..    Page 1 of 10



WCW · WWF · ECW · Indies · Int'l

## Miller Time

Home

WrestleManiacs

ScoopThis

Bombshells

Toys

Rankings

Photos

Audio

Schedules

Columns

Almanac

Forums

Chat

Store

WOW Mag

Email Us

**Federations**

WCW

WWF

ECW

Indies

Int'l

# Exclusive interview with WWF's head writer Vince Russo

September 30, 1999

## By Ben Miller
WrestleLine/WrestleManiacs

**BEN:** The people you closed the door on, I don't want to ask for names, have they ended up showing up on ECW or WCW, or do they end up staying on the fringe of the business for the same reason you didn't want them?

**RUSSO:** No, they wind up showing in ECW and WCW. I think that's why you have such chaos, especially in WCW's locker room. When there is a free agent out there, one of the first things we look at is that there is such peace and harmony and a family feeling in our locker room, if we bring this guy in, how is it going to affect that? If it's going to affect that in a negative way, we don't bring them in. These guys definitely get picked up in ECW and WCW. Like I said, I think that's part of the reason why you have so many problems in WCW.

**BEN:** Two guys that have been critical of you at various times are **Dave Meltzer** who obviously writes the *Wrestling Observer* and **Bruce**

EXHIBIT "C"

WrestleManiac - WrestleLine is your Professio..    Page 2 of 10

**Mitchell**. Do you have any opinion on those guys?

**RUSSO:** Well yeah, it just really bothers me. First of all, you've got to understand something, I never in my life claimed to be a great journalist, because the way I write ... I don't try to write to impress people. I don't try to write in a style like look at me, I'm smarter than you. I try to write in a style that people ... the common guy - the wrestling fan will understand. That's how I try to write, and that's the most important thing to me - that I write in a way that our fan is going to understand. I am not above anybody, and another thing too, every one of my columns, even if it is pro-WWF, I write what I truly believe in my heart. Nobody tells me to write my column, if I write it positive, or negative, whatever the case may be, **Vince McMahon** lets it go, then I write about what I truly, truly feel. And I try to write the truth.

The thing that just bothers me, primarily about Dave Meltzer, I just feel he thinks he's better than everybody else. I think he tries to talk down on people like he knows everything, and the reality of the situation is that Dave Meltzer doesn't know shit. Because all Dave Meltzer's information is second hand information, and whoever is giving him that information is putting their little spin



Though there are some things Russo can't talk about, like the Owen Hart lawsuit, he believes in telling readers as much as possible. (WOW)

Case 3:08-cv-00522-B    Document 9    Filed 06/16/2008    Page 57 of 69
Case 3:08-cv-00522-B    Document 19-3    Filed 07/22/08    Page 57 of 69    PageID 243

WrestleManiacs - WrestleLine is your Professio..    Page 3 of 10

on it, and whereas you know - me - I'm there! I know what's going on. I'm behind the scenes. I talk to these guys on a daily basis. I know what's true. I know what's bullshit, and I tell the reader as much as I possible can.

Of course there are some things I can't talk about. I even mentioned to you like the Owen situation - anything involving a lawsuit, I can't talk about, you know. But it just really bothers me when you have a guy who feels that he's above it all, when the reality is he's getting the information second hand, and some of it right, and some of it is absolutely bullshit, and he doesn't have a clue as to what's right and what's bullshit. And that's what bothers me. They can be as critical as they want to be, but I would much rather have a job and be in a position where I know what I'm talking about rather than have to rely on gossip.

**BEN:** I see where you're coming from. Obviously those guys have to know someone in the company. If you ever found out that someone was a mole for one of these newsletters or something like that, would you get mad at them?

