**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TNA Entertainment, LLC,** | ) ) | |
|     **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **Charles "Carlos" Ashenoff,** | ) ) | |
|     **Defendant,** | ) ) | **CIVIL ACTION NO.: 808CV-522-B** |
| **v.** | ) ) | |
| **Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor III (p/k/a Terry Taylor), and Wayne Keown (p/k/a Dutch Mantel),** | ) ) ) | |
| **Third-Party Defendants** | ) ) | |

**PLAINTIFF'S RESPONSE**
**TO DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

**FULBRIGHT & JAWORSKI L.L.P.**

Richard S. Krumholz
State Bar No. 00784425
William P. Finegan
Texas Bar No. 07008700
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:    214/855-8022
Facsimile:    214/855-8200

**ATTORNEYS FOR PLAINTIFF TNA
ENTERTAINMENT, LLC**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................. 1

BACKGROUND ................................................................................................... 4

    Ashenoff's Contracts With TNA ...................................................................... 4
    Ashenoff's Extortion...................................................................................... 7
    Ashenoff's Meritless Allegations Against TNA............................................... 9
    The Requested Declarations ........................................................................ 10

ARGUMENT AND AUTHORITIES ...................................................................... 11

I.      MOTION TO DISMISS STANDARD............................................................ 11

II.    DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
       JURISDICTION SHOULD BE DENIED ..................................................... 12

      (a)    TNA Seeks Declaration Of Its Rights Under Several Independent Federal
           Statutes................................................................................................ 12

      (b)    TNA Easily Satisfies the "Actual Case or Controversy" Requirement ............... 14

      (c)    Ashenoff's Request for Realignment Should Thus Be Denied ........................... 16

III.   DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
       SHOULD ALSO BE DENIED..................................................................... 17

CONCLUSION.................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................. 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ameritech Ben. Plan Committee v. Communication Workers of America*,
    220 F.3d 814 (7th Cir. 2000) ............................................................12, 16, 24

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*,
    846 F.2d 731 (Fed. Cir. 1988)....................................................................14

*Bombardier Aero v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348
    (5th Cir. 2003)...........................................................................................11

*Fries v. Desselle*, 378 B.R. 304 (Bankr. D. Kan. 2007) ....................................16

*GE Capital Corp. v. Posey*, 415 F.3d 391 (5th Cir. 2005)...........................11, 12

*Heydon v. MediaOne of S.E. Mich., Inc.*,
    327 F.3d 466 (6th Cir. 2003) .....................................................................13

*McKee Foods Kingman v. Kellogg Co.*,
    474 F. Supp. 2d 934 (E.D. Tenn. 2006).....................................................14

*Morrison v. Parker*, 90 F. Supp. 2d 876 (W.D. Mich. 2000) ...........................15

*Post Performance, LLC v. Renaissance Imports*,
    333 F. Supp. 2d 834 (E.D. Mo. 2004)..................................................13, 14

*Skelly Oil Co. v. Phillips Petroleum Co.*,
    330 U.S. 667 (1950)...................................................................................13

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592 (2d Cir. 1996) .......................12, 14

*TTEA v. Ysleta del Surety Pueblo*, 181 F.3d 676 (5th Cir. 1999) ................12, 24

*Zimmer Enterprises, Inc. v. Atlandia Imports, Inc.*,
    478 F. Supp. 2d 983 (S.D. Ohio 2007) .................................................13, 14

## STATE CASES

*Arthur's Garage v. Racal-Chubb Security System, Inc*,
    997 S.W.2d 803 (Tex. App.—Dallas 1999, no pet.)....................................20

*Atlantic Richfield Co. v. Petroleum Personnel, Inc.*,
    768 S.W.2d 724 (Tex. 1989).................................................................20, 22

*Baty v. ProTech Ins. Agency*, 63 S.W.3d 841
    (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ................................21

*Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368 (Tex. 2001) ............................................19

*Dresser Industrial, Inc. v. Page Petroleum, Inc.*,
    853 S.W.2d 505 (Tex. 1993)......................................................................................19

*Fairfield Insur. Co. v. Stephens Martin Paving, L.P.*,
    246 S.W.3d 653 (Tex. 2008)......................................................................................18

*Garza v. Bunting*, No. 05-06-01307-CV,
    2007 Tex.App. LEXIS 4201 (Tex. App.—Dallas May 30, 2007, no pet.).................20

*Lawrence v. CDB Servs.*, 44 S.W.3d 544 (Tex. 2001) ......................................................19

*Memorial Medical Center of E. Tex. v. Keszler*,
    943 S.W.2d 433 (Tex. 1997)......................................................................................21

*Murphy v. Young Men's Christian Association of Lake Wales, Inc.*,
    974 So.2d 565 (Fla. App. 2008)................................................................................20

*Newman v. Tropical Visions, Inc.*,
    891 S.W.2d 713 (Tex. App.—San Antonio 1994, writ denied)..................................19

*Storage & Processors, Inc. v. Reyes*,
    134 S.W.3d 190 (Tex. 2004)......................................................................................23

*Sunny Isles Marina, Inc. v. Adulami*, 706 So.2d 920 (Fla. App. 1998) ............................20

*Theis v. J&J Racing Promotions*, 571 So.2d 92 (Fla. App. 1990)....................................20

*Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931 (Tex. 1991)..................................21

## STATUTES AND RULES

42 U.S.C. § 1981.........................................................................................................3, 11

Fed. R. Civ. P. 8..............................................................................................................22

TEX. CONST. art. I, § 16 ..................................................................................................19

TEX. LAB. CODE ANN. § 406.033(e)................................................................................19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| TNA Entertainment, LLC, | ) ) | |
|      **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **Charles "Carlos" Ashenoff,** | ) ) | |
|      **Defendant,** | ) ) | **CIVIL ACTION NO.: 808CV-522-B** |
| **v.** | ) ) | |
| **Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor III (p/k/a Terry Taylor), and Wayne Keown (p/k/a Dutch Mantel),** | ) ) ) | |
| **Third-Party Defendants** | ) ) | |

**PLAINTIFF'S RESPONSE**
**TO DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

Plaintiff TNA Entertainment, LLC ("TNA" or "Plaintiff") opposes Defendant Charles Ashenoff's ("Defendant" or "Ashenoff") Motion to Dismiss (the "Response") and respectfully shows as follows:

**SUMMARY OF ARGUMENT**

Defendant's Motion to Dismiss is frivolous and should be denied in its entirety. This is a classic declaratory judgment action where subject-matter jurisdiction clearly exists under the federal trademark and discrimination statutes, and where the defendant cannot credibly deny that there is an actual, tangible, and ongoing controversy between the parties.