**RUSSO:** I don't necessarily know if they do know someone in the company, and the only reason I say that is because on so many occasions, the information is wrong. It's just flat wrong. I remember one time Dave Meltzer had something in there about me, a couple of years ago, it was rumored that one of the WCW wrestlers died in a car crash ... that black guy ... that Pit guy ---

**BEN:** Oh yeah. Craig "Pitbull" Pittman.

WrestleManiacs - WrestleLine is your Professio..    Page 4 of 10

**RUSSO:** Yeah, the next thing I know I'm reading in Meltzer's newsletter that Russo was on the phone spreading this rumor. Just stuff like that. I can't fathom that they know somebody on the inside with credibility, because as I said, yeah half of their stuff is right on the money, and the other half is totally bullshit.

**BEN:** I see where you're coming from, but wrestling is a business obviously, where in the past, more than in the present, it's tough to get the truth. In my defense, because I'm someone who reads those newsletters, you don't know where the truth is coming from. It's hard to tell sometimes.

**RUSSO:** I don't necessarily agree with you on that, because why is it tough to get the truth? If Dave Meltzer ever called me, or a **Wade Keller** ever called me, or if any of those guys ever called me, I'm going to tell them the truth, and I'm going to tell them what I know. I have nothing to hide. If they ask me a question, I'm going to tell them the answer to the question. But the difference is, if they ask you a question, and you honestly don't know the answer to it, then you're a liar. Like you asked me about the IPO. I honestly don't know anything about that, and quite frankly, I really don't care. My plate is so full with writing television, I don't know about that. But to a Meltzer or a Keller, if they ask me that same question, and I answer it the same way, well I'm lying, and they're not getting the truth from me.

**BEN:** I understand, but to the average fan, it's not like you can get the entire truth like on the some of the uglier side of the business, like with deaths and stuff like that. It's not like you can

WrestleManiacs - WrestleLine is your Professio..    Page 5 of 10

go to WWF.com and create a detailed itinerary of what was at **Brian Pillman**'s bedside. So sometimes you have to go to outside sources to find the truth.

**RUSSO:** Right.

**BEN:** This is something I've always wanted to see in American professional wrestling, have you guys, the TV writing team, ever thought of having the title like All Japan Pro Wrestling where there's no gimmick matches, no run-ins, no count outs, it's just two guys in a wrestling match. And not every match to be like that, because I know how it can get boring and monotonous, but just one title ---

**RUSSO:** I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this - it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American, and I don't want to sound like a big bigot or a racist or anything like that, but I'm an American ... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

**BEN:** Yeah, I really like All Japan.

**RUSSO:** Which is cool, but the reality of it is, that's a small minority of our audience.

**BEN:** But I'm not talking so much about the fact

WrestleManiacs - WrestleLine is your Professio..    Page 6 of 10

that you would have to use the guys from Japan, I'm just saying, two guys who I think are good wrestlers, maybe **D'Lo Brown** and **Jeff Jarrett**, who maybe don't have the interview skills or the charisma of a **Rock** or **Steve Austin**, but if you put them out there in longer matches where they could show their in ring talent ---

**RUSSO:** What do you call a longer match?

**BEN:** I don't know, maybe 12 minutes?

**RUSSO:** There is no way on television ---

**BEN:** Not on television. I mean more PPV, and on television it would 6-8 minutes. I don't think matches on television outside of the main event should go more than 8 minutes.

**RUSSO:** But the thing you don't understand is, and I can tell you first hand, the way television is, and how short the matches are on TV - what we've done now basically is we've basically trained the audience. It's crash TV. It's in and out. What's the finish? Let's get to the next thing.

**BEN:** Absolutely.

**RUSSO:** That's the way we've trained the fan, and I've got to tell you, I don't know how many PPVs you go to, but a couple of years ago when I wasn't writing the PPVs, and we just really started this trend with the way the business is now, we would have 15, 20, 25 minute matches, because it was the PPV, 5 minutes in, people were sitting on their hands.