By way of background, Ashenoff is a professional wrestler who, for several years, wrestled with TNA under several Independent Contractor Agreements. During this timeframe,

---

Ashenoff wrestled under the same ring name "Konnan" and acted out the same character he had been successfully using for many years before joining TNA's ranks—an Hispanic "gangster" who regularly used racially charged language and motifs.

After receiving a suspension letter in the Summer of 2007 for violating his Independent Contractor Agreement, Mr. Ashenoff began to make extortionate demands by accusing TNA of various misdeeds and making threats that he would publicly embarrass TNA if he were not paid substantial sums of money.  Specifically, in July of 2007, Ashenoff (days after receiving his suspension letter) threatened that "this will be public, it will be messy . . . ." unless TNA acceded to his demands.  *See* Ex. A attached hereto (July 30, 2007 email from Charles Ashenoff to Terry Taylor).  Three days later, Ashenoff sent another email demanding $300,000 and stating that "[i]f you do not agree with this, I will see you in court and you will hear me and the media." *Id.* (Aug. 2, 2007 email from Charles Ashenoff to Dixie Carter, Steve Campbell, Jeff Jarrett, and Terry Taylor).  The August 2, 2007 email further stated that if TNA did not agree to his demand, Ashenoff would appear on a program called *Real Sports*, and that "for twelve minutes, the only topic of discussion will be TNA and how [it is] run.  You had the audacity to say I was burying the company before, you haven't seen anything yet." *Id.*

Ashenoff's threats did not end there.  In March of 2008, after retaining counsel, Ashenoff sent TNA a demand letter and draft complaint that falsely accused TNA of violating federal anti-discrimination laws, providing Ashenoff with illegal drugs, and stealing his alleged trademarks and intellectual property – marks that TNA continues to use in its ongoing business and merchandising activities.  *See* Ex. B attached hereto, which includes the demand letter and draft complaint; *see especially* Count IX and ¶¶ 104-112 of draft complaint.  In his demand letter, Ashenoff reiterated his threats to gain the attention of news media and federal politicians and

regulators unless TNA promptly paid him $7 million to settle his claims "quickly and quietly"; notably, just months earlier in his 2007 correspondence, Ashenoff was demanding $300,000, less than five percent of the amount he now claims to be owed.  *Compare* Ex. B *with* Ex.A.  The draft complaint accompanying the demand letter purported to state claims under several federal statutes, including 42 U.S.C. § 1981, the United States Copyright Act of 1976, and Section 43 of the Lanham Act.  *See* Ex. B, Draft Complaint, Counts I and IX.  The ninth count of the draft complaint demanded an injunction barring TNA from using the material that was subject to his federal copyright and trademark claims.  *Id.* ¶ 112.

Instead of surrendering its marks, paying Ashenoff's outrageous ransom demand, or waiting idly by for Ashenoff to carry out his threats, TNA has instead done exactly what federal law permits it to do by asking a federal tribunal to declare its rights under the various federal statutes that Ashenoff's threats have raised.  Case after case holds that a federal court has subject-matter jurisdiction to declare a party's rights under a federal statute, particularly in situations like this where there is an ongoing dispute over a party's use of intellectual property. Ashenoff likewise cannot credibly argue that there is no "case or controversy" in light of his demand letter and draft lawsuit.  Simply put, the law does not require companies to tolerate the sort of extortionate threats that Ashenoff has made in this case.

The Court thus clearly has subject-matter jurisdiction over TNA's claims.  Defendant's remaining grounds for dismissal are fact-based arguments that have no place in a Rule 12 motion.  Defendant's request to "realign" the parties is likewise wrong-minded given that TNA has stated a valid claim.  The Motion should thus be denied in its entirety.

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
AND BRIEF IN SUPPORT**

# BACKGROUND[1]

Plaintiff TNA is engaged in the business of producing, arranging, staging, conducting and promoting professional wrestling events and programs throughout the world.  In conducting wrestling events, TNA contracts with wrestlers, writers, bookers and administrative personnel. *See* Plaintiff's Original Complaint and Request for Declaratory Judgment ("Complaint") ¶ 6.

Defendant Ashenoff has been a professional wrestler for over two decades.  He has wrestled for multiple wrestling organizations, including the World Wrestling Federation, World Championship Wrestling, Extreme Championship Wrestling, and most recently TNA.  *Id*. at ¶ 7.

For many years before he joined TNA, and during his TNA career, Ashenoff wrestled under the "ring name" of "Konnan" and portrayed the role of a Hispanic wrestler.  This character was developed by Ashenoff and others over more than twenty years in the wrestling business, and any suggestion that TNA somehow "forced" or "directed" Konnan to play a character he did not want to play is demonstrably untrue.  When Ashenoff first began providing services to TNA, TNA incorporated Ashenoff's "Konnan" character into its dramatic story lines and scenes for its purposes of providing creative entertainment to its audience.  *Id*. at ¶ 8.

## Ashenoff's Contracts With TNA

On or about January 2004, Ashenoff entered into an independent contractor agreement with TNA (the "2004 Agreement") under which he was retained to "render . . . wrestling and performing services in connection with, the rehearsal, performance and broadcast of 26 or more Programs designated to you by TNA . . . ."  *Id.* ¶ 9; *see also* Ex. A to Defendant's Answer and Counterclaims [Dkt. #9].  In August 2005, TNA and Ashenoff entered into a second independent

---

[1] Defendant's Motion recites a series of allegations from its "Answer and Counterclaims" and purports to rely on them in support of its arguments for dismissal.  This is, of course, wholly improper.  It is well-settled that a court

contractor agreement (the "2005 Agreement"), which contains many of the same provisions as

the 2004 Agreement (together the "Independent Contractor Agreements").  *See* Complaint ¶ 10;

*see also* Ex. B to Defendant's Answer and Counterclaims [Dkt. #9].