**BEN:** That's true -

WrestleManiacs - WrestleLine is your Professio..   Page 7 of 10

**RUSSO:** The house was silent. The reason being, we've trained these people a certain way, and now that's why I'm writing the PPVs, because basically, the PPVs need to be written the same way as television, because that's what the fans expect.

**BEN:** That is true, but you have to recognize that WCW does a lot of short matches too, but when you go on their PPV and see a really good "wrestling match" where the workrate is high, with like ... I can remember **Raven** and **Saturn** v. **Malenko** and **Benoit** on PPV, and it went like 12 or 13 minutes and the crowd was hot the entire time. You don't think that type of thing would work in the WWF?

**RUSSO:** I think that's a rarity. I watch everything that I can. I've never watched Mexican or Japan, because I don't give a shit. I live here, that's all I care about. But one thing I got to tell you, I was watching ECW last week, **Van Dam** and who--?

Stone Cold Jersey!
• WWF Attitude Tee
• NWO Bucket Cap
• Sable Attitude Bear
• Hogan Flag
• Goldberg T-Shirt

**BEN:** I won't even go into that.

**RUSSO:** No, but who's the other guy?

**BEN: Jerry Lynn.**

**RUSSO:** Ok Jerry Lynn. Now I got to tell you something, seriously, I was sitting here really enjoying the hell out of the match, but it got to the point even with me where it was like, OK end this. The thing is, you've got to understand, in this day and age, there are so many things for people to do that their attention span is so

WrestleManiacs - WrestleLine is your Professio..    Page 8 of 10

short. Why do you think when there is a commercial people change the channel? You know what I'm saying?

**BEN:** I agree, but are you saying that something that I thought was just as incredible, I don't know if you saw the last ECW PPV, but **Mike Awesome** versus **Masato Tanaka** and they went out there for a good 13-15 minutes and they had what people would call a **** or a **** ½ match, is that going to be obsolete in the WWF? In that match where they basically stayed around the ringside area, and there's a clean finish - even though I know they used table and chairs - but there is no in the crowd brawling, is kind of thing going to become obsolete in the WWF you think?

**RUSSO:** I don't want to say obsolete, but I don't see it going back in that direction. The only reason I tell you that, I'm at every show, I'm there, you put Rock and Mick in that ring with microphones, the people will sit there for a half an hour and be entertained. You put a wrestling in that ring for over ten minutes, they want to know, let's get to the finish, and let's go on to the next thing. And you gotta understand from a writing point of view, I am not dictating to these fans. I am basically in the arena every Monday and Tuesday night, I am in the arena, I am listening to the fans. All that I am trying to do from a television-writing standpoint is give the masses what they want. Now, I'm not saying give the smart wrestling fan what they want, I'm saying give the masses, and that's my job.

**BEN:** I see that, and I don't want to beleaguer it, but some would argue that it's true, that WWF fans mainly sit on their hands for matches that go more than 10 minutes, but some would

**WrestleManiacs - WrestleLine is your Professio..   Page 9 of 10**

argue that it's because the quality of the in-ring wrestling isn't as good. Don't you think that if you put two good wrestlers in the ring, and I know we had talked about the Van Dam - Lynn thing, but I don't consider Van Dam to be that great of a wrestler, I look more to the Masato Tanaka - Mike Awesome example. Don't you think if you put two good wrestlers in there, who had a match which could stir the fans emotions, that that would ... look at what happened with **Sting** and Benoit? I know they still got killed by Raw when Raw opened, but they kept a much larger percentage than they had been by starting off their show with interviews. Do you think there's any validity to that?

**RUSSO:** No. I think they kept a much bigger number than they did, because that was really a well-booked match where you couldn't call the outcome. Benoit isn't going to beat Sting in the middle of the ring, and Sting isn't going to beat Benoit, so what are they gonna do? That was the appeal to the match.