These Independent Contractor Agreements specifically state that Texas law would apply

to this relationship.  Indeed, both expressly state as follows:

> 11. . . . **THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF TEXAS, AND ITS VALIDITY, CONSTRUCTION, AND EFFECT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLICABLE TO AGREEMENTS EXECUTED AND TO BE PERFORMED WHOLLY THEREIN, AND WITHOUT REGARD TO ANY CONFLICTS OF LAWS PROVISIONS THEREOF.  YOU AND TNA IRREVOCABLY SUBMIT TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITUATED IN DALLAS COUNTY, TEXAS FOR THE RESOLUTION OF ANY DISPUTE HEREUNDER OR THE COMMENCEMENT OF ANY ACTION IN CONNECTION HEREWITH.  YOU AND TNA SPECIFICALLY AND IRREVOCABLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER**.

Complaint ¶ 12; Ex. A to Counterclaims [Dkt. #9] ¶ 10; Ex. B to *id.* ¶ 11.

Additionally, both of the Independent Contractor Agreements included a separately

signed Addendum with the following Waiver and Release of Liability, Assumption of Risk and

Indemnity Agreement (the "Waiver"):

> By signing the Agreement and this Addendum with TNA, which provides me with consideration that includes the opportunity to engage in the activity of professional wrestling, I hereby acknowledge and reflect my understanding that professional wrestling is an activity that is inherently dangerous and which involves a high degree of risk of serious bodily injury and/or death, as well as property damage.

> By signing this Addendum, **I HEREBY WAIVE, DISCHARGE AND RELEASE ANY AND ALL CLAIMS I HAVE, MAY HAVE, OR THAT I MAY EVER HAVE IN THE FUTURE, AGAINST TNA, ITS PARENT AND AFFILIATES AND ALL OF THEIR RESPECTIVE AGENTS, OFFICERS,**

---

must assume the truth of a plaintiff's allegations when considering a Rule 12 motion and may not rely on a
defendant's own account of the facts.

---

**EMPLOYEES AND DIRECTORS . . . (THE "TNA" PARTIES") THAT ARISE FROM OR RELATE IN ANY WAY TO MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR IN ANY RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE.  IN THAT REGARD, I ALSO AGREE ON MY OWN BEHALF, AS WELL AS ON BEHALF OF MY PERSONAL REPRESENTATIVES, MY ASSIGNS, MY HEIRS, AND MY NEXT OF KIN THAT I WILL NOT FILE SUIT OR ASSERT ANY DEMANDS OR CLAIMS FOR LIABILITY OR DAMAGES FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES OF ANY KIND ARISING OUT OF MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE**.

**I HEREBY ASSUME FULL RESPONSIBILITY FOR ANY AND ALL RISK OF PERSONAL OR BODILY INJURY, DEATH, OR PROPERTY DAMAGE**, now and forever, arising out of or related to participation in the activity of professional wrestling, whether foreseen or unforeseen and whether caused by the negligence of the TNA Parties or otherwise.  **I HEREBY SEPARATELY AGREE TO DEFEND, INDEMNIFY and SAVE and HOLD HARMLESS** the TNA Parties from any all loss, liability, damage, fees, expenses or costs that they may incur, now and forever, in connection any personal or bodily injury to me, my death, or damage to my property that arises out of or may be attributable to my participation in the activity of professional wrestling, whether caused by the negligence of the TNA Parties or otherwise.

**I HEREBY** acknowledge that **INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT ASSISTANCE OR PROCEDURES OF THE TNA PARTIES** and I further agree that this Waiver and Release of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the TNA Parties, **INCLUDING NEGLIGENCE IN PROVIDING ASSISTANCE** and is intended to be as broad and inclusive as permitted by law . . . .

**I have read this Waiver and Release . . ., fully understand that I have given up substantial rights by signing it.  I am aware of its legal effect and consequences, and I have signed it freely and voluntarily without any inducement, assurance, or guarantee made to me, and I intend my signature to be my complete unconditional release of all liability to the greatest extent that is allowed by law . . . .**

Complaint ¶ 13 (all emphasis in original); Addendums to Ex. A and Ex. B to

Counterclaim [Dkt. #9].

The Independent Contractor Agreements also specifically provide that TNA is fully entitled to use all of the alleged intellectual property that Ashenoff accuses TNA of stealing.  The agreements provide that TNA may use all of Ashenoff's "Original Intellectual Property," including any trademarks Defendant owned prior to the agreement, as well as any "New Intellectual Property," including trademarks crated after the 2005 Agreement was signed, ***both during and after the term of the agreement***.  Complaint ¶ 14.

## Ashenoff's Extortion

Beginning in the Summer of 2007, Mr. Ashenoff made extortionate threats by blatantly stating that he would go on HBO Sports to make his baseless allegations "public" and "messy" for TNA and its management.  *See* Ex. A (July 30, 2007 email from Charles Ashenoff to Terry Taylor).  Ashenoff later demanded that TNA pay him $300,000 and threatened to take his allegations to the "media" and to "congress" if TNA refused to pay.  *Id.* (Aug. 2, 2007 email from Charles Ashenoff to Dixie Carter, Steve Campbell, Jeff Jarrett, and Terry Taylor).

Ashenoff's threats did not stop there.  In brazen violation of the Independent Contractor Agreements, Ashenoff sent TNA a demand letter and draft lawsuit in March 2008 that alleged what Ashenoff described as "bodily injury claims," "racial discrimination claims," and trademark claims.  *Id.* ¶ 15; *see* Ex. B hereto.  The demand letter threatened TNA with public embarrassment and made numerous other explicit and implicit threats, claiming that "[t]he public's apparent appetite for stories regarding the dark side of professional wrestling appears to be all but insatiable.  No doubt this controversy would only add fuel to the fire."  *See* Ex. B, Demand Letter, at 10.  The letter also warned that "this dispute would undoubtedly draw the attention of opportunistic politicians," and that the "high-profile filing of a claim against TNA . . . at the very time that Congress is set to hold hearings to investigate the industry can only cause

TNA and the wrestling industry more headaches and heighten the possibility that the Federal government will undertake to regulate the industry." *Id.* The letter then stated that Ashenoff would be willing to accept a "one time payment of $7,000,000.00" to "settle this matter quickly and quietly . . . ." *Id.* Notably, between July of 2007 and March of 2008 Ashenoff's demands increased by $6.7 million (*i.e.*, from $300,000 to $7 million).