**BEN:** OK.

**RUSSO:** Don't get me wrong, I love to see a good wrestling match, but my job is ... I get paid to give the people what they want, and whether I agree or disagree with them is not my job. I'm not writing television to please Vince Russo. I'm writing television to please the masses, and like I say, when I go out in a crowd, and I see the response from a Mick - Rock promo, and response to a wrestling match, I know what they want to see. And again, it's not Vince Russo writing TV for Vince Russo, I'm just trying to give the people what they want.

**Part 1 · Part 2 · Part 3**

WrestleManiacs - WrestleLine is your Professio.. Page 10 of 10

**E-mail Ben Miller | Miller Time archive**

**WCW · WWF · ECW · Indies · Int'l**



Copyright © 1999 SportsLine USA, Inc. All rights
reserved.

This website is not sponsored or endorsed by the WWF,
WCW or ECW. This is not an official site.

## Ichter, Cary

**From:**    Charles Ashenoff [kdoggashenoff@yahoo.com]

**Sent:**    Thursday, June 21, 2007 12:42 AM

**To:**    terry taylor

**Subject:** Re: termination letter

i dont think i ever got a copy of that promissory note, can u get it to me.  U will always be my friend if u ever need work in mexico let me know. I am so glad i left, i feel free and great.  carlos

*terry taylor <terrytaylor812@yahoo.com> wrote:*

> Carlos,
> TNA is terminating your contract.
> Our Legal Department will be in contact with you regarding the terms of your release and the payment plan for the promissory note.
>
> Terry Taylor
> TNA Entertainment
> Director of Talent Relations
> 209 10th Ave S.
> Suite 302
> Nashville, TN 37203
> Off 615-244-5557
> Fax 615-254-5488
> ttaylor@tnawrestling.com

Pinpoint customers who are looking for what you sell.

**EXHIBIT "D"**



July 11, 2007

Mr. Charles Ashenoff
1894 Cabernet Drive
Chula Vista, CA 91913

Dear Mr. Ashenoff:

TNA Entertainment is hereby suspending you indefinitely from performing for TNA due to the following contract violations. You have been late or absent on more than two occasions (including two recent occasions in which you failed to appear for wrestling events and failed to provide notice to TNA regarding your absences).

In addition, I have attached a copy of the Promissory Note payable to TNA which you executed on December 13, 2006 under which you agreed to make $1,000 payments to TNA on the 15th of each month. As you will recall, this Note resulted from the loan which TNA made to you in the amount of $18,000. The current balance owing on the loan is $16,000. We trust that you will honor your commitment and make the monthly payments on this loan. If not, TNA will be forced to take legal action.

In addition, I wish to remind you that the breach section of your contract provides that you will not publicly denigrate TNA and provides further that TNA may recover damages as may be established in a court of law in the event you breach this or other provisions of the Agreement.

Please contact me with any questions.

Sincerely,

Stephen Campbell
Senior Counsel

4100 Spring Valley, Suite 1001
Dallas, Texas 75244
Ph: 972/980-7159 Fax: 972/980-6815
www.tnawrestling.com
S:\Legal\TNA Entertainment\Corresp\Charles Ashenoff ltr 7-11-07.doc

209 10th Avenue South, Suite 302
Nashville, Tennessee 37203
Ph: 615/ 244-5557 Fax: 615/ 244-5755
www.tnawrestling.com

EXHIBIT "E"

**From:** Charles Ashenoff [mailto:kdoggashenoff@yahoo.com]
**Sent:** Wednesday, August 23, 2006 12:42 AM
**To:** Dixie Carter
**Subject:** RE: konnan

thank u for the words of encouragement, tna has really changed alot since u are not around, it has gotten very stressful but anyways i would love to talk to u because u mentioned to me last time we talked about this that if the male is the problem which in this case it is, it is easier than if the woman is the problem. I just need some guidance since obviously u had been trying for a long time and now have finally found  great success. I really need to have 2 babys i feel like i am getting to old to enjoy them.  But how can u be to old if u love something,  I hope to see u soon i really need to talk to u, please my warmest regards as always for your family and with all due respect, much love from me to u,  thank u carlos

*Dixie Carter <dcarter@trifecta-ent.com>* wrote:
Thanks so much for your email.  And THANK YOU for your great work, attitude and patience in us getting here.  You will lead our charge as we row this audience, both Hispanics and other....  You're doing a great job, you always have, but you seem to have hit a stride.  I am hopeful LAX will take off and become a dominate force for the long haul.