The draft complaint attached to the letter closely resembles the Counterclaims that Ashenoff ultimately filed in this action. In addition to a federal discrimination claim under Section 1981, the draft complaint also included a federal claim for copyright and trademark infringement under the United States Copyright Act and the Lanham Act and purported to demand "an injunction *pendente lite* and a permanent injunction to arrest the willful infringements of his copyright and trademark rights" to the "LAX" brand and identity. *See* Ex. B, Draft Complaint, ¶ 112. "LAX," or "Latin American Exchange," is a team of Hispanic "stage characters," of which Ashenoff was formerly a member during his time at TNA. *See* Complaint ¶ 16. TNA has continued to use the LAX concept and logo following Ashenoff's suspension as expressly permitted under the Independent Contractor Agreements, with the remaining members of the LAX team continuing to wrestle as part of that team. *See* Ex. B, Draft Complaint, ¶¶ 50-54; 105-09. Ashenoff has explicitly threatened TNA with legal liability and injunctive relief over the continued use of the LAX concept, which poses a tangible and continuing controversy that threatens to impede TNA's ongoing business activities. *See id.* ¶ 54 (claiming that "TNA continues to use the LAX brand and the LAX [logo] without the permission of Mr. Ashenoff, despite demands that TNA cease and desist from same").

## Ashenoff's Meritless Allegations Against TNA

Ashenoff's allegations against TNA have no good faith factual basis and are simply an effort to browbeat TNA into paying a settlement.  As stated above, Ashenoff's trademark and copyright claims are expressly foreclosed by the plain language of the Independent Contractor Agreements—that is, agreed upon language that specifically authorized TNA's use of the marks and concepts at issue.  Likewise, Ashenoff's race discrimination claims are largely based on Ashenoff's own portrayal of "Konnan" – a character that Ashenoff himself created and voluntarily portrayed for years before joining TNA.  The retaliation claim is particularly disingenuous given that Ashenoff did not report a single complaint that TNA engaged in racial discrimination until *after* TNA notified him of his suspension.  Complaint ¶ 17.

Ashenoff's allegations that TNA provided him with unprescribed painkillers that supposedly caused him to suffer kidney failure are also without merit.  Not only are these claims factually inaccurate, but they are also plainly foreclosed by the waiver in the Independent Contractor Agreements, in which Ashenoff expressly waived and released **"ANY AND ALL CLAIMS I HAVE, MAY HAVE, OR THAT I MAY EVER HAVE IN THE FUTURE AGAINST TNA . . . THAT ARISE FROM OR RELATE TO IN ANY WAY TO MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR IN ANY RELATED ACTIVITIES, WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE"** (emphasis in original).  *See* Complaint ¶ 13; *see also id.* (precluding Ashenoff from suing TNA "**FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES OF ANY KIND ARISING OUT OF MY PARTICIPATION IN THE ACTIVITY OF PROFESSIONAL WRESTLING OR RELATED ACTIVITIES,**

**WHETHER CAUSED BY THE NEGLIGENCE OF THE TNA PARTIES OR OTHERWISE**.").

Ashenoff openly admits that his apparent decision to take unprescribed painkillers was "related to" his professional wrestling activities with TNA.  Indeed, Ashenoff acknowledges that the very reason he supposedly ingested such drugs was to enable him to perform his wrestling obligations.  *See, e.g.,* Defendant's Brief [Dkt. #10] at 3-4 (alleging that "[a]s a consequence of the wrestling industry's scheduling challenges and physical demands, wrestling organizations often make un-prescribed pain killers and muscle relaxants, as well as other prescription and illegal drugs, available to wrestlers"); *id.* at 4 ("To facilitate his ability to perform despite his hip injury, TNA and its agents provided Mr. Ashenoff with un-prescribed pain killers and muscle relaxants"); *id.* at 4 ("To facilitate his participation in these [TNA wrestling] events, TNA and its agents continued to provide Mr. Ashenoff with un-prescribed prescription drugs . . . ").  Thus, by Ashenoff's own admission, the alleged effects of his supposed drug use clearly "arise from or relate to in any way" to Ashenoff's "participation in the activity of professional wrestling or in any related activities" and are thus barred by the waiver and release in Ashenoff's Independent Contractor Agreements.

Accordingly, Ashenoff's extortionate threats have no legal or factual merit and are simply that – an attempt to coerce TNA into paying an exorbitant settlement by threatening it with bad publicity, government interference, and the loss of its trademarks.  As set forth below, TNA has every right to seek declaratory relief in federal court.

## The Requested Declarations

TNA is seeking declarations on numerous issues, including whether: (1) Texas law applies to all of the controversies arising out of the Independent Contractor Agreements, (2)

Defendant was an independent contractor and not an employee of TNA,[2] (3) to the extent TNA's employees or contractors purportedly provided Defendant with illegal or non-prescription medications (if at all), they did so outside the scope of their employment or authority, (4) all claims for personal and bodily injury have been released, (5) declaratory relief based on 42 U.S.C. § 1981, and (6) TNA has a legal right to use the LAX logo and has not violated any applicable trademark statutes or laws.   In each of these requests, TNA has requested valid, necessary relief; relief that cannot be gained without a declaration from this Court.[3]

## ARGUMENT AND AUTHORITIES

### I.   MOTION TO DISMISS STANDARD

Dismissal under Rules 12(b)(1) and 12(b)(6) is appropriate only in those extreme situations where a complaint has no possibility of success.  *See Bombardier Aero v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 351 (5th Cir. 2003) (under both Rules 12(b)(1) and 12(b)(6), "a claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief."); *see also GE Capital Corp. v. Posey*, 415 F.3d 391, 395 (5th Cir. 2005) (reversing order of dismissal).

TNA's claims fall under the notice pleading standard of Rule 8, which the Fifth Circuit has described as a "low bar" that can be met through "undetailed allegation[s]."  *GE Capital Corp.*, 415 F.3d at 396 (allegation that "Defendant negligently drove a motor vehicle against plaintiff" satisfies Rule 8; "If such an undetailed allegation will suffice, so must GECC's").  The sole question is whether the allegations in the Complaint "give the defendant fair notice of what

---

[2] The fact that Defendant now apparently agrees that he was an independent contractor is not a reason to dismiss the claim, rather it further supports a judgment in favor of Plaintiff on this claim.