Things here are crazy busy.  I've needed to be in the office versus Orlando, but I hope to get back down there more regular very soon.

Thank your wife for her kind words as well.  More than anything, I hope you are happy personally.  That is the key to all other success.  Keep me posted on any baby happenings too!!!

All the best,

D.

| | |
|---|---|
| **From:** | Charles Ashenoff [kdoggashenoff@yahoo.com] |
| **Sent:** | Tuesday, July 31, 2007 1:27 AM |
| **To:** | Dixie Carter |
| **Cc:** | jeff jarrett |
| **Subject:** | RE: konnan |

Dixie this is a letter i originally wrote on august 27, 2006, when me monty brown, ron killings and hector melendez were going to file a racial discrimination lawsuit against the company. At the time i did not have the money to go ahead with this, I now have legal consel and Triple A will be making remuneration on this case. I have been vilified in this whole thing when in actuality your company and yourself made promises to me that were not kept. I dont know if u dont know whats going on or dont want to know whats going on or dont care about whats going on but tommorrow i will send u a letter detailing things i know u dont know and will be news to u and yes we will go through protacted and public litigation.

Here is the letter dated august 27, 2006

Sincerely,


Charles Ashenoff
Independent Contractor

Well dixie i dont even know where to really start because i really believe u do not know what is going on behind the scenes a lot of the boys have been coming up to me for the last year but expecially in the last 3 months it has gotten out of hand. The booking committe has fostered an atmosphere of fear by systematically getiing rid of people they dont like and surrounding themselves with their friends, its croynism at its worst. The morale is at an alltime low and i have been there 4 yrs, i have been in wrestling for 16yrs, and even i tell wrestlers to go to u because terry taylors hands are tied on a lot of things.

   People are afraid to go to u because a couple times wrestlers went to u in the past about stuff and it got back to jeff and boy has he done a number on those guys. Everyone is afraid to tell u and i actually believe that the booking committe tells u what u want to hear or hides stuff from u.. Mostly its the booking committee using their power to get back at people by taking them off tv or sending them home or having them blantantly look bad on tv. They are drunk on power. I have personally heard jeff say dixie doesnt run the wrestling part i do, well as far as i am concerned u run the company and he and the rest of the committe have betrayed your trust. I know u would not condone their behavior, there are a couple of guys that have asked for their release and u would not believe some of the racist things that have gone on and sexual harrasment that at any fortune 500 company would be grounds for dismisaal or a racial discrimination lawsuit..

I want to retiire at tna, i want to be happy. i have been disrespected, lied to and i have to tell u. If it was their money believe me they would not be booking this way, we have much better talent than WWE but it is not used correctly. If this costs me my job it will be worth if u at least investigate my claims, i dont know how much of a profit u are making but believe me it would be double for sure or probably triple if this was run right.

**EXHIBIT "6 "**

In summation i just want to say that the reason i am telling u this is because there are alot of fine, decent, human beings in your company whose spirtis are broken, who have been disrespected and i know the loving caring person that u are and i am not brown nosing but the fine classy people your parents are and they would not condone racism or the total lack of apathy on their part towards those they dont deem part of their inner circle, enough is enough, please dixie i have no hidden agenda, i am not politicking to be on the booking committee, just enough is enough.  Did u know they are looking for someone to replace me at the spanich announcing booth  and are mad the LAX is to over so they are talking  about taking away our unique entrance?  Carlos .