[3] Of note, Defendant does not attack Plaintiff's request for declaratory relief concerning the use of the LAX logo. As such, this claim should not be dismissed.

the plaintiff's claim is and the grounds upon which it rests." *Id.* at 396 (quoting FED. R. CIV. P. 8(2)) (internal quotation marks omitted).  TNA has clearly met this standard.

**II.    Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction Should be Denied**

Ashenoff primarily argues that the Court lacks subject-matter jurisdiction over his claims because there is no federal question and no actual case or controversy.  *See* Ashenoff Brief at 9-11, 19.  Neither of these arguments holds any water.

**(a)    TNA Seeks Declaration Of Its Rights Under Several Independent Federal Statutes**

TNA's complaint clearly states a federal question.  It is well-settled that a party may file a Section 2201 action in federal court to declare its rights under another federal statute, including without limitation the Lanham Act and Copyright Act.  *See, e.g, TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676, 682 (5th Cir. 1999) ("If [the other federal statute] gave the Tribe a right to sue TTEA, we would hold that TTEA could sue for declaratory judgment that the Tribe stated no claim [under that statute]"); *Ameritech Ben. Plan Committee v. Communication Workers of Am.*, 220 F.3d 814, 818 (7th Cir. 2000) (Section 2201 "allows suits for declaratory judgment where federal jurisdiction would exist in a coercive suit brought by the declaratory judgment defendant . . . .  Had the aggrieved employees . . . brought a suit to enforce Title VII and the Equal Pay Act against Ameritech, the district court would have had jurisdiction over the complaint because interpretation and application of these statutes present federal questions . . . .   Indeed, this is exactly what the employees did when they filed their counterclaims.  One way or the other, the claims on all sides present federal questions, and so our jurisdiction is secure"); *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 596 (2d Cir. 1996) ("Declaratory judgment actions are particularly useful in resolving trademark disputes, in order to promptly resolve controversies where the

alleged owner of a trademark right threatens to sue for infringement"); *Zimmer Enters., Inc. v. Atlandia Imports, Inc.* 478 F. Supp. 2d 983, 988 (S.D. Ohio 2007) ("[A] party who wants to embark on a marketing campaign, but has been threatened with suit over trademark infringement, can file a suit seeking a declaratory judgment that it is not infringing that trademark, thereby allowing it to proceed without the fear of incurring further loss"); *Post Performance, LLC v. Renaissance Imports*, 333 F. Supp. 2d 834, 838 (E.D. Mo. 2004) (federal question jurisdiction exists over Section 2201 action to declare noninfringement of Lanham Act where defendant sent demand letter accusing plaintiff of violating trademark).

By contrast, the cases cited on pages 9-11 of Ashenoff's Brief all involve situations where parties seek to manufacture federal jurisdiction by using the Declaratory Judgment Act as the sole federal "hook" for asserting jurisdiction over a purely state law dispute, or where parties seek to remove state law claims based on anticipated federal defenses.  Ashenoff's reliance on *Heydon v. MediaOne of S.E. Mich., Inc.*, 327 F.3d 466, 470 (6th Cir. 2003) is similarly misplaced.  In *Heydon* the court found that federal question jurisdiction did not exist where the federal law upon which they attempted to predicate jurisdiction, the Cable Communications Policy Act, did not provide a private right of action.

Here, by contrast, TNA is seeking a declaration of its rights under several independent federal statutes that provide private rights of action, including the Lanham Act, Copyright Act, and Section 1981.  Plaintiff's claims "present a federal question unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Skelly Oil Co. v. Phillips Petroleum Co.*, 330 U.S. 667, 672 (1950).  As demonstrated by the cases cited

above, the Court clearly has jurisdiction over TNA's claims and supplemental jurisdiction over

any pendent state law claims.[4]

(b)      **TNA Easily Satisfies the "Actual Case or Controversy" Requirement**

Ashenoff also baldly asserts that TNA may not use Section 2201 to declare that it is not

infringing his rights under other federal statutes because there is supposedly no actual "case or

controversy."  *See* Ashenoff Brief at 19.  This argument has no merit whatsoever.  The cases

cited above in Section (a) unambiguously hold that a party may file a declaratory judgment

action against a party who has threatened legal action over a trademark to declare that it is not

infringing the trademark.  *See, e.g., Starter Corp.*, 84 F.3d at 596; *Zimmer Enters.,* 478 F. Supp.

2d at 988; *Post Performance*, 333 F. Supp. 2d at 838.

Ashenoff likewise cannot credibly deny that his demand letter created a reasonable

apprehension of litigation sufficient to make declaratory relief appropriate, given that it included

a draft lawsuit with claims for trademark and copyright infringement and for race discrimination

under Section 1981, as well as many of the state law claims that Ashenoff now asserts in his

Counterclaim.  *See, e.g., McKee Foods Kingman v. Kellogg Co.*, 474 F. Supp. 2d 934, 938-39

(E.D. Tenn. 2006) (actual case or controversy existed where defendant sent cease and desist

letter threatening legal action if plaintiff did not stop using its trademark); *see also Arrowhead*

*Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988) ("If defendant has

expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual

controversy, certainty has rendered apprehension irrelevant, and one need say no more").  A

judgment on TNA's claims for declaratory relief will likewise clarify and settle the legal

relations at issue and will afford relief to the parties and controversy in this case.  Further, both

---

[4] Ashenoff apparently does not dispute that the Court would have supplemental jurisdiction over any nonfederal

parties have agreed to adjudicate the matter in this Court, presumably because this forum is convenient for both the parties and witnesses and would serve the purpose of judicial economy.

Ashenoff's reliance on *Morrison v. Parker*, 90 F. Supp. 2d 876 (W.D. Mich. 2000) is ironic, given that *Morrison* expressly supports granting declaratory relief here.[5]   According to *Morrison*, a district court "should exercise its discretion in favor of a declaratory judgment action (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id*. at 879 (citing *Grand Trunk Western R.R. Co. v. Consolidated Rail Corp.,* 746 F.2d 323, 326 (6th Cir. 1984)).   In applying these criteria, the district court should consider: "(1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata*;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *Id*. at 879-80 (citations omitted).

As stated above, TNA's requested declaratory relief would settle the controversy, would clarify the legal relations in issue, is not being used for the purpose of "procedural fencing" or for *res judicata* purposes (indeed, Ashenoff does not dispute that this case should be venued in the Northern District of Texas), would not increase the friction between the federal and state courts because there is no parallel state court litigation, and there is not an alternative remedy to

---

claims in the event it is found to have federal question jurisdiction over the federal claims asserted in the Complaint.

resolve federal questions of law.  Accordingly, TNA's claims for declaratory relief easily satisfy Ashenoff's relied upon test.

In sum, the Court clearly has subject-matter jurisdiction over TNA's declaratory judgment claims and supplemental jurisdiction over any pendent state law claims.  Defendant's motion to dismiss based on these issues must therefore be denied.

### (c)    Ashenoff's Request for Realignment Should Thus Be Denied

Ashenoff's request that the Court "realign" him as the plaintiff in this matter should likewise be denied.  This request is premised on Ashenoff's meritless argument that the Court lacks subject-matter jurisdiction over TNA's claims.  Because TNA has stated valid claims, there is no reason to realign the parties.  It is also noteworthy that Ashenoff does not seek "complete dismissal of TNA's Complaint," but simply seeks to realign himself as the plaintiff and continue litigating his claims in this forum – including claims under the very federal statutes on which TNA seeks declaratory relief.  Ashenoff can hardly dispute federal jurisdiction over TNA's declaratory claims when he himself asserts affirmative claims based on the same underlying statutes.  *See, e.g., Ameritech*, 220 F.3d at 818 (7th Cir. 2000) (finding federal jurisdiction over declaratory claim because "[h]ad the aggrieved employees . . . brought a suit to enforce Title VII and the Equal Pay Act against Ameritech, the district court would have had jurisdiction over the complaint because interpretation and application of these statutes present federal questions . . . . Indeed, this is exactly what the employees did when they filed their counterclaims").

---

[5] Ashenoff also cites *Fries v. Desselle*, 378 B.R. 304, 312 (Bankr. D. Kan. 2007), which did not even reach the ultimate question of whether the declaratory judgment action provided an independent basis for jurisdiction, noting that it "need not analyze jurisdiction" under Section 2201.  *Id.* at 313.

---

### III.     Defendant's Motion to Dismiss for Failure to State a Claim Should Also be Denied

The remaining grounds for dismissal set forth in pages 13-20 are fact-based arguments that are completely inappropriate for a Rule 12(b)(6) motion to dismiss.[6]  These arguments are also based on a complete misunderstanding of the applicable legal principles.

### (a)     Ashenoff Cannot Seek Dismissal Under Rule 12(b)(6) Simply By Alleging that TNA Provided Him With Illegal Drugs

Ashenoff first asserts that the waivers in the Independent Contractor Agreements are ineffective to waive his injury claims because, according to Ashenoff, his injuries supposedly resulted from illegal drugs allegedly supplied by TNA.  *See* Ashenoff Brief at 13-18.  Leaving aside whether Texas law would allow such claims to be released (which, as set forth below, it clearly does),[7] Ashenoff's argument against the waiver ultimately depends on his bare factual allegation that TNA supplied him with illegal drugs – a factual allegation that TNA vigorously disputes.  *See id.* at 15, 17 ("Mr. Ashenoff's claims for bodily and personal injuries are not based on TNA's negligence and his participation in professional wrestling.  Rather, Mr. Ashenoff alleges that the negligent distribution of prescription pain killers and muscle relaxants by TNA and the individual Counterclaim Defendants after and between performances caused him to go into acute renal failure, which necessitated a kidney transplant").

While TNA disputes whether Ashenoff has even asserted a viable claim or is capable of surviving summary judgment in his own right, at a bare minimum there are fact issues precluding

---

[6] Ashenoff also asserts that there is no claim or controversy over whether he is an independent contractor.  *See* Ashenoff Brief at 18-19.  The fact that Ashenoff has now judicially admitted one of TNA's numerous requests for declaratory relief hardly provides grounds for dismissing the entire case, given that Ashenoff clearly disputes many of the other requested declarations.

Ashenoff from demonstrating at the pleading stage that TNA provided him with illegal drugs. This type of argument has no place in a Rule 12 motion.

Likewise, whether TNA's conduct was "grossly negligent" – which Ashenoff incorrectly believes would render the release ineffective – is clearly a fact question that cannot be resolved without discovery (again, assuming *arguendo* that Ashenoff is even capable of surviving summary judgment on this claim).[8]   Indeed, Ashenoff does not even assert a claim for gross negligence in his Counterclaim.   In any event, the issue on a Rule 12 motion is not what Ashenoff "alleges" in response to TNA's Complaint, but whether TNA's Complaint states a valid claim on its face – which it does.   The Court should also take note that Ashenoff's Motion openly admits: (i) that his claim is based on the alleged "negligent" actions of TNA (the alleged "negligent distribution of prescription pain killers"); and (ii) that his decision to take the painkillers clearly "relates to" his "wrestling performances," meaning that his injury claims arising from this alleged drug use fall squarely within the waiver language.

**(b)      The Waiver Does Not Contravene Public Policy and Is Plainly Enforceable**

Even if the Court accepted Ashenoff's bald allegations as true, the waiver would still bar his claims for personal and bodily injury.   Texas courts strongly favor the freedom of parties to enter contracts.   *Fairfield Insur. Co. v. Stephens Martin Paving, L.P.*, 246 S.W.3d 653, 664 (Tex.

---

[7]  Ashenoff also states on page 13 of his Motion that Florida law applies, but provides no supporting analysis and later states that he will not brief this issue until after the pleadings are closed.  *See* Ashenoff Motion at 18.  Both of the Agreements attached to Ashenoff's Motion expressly provide that Texas law applies.  *See* Ex. A to Motion ¶ 10; Ex. B to Motion ¶ 11.  Texas honors contractual choice-of-law provisions unless the designated law is contrary to a "fundamental policy" of Texas.  *Id.* (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677-78 (Tex. 1990)). Ashenoff offers no basis for why Florida law should apply at this stage of the case.

[8]  Indeed, Ashenoff's Brief makes the brazenly fact-based argument that because "Mr. Ashenoff alleges, and a reasonable Florida jury could find that, TNA . . . [was] grossly negligent . . . Mr. Ashenoff's claims for personal and bodily injury resulting from same cannot be barred by the Waiver."  Ashenoff Brief [Dkt. #10] at 17.  Suffice it to say that the possibility a jury "could find" gross negligence is a far cry from demonstrating at the Rule 12(b)(6) stage that TNA actually was grossly negligent.

---

2008) (citing TEX. CONST. art. I, § 16); *Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 370 (Tex. 2001) ("competent parties in Texas 'shall have the utmost liberty of contracting'").  As a result, Texas courts "exercise judicial restraint in deciding whether to hold arm's-length contracts void on public policy grounds."  *Lawrence v. CDB Servs.*, 44 S.W.3d 544, 553 (Tex. 2001), *superseded by statute on other grounds,* TEX. LAB. CODE ANN. § 406.033(e) (Vernon 2005).  Thus, a court should not determine that a contract is void under public policy grounds "unless the transaction contravenes some positive statute or some well-established rule of law." *Id.* (quoting *Sherrill v. Union Lumber Co.*, 207 S.W. 149, 153-54 (Tex. Civ. App.—Beaumont 1918, no writ) (quotation marks omitted).

In this case, the Independent Contractor Agreements do not contravene any statute or well-established rule of law and, therefore, should be enforced.  Ashenoff does not contend that the Independent Contractor Agreements are unconscionable and does not deny that he entered them freely and voluntarily.  The releases and waivers in the Independent Contractor Agreements release both past and future bodily injury claims (Ashenoff had wrestled with TNA for several years before the 2005 agreement was executed).  However, even with respect to future claims, Texas courts expressly allow parties to contract to release claims in advance of liability.  *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 509 (Tex. 1993); *see also Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, 718 (Tex. App.—San Antonio 1994, writ denied) (parties are free to "agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent." (*quoting* W. PAGE KEETON, ET AL., THE LAW OF TORTS § 68, at 480–81 (5th ed. 1984)); "A release extinguishes a claim and bars recovery on the released matter."

*Garza v. Bunting*, No. 05-06-01307-CV, 2007 Tex. App. LEXIS 4201, at *12 (Tex. App.—Dallas May 30, 2007, no pet.).

Ashenoff also claims that "gross negligence" claims may not be released.  *See* Motion at 15-16.  As stated above, whether TNA's conduct was grossly negligent (which Plaintiff vigorously denises) cannot be resolved at the Rule 12(b)(6) stage.  In addition, the Dallas Court of Appeals has found a contractual release enforceable against a claim of gross negligence, and the Texas Supreme Court has not ruled on this issue.  *See Arthur's Garage v. Racal-Chubb Sec. Sys., Inc*, 997 S.W.2d 803, 810-11 (Tex. App.—Dallas 1999, no pet.) (provision limiting future liability in a monitoring contract for an alarm company was not against public policy and barred claim for "gross negligence"); *Atlantic Richfield Co. v. Petroleum Personnel, Inc*., 768 S.W.2d 724, 726 (Tex. 1989) (declining to rule on whether parties could release gross negligence claims pre-injury).[9]

Accordingly, Ashenoff's public policy arguments are wholly without merit and cannot sustain a Rule 12(b)(6) motion.[10]

---

[9] While Ashenoff has failed to articulate any basis for why Florida law applies, TNA notes that Florida courts have enforced releases that exculpate against gross negligence claims.  *See, e.g., Theis v. J&J Racing Promotions*, 571 So. 2d 92, 94 (Fla. App. 1990) ("Since the term 'negligence' as used in the release is not limited, it must be construed as intended to encompass all forms of negligence, simple or gross"; enforcing release).

[10] Again, while Ashenoff provides no basis for why Florida law applies, the Florida cases cited in Ashenoff's brief expressly state that Florida courts will enforce similar release agreements.  *See Sunny Isles Marina, Inc. v. Adulami*, 706 So. 2d 920, 922 (Fla. App. 1998) ("Such provisions, however, have been found to be valid and enforceable by Florida courts where the intention is made clear and unequivocal"; collecting cases); *Murphy v. Young Men's Christian Ass'n of Lake Wales, Inc.*, 974 So. 2d 565, 568 (Fla. App. 2008) (party may release itself from its own negligence if agreement clearly states that "it releases the party from liability for its own negligence").  Ashenoff's arguments would thus fare no better under Florida law.

(c)        **Ashenoff's "Express Negligence" and "Fair Notice" Arguments Are Meritless**

Ashenoff also asserts that the release fails to satisfy "express negligence doctrine" and conspicuousness requirements.  These assertions are particularly offensive given the care with which each of the these doctrines applied to the agreements at issue.  In short, and as set forth below, these arguments are wholly devoid of merit.

       1.        **The Release Need Not Identify Every Conceivable Claim That Is Being Released For It To Be Effective**

First, contrary to Ashenoff's argument, the so-called "express negligence" doctrine does not require a release to enumerate every conceivable claim that is being released for it to be enforceable.  *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848, 851 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (holding that when a release contains language that indicates "a specific intent to cover tort claims and contract claims, courts will not hesitate to find that the claims were released.") (citing *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000)).  Instead, the Texas Supreme Court has held that to release a claim, "the releasing document must 'mention' it," without requiring the document to specifically enumerate the claim.  *Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434-35 (Tex. 1997) (*citing Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991)).

Thus, so long as the claims to be released are mentioned, even broad language in a release will be enforced.  *Garza*, 2007 Tex. App. LEXIS 4201, at *19; *see also Baty*, 63 S.W.3d at 849 ("Courts will construe broadly drafted releases to encompass a wide variety of claims.").  For example, in *Enserch Corp. v. Parker,* the Texas Supreme Court held that language in an indemnity agreement stating that the indemnitor would indemnify the Defendant for any claim

arising out of the performance of the contract, "regardless of whether such claims . . . are founded in whole or in part upon the alleged negligence of [Defendant]" was sufficiently explicit to identify the intent of the parties.  794 S.W.2d 2, 8 (Tex. 1990).  And in *Atlantic Richfield Co. v. Petroleum Personnel, Inc.*, the Texas Supreme Court held that the use of the terms "any negligent act or omission," without specifying the kind, character or degree of negligence that is to be indemnified, was sufficiently specific.  768 S.W.2d at 726.

The Agreements and Waiver signed by Ashenoff plainly stated that he agreed to release, waive, and discharge TNA from "any and all liability" with respect to personal injury and any disability arising out of his performance under the contract.  Furthermore, Ashenhoff expressly agreed to waive, discharge, and release any and all bodily injury claims, even if caused or compounded by the negligence of TNA.  This language is plainly sufficient under Texas law. Ashenoff also openly admits that the whole purpose of his decision to use painkillers was to facilitate his participation in the physical performance of professional wrestling, thus rendering disingenuous his argument that he did not understand he would be releasing such claims.  *See* Motion at 3-4 (alleging that "[a]s a consequence of the wrestling industry's scheduling challenges and physical demands, wrestling organizations often make un-prescribed pain killers " available to wrestlers).

The releases and waivers thus clearly preclude many or all of Ashenoff's claims in this litigation.  At a bare minimum, however, TNA has satisfied the minimal requirements of Fed. R. Civ. P. 8.  This claim cannot be dismissed at the pleading stage.

## 2.  The Release Was Obvious and Conspicuous

Ashenoff also argues that the release language was not "sufficiently conspicuous to afford 'fair notice' of its existence."  *See* Motion at 14.  This argument is simply frivolous.

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**
**AND BRIEF IN SUPPORT**

Texas law only requires "that something must appear on the face of the [agreement] to attract the attention of a reasonable person when he looks at it" for a release to be enforceable. *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004). Language in a contract may satisfy this requirement by "appearing in larger type, contrasting colors, or otherwise calling attention to itself." *Id.* (citing *Littlefield v. Schaefer*, 955 S.W.2d 272, 274-75 (Tex. 1997)). For example, in *Enserch*, the court held that a one page contract where the indemnity language was on the front side, not hidden under a separate heading nor surrounded by completely unrelated terms was sufficiently conspicuous to afford fair notice of its existence. 794 S.W.2d at 8.

The release and waiver easily meets this requirement. Although the main body of the Agreement is contained in a multi-paged document, the release language is set forth in a separate one-page Waiver that Ashenoff separately signed. The relevant release language is in **bold** and **ALL CAPITAL LETTERS**, the type of emphasis that was approved by the *Reyes* court. *Reyes*, 134 S.W.3d at 192. Just as in *Enserch*, both are one-page, single-sided documents, set apart from the remainder of the document, and the exculpatory language is not hidden or surrounded by unrelated language.

Accordingly, the Waivers are enforceable. At a minimum, however, Ashenoff cannot prevail on this issue at the Rule 12(b)(6) stage.

(d)     **Ashenoff's Remaining Arguments Are Meritless And Duplicative**

The remaining arguments on pages 18-21 are equally meritless. For example, Ashenoff makes the perplexing argument that the Court should *deny* TNA's requested declaration that Ashenoff is an independent contractor on the ground that Ashenoff has admitted the truth of this claim. *See* Motion at 18. First, the Court should note that in his demand letter, Ashenoff merely conditionally admitted this fact—thus, at the time of filing this suit no unconditional admissions

was present.  *See*  Exhibit B, Demand Letter, at 9 & n.17.  Needless to say, the fact that Ashenoff now openly admits the truth of one of TNA's claims is hardly grounds for denying it.  In addition, Ashenoff acknowledged that he filed a notice with the Equal Employment Opportunity Commission, which would admittedly lack jurisdiction over this dispute if Ashenoff were an independent contractor.  *See* Ex. B (demand letter).  The issue of whether Ashenoff is an independent contractor thus presents an actual controversy that needs to be resolved.

Ashenoff's other two arguments on page 19 are entirely duplicative of his previous arguments.  As stated above, Ashenoff cannot demonstrate at the Rule 12(b)(6) stage (or for that matter at any other stage) that the releases and waivers do not bar his personal and bodily injury claims.  And, as also stated above, the preponderance of case law in this circuit and elsewhere allows parties to seek declaratory relief for nonliability when the opposing party can bring a "coercive" claim for liability under the same statute.  *See, e.g., TTEA*, 181 F.3d at 682 ("If [the other federal statute] gave the Tribe a right to sue TTEA, we would hold that TTEA could sue for declaratory judgment that the Tribe stated no claim [under that statute]"); *Ameritech*, 220 F.3d at 818.  Ashenoff likewise cannot plausibly argue that this case does not involve an actual claim or controversy, given that he has served TNA with a draft lawsuit seeking to enjoin it from using his alleged trademarks and claiming other relief, and given his repeated attempts to extort money from TNA based on these allegations.

## <u>CONCLUSION</u>

Based upon the foregoing, Plaintiff TNA requests that this Court deny Defendant's Motion to Dismiss.  Plaintiff TNA further requests all such other and further relief to which it may show itself to be justly entitled.

Respectfully submitted,


**FULBRIGHT & JAWORSKI L.L.P.**



*/s/ Richard S. Krumholz, Esq.*
Richard S. Krumholz
Texas Bar No. 00784425
William P. Finegan
Texas Bar No. 07008700

FULBRIGHT & JAWORSKI, LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
T: 214-855-8000
F: 214-855-8200

**ATTORNEYS FOR PLAINTIFF TNA
ENTERTAINMENT, LLC**

## CERTIFICATE OF SERVICE

This pleading was served in accordance with the Federal Rules of Civil Procedure by regular U.S. mail and via ECF on the following counsel of record on August 11, 2008:

Cary Ichter
Adriana Midence
ADORNO & YOSS, LLC
Two Midtown Plaza, Suite 1500
1349 W. Peachtree Street, N.W.
Atlanta, Georgia  30309

Kevin Wiggins
Tracey Wallace
ADORNO YOSS WHITE & WIGGINS LLP
Bank of America Plaza, Suite 6200
901 Main Street
Dallas, Texas 75202

Robert Blackwell
BROWN & HOFMEISTER, L.L.P.
740 E. Campbell Road, Suite 800
Richardson, Texas  75081

_/s/ Richard S. Krumholz_
Richard Krumholz

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
AND BRIEF IN SUPPORT**