# EXHIBIT B

**ADORNO & YOSS**

A LIMITED LIABILITY CORPORATION
1349 W. PEACHTREE STREET, NE, SUITE 1500
ATLANTA, GA 30309
PHONE: (404) 347-8300, FAX: (404) 347-8395
WWW.ADORNO.COM



CLARY ICHTER

DIRECT LINE: (404) 347-8488
DIRECT FAX: (404) 601-5897
EMAIL: CIC-ITER@ADORNO.COM

March 11, 2008

**VIA UPS**

Guy S. Blake, Esq.
Davis, Shapiro, Lewit & Hayes, LLP
150 South Rodeo Drive
Suite 200
Beverly Hills, CA 90212

Re:   Ashenoff v. TNA Entertainment, LLC, Panda Energy
      International, Inc., Jeffrey L. Jarrett, Dixie Carter, Paul W.
      Taylor, III, and Wayne Cowan

Dear Mr. Blake:

The undersigned represents Charles "Carlos" Ashenoff, professionally known as "Konnan." It is my understanding that you represent TNA Entertainment, LLC ("TNA"). If I am incorrect, please notify me immediately so that I may forward this correspondence to the appropriate party. Additionally, please let me know if you do not represent Panda Energy International, Inc. ("Panda"), Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor (referred to herein by his professional name, "Terry Taylor") or Wayne Cowan (referred to herein by his professional name, "Dutch Mantel") (collectively, with TNA, referred to herein as "Defendants"). For reasons that will become obvious as you read this letter, I want to give each Defendant notice of this communication. That said, I am also forwarding a copy of this letter to L. Stephen Rizzieri, Esq., who I understand is the Chief Legal Officer and General Counsel to Panda.

<u>Introduction</u>

Mr. Ashenoff began wrestling for TNA in 2002. Initially, he worked without a written agreement with TNA. Ultimately, in or about January 2004 and August 2005, Mr. Ashenoff entered into two agreements with TNA (collectively the "Agreement"). The Agreement provided in pertinent part that Mr. Ashenoff was to perform wrestling services for TNA, and TNA was to compensate him for his efforts. <u>See</u>

{A0203106_1}

03/12/2008 11:00 IFAX lafax@davisshapiro.com          → G Blake          ⊘002/011

Guy S. Blake, Esq.
March 11, 2008
Page 2

TAB "A."[1]   The purpose of this letter is to inform you of various claims Mr. Ashenoff has arising out of his relationship with TNA, and to advise you of Mr. Ashenoff's intention to initiate litigation against the Defendants unless we are able to reach a prompt resolution of his claims.

This letter is organized by the primary claims Mr. Ashenoff intends to assert against the Defendants. For the purpose of brevity, this letter will not address all of Mr. Ashenoff's claims, but instead will focus on the two central claims we intend to assert: (1) a claim for permanent bodily injury Mr. Ashenoff has sustained from the consumption of un-prescribed medications that agents of TNA supplied to him and that he was encouraged to take by TNA; and (2) a claim of racial discrimination against TNA. The omission in this letter of various other claims set forth in the Complaint should not be taken to suggest that we are not serious about those additional claims or that we will not vigorously pursue them. Mr. Ashenoff is prepared, however, to settle those and any other claims he may have if, and only if, the Defendants can reach a satisfactory settlement with the Defendants.

### Bodily Injury Claim

Approximately five (5) years ago, Mr. Ashenoff joined TNA. At the time he joined, Mr. Ashenoff had a bothersome hip injury that caused him occasional discomfort. As he wrestled with TNA, that bothersome injury became a nagging injury, then a chronic problem, and eventually a dislocated hip and an unbearable source of pain for Mr. Ashenoff.

Despite the problems Mr. Ashenoff was having with his hip, TNA continued to book him for matches that included moves and maneuvers that aggravated his condition. TNA knew, or in the exercise of ordinary care should have known, that Mr. Ashenoff's condition was deteriorating as he continued to wrestle. Reflecting the caliber of care with which it treated its wrestlers, TNA had no doctors, trainers or otherwise medically competent personnel on staff or under contract who could provide even the most rudimentary medical or physical counseling or advice to wrestlers. Further, TNA knew, or in the exercise of ordinary care should have known, that Mr. Ashenoff, like many of the wrestlers it had under contract, was financially unable to secure health insurance and lacked the resources with which to obtain even basic medical care.

When Mr. Ashenoff made TNA aware of his injuries and the effect they were having on his ability to perform, he was told that if he did not work he would not be

---

[1] I have enclosed herewith a notebook of various exhibits, including our proposed Complaint and first round of written discovery. The "TAB" references herein correspond to the TABs in the notebook.

03/12/2008 11:00 IFAX lafax@davisshapiro.com                → G Blake                ☑003/011

Guy S. Blake, Esq.
March 11, 2008
Page 3

paid, and he would eventually be released. Mr. Ashenoff was aware that TNA had released other performers who were rendered unable to work by injuries they sustained while performing.

Early in his relationship with TNA, Terry Taylor and Dutch Mantel, acting in their capacity as agents and representatives of TNA, provided a solution to Mr. Ashenoff that would allow him to keep his job and wrestle: pain killers. Specifically, soon after Mr. Ashenoff arrived at TNA, Messrs. Taylor and Mantel supplied Mr. Ashenoff with Vicodin and Somalgesics ("Somas") in large quantities. Additionally, TNA not only created an environment in which wrestlers were actively encouraged to use large quantities of pain killers, but TNA operated its business in a manner that virtually forced wrestlers who wanted to remain employed to use these drugs, and then TNA conveniently supplied the drugs. For nearly five (5) years, Messrs. Taylor and Mantel, acting as agents of TNA, were a regular source of un-prescribed pain killers for Mr. Ashenoff.

As a consequence of the work he did for TNA, Mr. Ashenoff eventually had to undergo a hip replacement surgery. Remarkably, even after this surgery, while he was still in a wheelchair and later on crutches, TNA's bookers made it clear to Mr. Ashenoff that he was required to perform at TNA events. In order to facilitate these performances, TNA again provided Mr. Ashenoff with large quantities of un-prescribed pain killers.

The link between kidney disease and the use of Vicodin and Soma (carisoprodol) is well established. Vicodin contains two active ingredients: hydrocodone bitrartrate ("hydrocodone") and acetaminophen.[2] Each Vicodin tablet contains 660 mg of acetaminophen. Acetaminophen is a dose-related hepatotoxin.[3] Toxicity begins in adults at 10 mg acetaminophen. Compared with those who abstain from the drug, chronic users of phenacetin-based painkillers are 12.5 times more likely to die from renal disease.[4] Acetaminophen, taken in large doses over a prolonged period, causes a specific form of kidney disease, characterized by papillary necrosis and interstitial scarring.

---

[2] http://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?id=4164&type=display

[3] CJ McClain, S. Price, S. Barve, R. Devalarja, S. Shedlofsky, *Acetaminophen hepatotoxicity: An Update*, Curr. Gastroenterol Rep. 1999-Feb-Mar;(1):42-9.

[4] J. Raloff, *New Worries over Non-Aspirin Analgesics*, Science News, Vol. 139, No. 3., Jan. 19, 1991, p. 39.

Guy S. Blake, Esq.
March 11, 2008
Page 4

In acetaminophen overdosage, serious sides effects are numerous, including fatal hepatic necrosis,[5] renal tubular necrosis, acute renal failure.[6] Side effects are not limited to victims of overdose. Acute renal failure has been evidenced after administration of therapeutic doses as well.[7] The relative risk of chronic renal failure rises with increasing cumulative lifetime dosages of acetaminophen.[8]

Somalgesic is a centrally-acting skeletal muscle relaxant with two active ingredients: carisoprodol and Naproxen. Use of Naproxen comes with serious side-effects that increase proportionally with the dosage.[9] Naproxen can cause serious kidney problems, including sudden kidney failure.[10] Naproxen has also been shown to cause acute hepatic injury.[11]

Naproxen belongs to the category of drugs known as Nonsteroidal anti-inflammatory drugs ("NSAIDs"), whose adverse reaction profile includes, gastrointestinal toxicity, renal dysfunction, and nephrotoxicity.[12] The risk of these adverse reactions increases when NSAIDs are combined with other hepatotoxic drugs.[13] Taken in large doses over a prolonged period, NSAIDs cause a specific form

---

[5] JE Lane, MG Belson, DK Brown, and A. Scheetz, *Chronic Acetaminophen Toxicity: a case report and review of the literature*; J Emerg Med. 2002 Oct;23(3):253-6.

[6] B. Satirapoj, P. Lohachit, T. Ruamvang, *Therapeutic dose of acetaminophen with fatal hepatic necrosis and acute renal failure*; J Med Assoc Thai, 2007 Jun; 90(6): 1244-7.

[7] *Id*

[8] *Id*

[9] M. Hamera-Slynarska, K. Slynarski, *Ortop Traumatol Rehabil.*, Mar. 30, 2001; 30(3): 126-8.

[10] Harry A. Guess, *How Should Acute Hepatic Drug Effects Be Studied Epidemiologically?*, Epidemiology, Vol. 4, No. 6, Nov. 1993, pp. 487-489.

[11] M. Lapeyre-mestre, Am de Castro, MP Bareille, JG Del Pazo, AA Requejo, LM Arias, JL Montrastruc, A. Carvajal, *Non-steroidal anti-inflammatory drug-related hepatic damage in France and Spain: analysis from national spontaneous reporting*, Fundam Clin Pharmacol., Aug. 20, 2006; 20(4):391-5.

[12] Suzanne Perex Gutthan, Luis A, Garcia Rodriquez, *The Increased Risk of Hospitalizations for Acute Liver Injury in a Population with Exposure to Multiple Drugs*, Epidemiology, Vol. 4. No. 6. , Nov. 1993, pp. 496-501. HF Cheng, RC Harris, *Renal effects of non-steroidal anti-inflammatory drugs and selective cyclooxygenase-2 inhibitors*, Curr Pharm Des. 2005; 11(14): 1795-804.

[13] *Id*

Guy S. Blake, Esq.
March 11, 2008
Page 5

of kidney disease characterized by papillary necrosis and interstitial scarring.[14] Patients have progressive chronic renal failure and are susceptible to the subsequent development of uroepithelial tumors.[15]

Most patients who use pain killers do not experience permanent kidney damage because they have doctors overseeing their care and the administration of pharmaceuticals. Mr. Ashenoff did not have the benefit of a doctor's care because the drugs were illegally provided to him and because TNA is more interested in putting on wrestling events than it is in the health and well being of its wrestlers.

While it is possible to experience kidney disease without the consumption of pain killers, the incidence of end-stage renal disease ("ESRD") in Mr. Ashenoff's age cohort is extremely rare. According to information from the United States Renal Data System ("USRDS") web site, roughly 130 out every one million people develop ESRD.[16] According to Dr. Roland Blantz, Head of the Nephrology-Hypertension Division of the University of California, San Diego hospital where Mr. Ashenoff was treated, the most likely explanation for Mr. Ashenoff's rapid progression to ESRD was his consumption of un-prescribed pain killers supplied by TNA. See Statement of Dr. Roland Blantz, Tab "B."

As a result, Mr. Ashenoff was diagnosed with ESRD in 2006, a condition that required him first to endure kidney dialysis and later undergo a kidney transplant on July 31, 2007. Mr. Ashenoff's transplant was complicated by rejection issues he initially had, which will diminish the long-term viability of the kidney transplant.

A kidney transplant is a major surgery with serious short and long-term consequences. In addition to the several months it takes to recover from such a procedure, patients must adhere to a strict regimen of immuno-suppressant drugs and incur a host of other medical costs that on average, according to USRDS statistics, cost $15,783 per year for patients in Mr. Ashenoff's age cohort. See USRDS

---

[14] GM Rocha, LF Michea, EM Peters, M Kirby, Y Xu, DR Ferguson, MB Burg, *Direct toxicity of nonsteroidal antiinflammatory drugs for renal medullary cells*, Proc Natl Acad Sci USA, Apr. 24, 2001; 98(9): 5317-22.

[15] *Id*

[16] The United States Renal Data System (USRDS) is a national data system that collects, analyzes, and distributes information about end-stage renal disease (ESRD) in the United States. The USRDS is funded directly by the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) in conjunction with the Centers for Medicare & Medicaid Services (CMS, formerly HCFA). USRDS staff collaborates with members of CMS, the United Network for Organ Sharing (UNOS), and the ESRD networks, sharing datasets to improve the accuracy of ESRD patient information.

03/12/2008 11:00 IFAX lafax@davisshapiro.com          → G Blake          ☐006/011

Guy S. Blake, Esq.
March 11, 2008
Page 6

Economic Costs of ESRD, p. 323, TAB "C." Those costs will increase as Mr. Ashenoff ages and as medical costs increase.

Additionally, a transplanted kidney donated by a live donor is expected to last for 15 years, meaning that Mr. Ashenoff will either require another transplant in 14 years or have to go back on dialysis. The cost of a transplant in 14 years is anyone's guess, but it undoubtedly will be enormously expensive.

Most importantly, Mr. Ashenoff's life expectancy has been substantially reduced as a consequence of his ESRD and the kidney transplant. The USRDS web site indicates that on average, the future life expectancy of a male age 40 to 44 is 35.4 additional years. The average life expectancy of a male transplant patient in the same age cohort is 22.6 years. See USRDS Mortality and Causes of Death, p. 236, TAB "D." This is in part because Mr. Ashenoff's new kidney can only operate at approximately 50 percent (50%) functionality because of ancillary issues that transplant patients present, and because additional transplant operations will present new physical dangers, including the new threat of rejection. Whatever the complications, the bottom line remains the same: Mr. Ashenoff is looking forward to a life shortened by nearly thirteen (13) years.

## Racial Discrimination at TNA

Pursuant to his Agreement with TNA, Mr. Ashenoff was subject to TNA's direction and control. TNA controlled not only the choreography of matches and the storylines to be followed, but it also defined the nature of the character Mr. Ashenoff was to play. In so doing, TNA directed Mr. Ashenoff to perform in a manner that was a clear amalgamation of Hispanic stereotypes. Specifically, TNA directed Mr. Ashenoff to: (1) speak in Spanish slang or with a Spanish accent; (2) dress as and adopt stereotypical characteristics of members of a Latino street gang; (3) use racially charged language when referring to and addressing a Caucasian wrestler; and (4) strike another wrestler with a tequila bottle, suggesting that Hispanics always have a bottle of tequila readily available. In short, TNA used Mr. Ashenoff and his character, Konnan, as the embodiment and personification of a racial slur against Hispanics.

Even more troubling than TNA's use of Mr. Ashenoff to perpetuate racial and ethnic stereotypes was the fact that this activity occurred against the backdrop of TNA's openly racist culture. Each time Mr. Ashenoff objected to the ethnic and racial themes and degrading stereotypes perpetuated by TNA, his concerns were completely ignored by TNA. TNA's management personnel, bookers and agents frequently referred to all Hispanics as Mexicans, "brownies," "drunken Puerto Ricans," and the like. TNA's management would also refer to African-Americans as

03/12/2008 11:00 IFAX lafax@davisshapiro.com                    → G Blake           ☑ 007/011

Guy S. Blake, Esq.
March 11, 2008
Page 7

"niggers" and, whenever African-Americans objected to their treatment, they were
referred to as "uppity negroes."

Moreover, during the time Mr. Ashenoff worked with TNA, TNA paid
virtually all minority performers, including Mr. Ashenoff, substantially less for their
services than other similarly situated non-minority performers. We are confident that
we will be able to develop considerable evidence to support this position through the
discovery process if we are forced to pursue litigation.

Suffice it to say that TNA took no steps to ensure that its management and
culture were free of racism. Indeed, it appears TNA went out of its way to hire
management personnel with a history of blatant racism in the wrestling profession.
Specifically, Terry Taylor and Vince Russo, who were both formerly employed by
World Championship Wrestling ("WCW"), were central figures in a discrimination
lawsuit filed by twelve (12) minority wrestlers against WCW in or about 2000 (the
"WCW Litigation").

During the course of the WCW Litigation, a substantial volume of evidence
was gathered and made part of the public record that reflected upon the bigoted
attitudes of Terry Taylor and Vince Russo. Mr. Taylor, whom I deposed during the
course of that litigation, testified that he was on the Booking Committee at WCW
and involved in recruiting and talent relations. In the course of the WCW Litigation,
no fewer than nine (9) witnesses testified that they heard Mr. Taylor refer to African
Americans as "niggers" at various times. Of those nine, *only two were parties to
the litigation*. I have enclosed herewith Plaintiff's Statement of Material Facts to
Which There Exist Genuine Issues to be Tried from the WCW Litigation at TAB
"E." At pages 7-16, you will find quoted materials from sworn affidavits and
deposition testimony regarding Mr. Taylor's use of racist language that reflect upon
his racist thinking.

In the same document, at pages 21-25, you will find sworn testimony
concerning the racist attitudes of Mr. Russo and how those attitudes manifested
themselves at WCW. No fewer than three (3) witnesses testified to hearing Mr.
Russo use the word "nigger" at various times. See p. 22, para. 90. Mr. Russo referred
to African-Americans as "Moolions," which he apparently believed to be the name of
a tribe indigenous to Africa. One witness testified that Mr. Russo expressed the
opinion that "whites ruled wrestling." See p. 23, para. 95. Additionally, Mr. Russo
was quoted by one witness as saying that WCW was going to have a white champion
because "that is the way I want it." See p. 25, para. 101. All of the testimony quoted
herein came from non-parties.

03/12/2008 11:00 IFAX lafax@davisshapiro.com                    → G Blake              Ø 008/011

Guy S. Blake, Esq.
March 11, 2008
Page 8

        Mr. Russo went so far as to admit to and attempt to justify his discriminatory
practices in an interview published over the Internet in or about September 1999. In
this interview, Mr. Russo is quoted as follows:

> I'm going to tell you something right now that you will
> absolutely not agree with, but I've been a wrestling fan my
> whole life and I will live and die by this-it is hard enough,
> believe me I write this shit, it is hard enough to get somebody
> over. You will never ever, ever, ever see the Japanese wrestler or
> the Mexican wrestler over in American mainstream wrestling.
> And the simple reason for that is, even myself, I'm an
> American... if I'm watching wrestling here in America, I don't
> give a shit about a Japanese guy. I don't give a shit about a
> Mexican guy. I'm from America, and that's what I want to see.
> Now there are the smart fans that love that type of shit, like
> you.

        For your reference, a true and correct copy of a printed version of Mr. Russo's
interview in included in the notebook enclosed with this letter at TAB "F."
Shockingly, Mr. Russo now works at TNA as a booker, and in that capacity
determines which wrestlers get a "push" and which ones do not.

        TNA is a racist organization because it has hired racists. TNA has hired
racists because it did nothing to investigate the public record concerning the racist
attitudes of, among others, Messrs. Russo and Taylor. The WCW Litigation was well
known, not only within WCW, but in the wrestling world as well. See TAB "G" for a
collection of internet postings mentioning the WCW Litigation. You will note that
one post even quotes Mr. Russo's bigoted rant from above, calling it one of the "50
Dumbest Wrestling Moments Ever."

        Mr. Jarrett was still with WCW when the WCW Litigation was filed. The fact
that WCW was being sued for discrimination was well known in the wrestling
business. The notion that Mr. Jarrett and others within TNA did not know about the
litigation or Messrs. Taylor and Russo's involvement in it strains credulity.

        During the waning days of his relationship with TNA, Mr. Ashenoff began to
complain more vigorously about the racist environment at TNA. Ultimately, the
conditions became so unbearable that Mr. Ashenoff asked to be released from his
Agreement with TNA.  In retaliation for his complaints of racial and ethnic
discrimination, rather than give him a release, TNA decided to indefinitely suspend
Mr. Ashenoff so that he would continue to be bound by the terms of the Agreement,
including the non-competition provisions. For your reference, a true and correct

03/12/2008 11:00 IFAX lafax@davisshapiro.com                    → G Blake          ☑009/011

Guy S. Blake, Esq.
March 11, 2008
Page 9

copy of the letter Mr. Ashenoff received from TNA suspending him is included in the notebook enclosed with this letter at TAB "H."

Mr. Ashenoff performed his duties as a TNA personality and wrestler in a manner consistent with TNA's expectations, and TNA never criticized Mr. Ashenoff's performance. In fact, on or about August 26, 2006, Ms. Carter, the President of TNA, wrote the following to Mr. Ashenoff in an e-mail: "THANK YOU for your great work, attitude and patience in us getting here...You are doing a great job, you always have, but you seem to have hit a stride." A true and correct copy of said e-mail is attached hereto at TAB "I."

I am also enclosing a copy of a Complaint prepared for Mr. Ashenoff to be filed in federal district court and a Charge of Discrimination that was filed with the EEOC on December 18, 2007[17]. See TABs "J" and "K." I have included a copy of Mr. Ashenoff's First Interrogatories and Requests for Production of Documents, which will accompany his Complaint should he be forced to file suit. See TAB "L."

The Complaint also sets forth claims arising under the Drug Dealer Liability Act. Many states have passed these law which make a "drug dealer" liable for injuries his illegal conduct causes. We cited the Florida law because most of the pain killers supplied to Mr. Ashenoff by TNA agents were delivered in Florida while TNA was taping there.

Pursuant to the Drug Dealer Liability Act, Fla. Stat. § 772.12(2), Defendants would be liable to Mr. Ashenoff for "threefold the actual damages [he] sustained" as a consequence of his injuries. Given the nature of Mr. Ashenoff's damages, that number would, no doubt, be enormous. Defendants would also be liable to Mr. Ashenoff for his reasonable attorneys' fees and court costs under that statute.

The Complaint also makes claims pursuant to the Florida Racketeer Influenced and Corrupt Organizations Act ("RICO"), Fla. Stat. Ann. § 895. Damages recoverable under this law also include treble damages and costs of litigation. Additionally, if TNA and/or Panda are found liable under either of these statutes, they could lose any state granted charters, permits or licenses, and would be subject to dissolution by a court of competent jurisdiction.

---

[17] I realize that it is unusual to file a Complaint and a Charge of Discrimination at the same time, but we would file the Complaint accepting TNA's contractual position that Mr. Ashenoff was an independent contractor. The EEOC charge was as a precautionary measure in case TNA changed its position and claimed Mr. Ashenoff was an employee. If TNA confirms by way of an admission *in judicio* that Mr. Ashenoff was an independent contractor, we will likely abandon the EEOC Charge of Discrimination.

03/12/2008 11:00 IFAX lafax@davisshapiro.com                    → G Blake        ☑010/011

Guy S. Blake, Esq.
March 11, 2008
Page 10

The discrimination claims set forth in the Complaint are made under 42 U.S.C. § 1981, not Title VII because, according to his contract, Mr. Ashenoff was an independent contractor, not an employee. Mr. Ashenoff is entitled to recover his actual damages in the form of back pay, front pay, compensation for emotional injury, punitive damages and costs of litigation pursuant to those claims. The damage caps that apply to Title VII claims do not apply to Section 1981 claims.

The current legal and political climate is not good for professional wrestling. The media has focused on the unseemly underside of the industry, and the public's apparent appetite for stories regarding the dark side of professional wrestling appears to be all but insatiable. No doubt, this controversy would only add fuel to the fire.

Similarly, this dispute would undoubtedly draw the attention of opportunistic politicians who wish to crusade against easy targets like professional wrestling. The high-profile filing of a claim against TNA—a claim that details, among other things, the criminal activities of TNA's management—at the very time that Congress is set to hold hearings to investigate the industry can only cause TNA and the wrestling industry more headaches and heighten the possibility that the Federal government will undertake to regulate the industry.

Clearly, litigation involving these issues is not in TNA's best interest. Mr. Ashenoff would prefer to settle this matter quickly and quietly as well. Therefore, Mr. Ashenoff is willing to settle any and all claims he has against all Defendants in exchange for a one time payment of $7,000,000.00.

While it would be easy to doubt our sincerity about these claims, I would urge you to consider history. WCW doubted we would file suit, but we did. WCW thought they could outlast the plaintiffs, but they did not. We maintained the suit for over two (2) years; we took dozens of depositions; we fought all the procedural fights. Ultimately, WCW settled. I would be happy to tell you how much WCW paid, but WCW insisted upon an iron-clad confidentiality provision. (That should tell you something.) Between filing and settling, I am sure WCW spent millions. We did, but it was money very well spent.

We are prepared to meet with representatives of the proposed Defendants to discuss this situation. If TNA will not agree to these terms or negotiate in good faith, Mr. Ashenoff has authorized me to file the enclosed. In that event, Mr. Ashenoff will seek all the relief described therein, including punitive damages and his reasonable attorneys' fees.

03/12/2008 11:01 IFAX lafax@da---sshapiro.com                    → G Blake              ☒011/011

Guy S. Blake, Esq.
March 11, 2008
Page 11


     I look forward to hearing from you with respect to this matter by April 15, 2008.


Sincerely,

ADORNO & YOSS, LLP


Cary Ichter


cc:    Mr. Charles Ashenoff
       Adriana Midence, Esq.
       L. Stephen Rizzieri, Esq.

## IN THE UNITED STATES DISTRICT COURT

| | |
|---|---|
| CHARLES ASHENOFF, | ) |
| | ) |
|     PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) |
| TNA ENTERTAINMENT, LLC, PANDA | ) |
| ENERGY INTERNATIONAL, INC., | )  CIVIL ACTION NO.:_____ |
| JEFFREY L. JARRETT, DIXIE | ) |
| CARTER, PAUL W. TAYLOR III | ) |
| (P/K/A TERRY TAYLOR), AND | ) |
| WAYNE COWAN (P/K/A DUTCH | ) |
| MANTEL), | ) |
| | ) |
|     DEFENDANTS. | ) |

### COMPLAINT

Plaintiff Charles Ashenoff hereby files this Complaint against Defendants TNA Entertainment, LLC, a Delaware limited liability corporation, Panda Energy International, Inc., a Texas business corporation, Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor (p/k/a Terry Taylor), and Wayne Cowan (p/k/a Dutch Mantel) (collectively "Defendants"), respectfully showing the Court the following:

### JURISDICTION

1.

This Court has jurisdiction over Mr. Ashenoff's federal claims under 28 U.S.C. §§ 1331, 1343(a)(4) and 42 U.S.C. § 1981.

{A0202427_1}

2.

This Court has supplemental jurisdiction over Mr. Ashenoff's state law claims under 28 U.S.C. § 1367, because they are so related to Mr. Ashenoff's federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

3.

The venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

**PARTIES**

4.

TNA Entertainment, LLC ("TNA") is a Delaware limited liability corporation and may be served through its registered agent at its registered office at CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, Tennessee, 37929-9710. TNA is subject to the jurisdiction of this Court.

5.

Panda Energy International, Inc. ("Panda") is a Texas corporation and may be served through its registered agent in Dallas, Texas, at its registered office at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201. Panda is

{A0202427_1}

2

the parent company of TNA and is subject to the jurisdiction of this Court.

6.

Defendant Jeffrey L. Jarrett is a resident of the State of Tennessee and may be served at his residence, 144 Island Drive, Hendersonville, TN 37075-4507. Defendant Jarrett is the Vice-President of TNA and subject to the jurisdiction of this Court.

7.

Defendant Dixie Carter is a resident of the State of Tennessee and may be served at her residence, 9243 Prestmoor Place, Brentwood, TN 37027-2403. Defendant Dixie Carter is the President of TNA and is subject to the jurisdiction of this Court.

8.

Defendant Paul W. Taylor III (p/k/a and referred to herein as Terry Taylor) is a resident of the State of Tennessee and may be served at his residence, 1603 Lantana Drive, Thompsons Station, TN 37179-9768. Defendant Taylor is subject to the jurisdiction of this Court.

9.

Defendant Wayne Cowan (p/k/a and referred to herein as Dutch Mantel) is a resident of the State of Tennessee and may be

served at his residence, _____, TN.   Defendant
Mantel is subject to the jurisdiction of this Court.

## TNA Unlawfully Discriminates Against Minority Wrestlers

10.

TNA is engaged in the business of producing, arranging,
staging, conducting and promoting professional wrestling events
and programs throughout the world.   In conducting wrestling
events, TNA principally uses Caucasian wrestlers, writers,
bookers and administrative personnel.   Out of the nearly fifty
(50) wrestlers on TNA's roster at any given time, on the average
only four or five are African-American and fewer still are
Hispanic.

11.

Professional wrestling matches are staged events in which
the outcomes are predetermined and the wrestlers are required to
follow various scripts and story lines in their matches.   TNA is
solely responsible for determining the outcome of matches and
developing the story lines to be performed by the wrestlers.

12.

TNA has never had a minority represented as a booker or
member of its management team.   TNA has never had a Hispanic or
African-American booker or executive at any level.

{A0202427_1}

4

13.

TNA historically has exploited racial and national origin animus in its story lines. For example, certain wrestlers are adorned in stereotypical ethnic garb, directed to act according to negative ethnic stereotypes associated with the particular ethnicity, and story lines are developed to provoke "negative" fan reaction toward the particular wrestler and ethnic group. For example, Mr. Ashenoff was instructed by TNA to play the role of an Hispanic street thug or gang member and to use racially charged and offensive terms in referring to Caucasians. At one time, Mr. Ashenoff was directed to strike another wrestler with a tequila bottle, suggesting that Hispanics always have a bottle of tequila readily available. Similarly, another Hispanic TNA wrestler is known as "Homicide," a name which is intended to evoke a connection between Hispanics and violent criminal activity. Homicide, like Mr. Ashenoff, was directed to play the role of a gang member and street thug. In short, minority characters created by TNA personify racial and ethnic slurs.

14.

The individuals at TNA responsible for booking matches and writing the story lines for wrestling shows and events, including Defendant Jarrett, commonly refer to African-Americans as "niggers," "uppity Negroes," and other racially hostile

{A0202427_1}

5

terms.   Members  of  TNA's  management  group  have  frequently

referred   to   Hispanic   wrestlers   using   similarly   derogatory

language,   such   as   "brownies,"   "drunk   Puerto   Ricans,"   and

generally  referring  to  all  Hispanics  as  "Mexicans"  or  'illegal

aliens."    TNA   bookers   and   writers   overtly   and   blatantly

discriminate  against  Hispanics  and  African  Americans.

### Charles Ashenoff's Relationship with TNA

15.

On  or  about  August  5,  2005,  TNA  entered  into  an  agreement

with  Mr.  Ashenoff  governing  the  relationship  between  the  parties

(the  "Ashenoff  Agreement").    A  true  and  correct  copy  of  the

Ashenoff  Agreement  is  attached  hereto  as  Exhibit  "A."

16.

The   provisions   in   the   Ashenoff   Agreement,   other   than

compensation  and  term,  are  substantially  similar  to  those  TNA

enters  into  with  virtually  all  of  its  wrestlers  and  performers.

17.

Under  the  terms  of  the  Ashenoff  Agreement,  Mr.  Ashenoff  is

classified  as  an  independent  contractor,  and  the  Ashenoff

Agreement  specifically  provides  that  Mr.  Ashenoff  was  not  an

employee.

{A0202427_1}

18.

Under the terms of the Ashenoff Agreement,   Mr. Ashenoff
was to provide services related to performing as a professional
wrestler   at   TNA   events.     In   so   doing,   Mr.   Ashenoff   was
contractually "subject to TNA's direction and control" and was
governed by "rules and regulations set out by TNA."

### Racism at TNA

19.

TNA required Mr. Ashenoff to perform under the name Konnan.
The character Konnan is an amalgamation of Hispanic stereotypes.
As Konnan, TNA directed Mr. Ashenoff to speak in Spanish slang
or   with   a   Spanish   accent,   and   to   adopt   stereotypical
characteristics of members of Latino street gangs.   TNA further
required   Mr.   Ashenoff   to   use   racially   charged   language   in
referring to and addressing Caucasian wrestlers.   In short, TNA
use the Konnan character to personify racial and ethnic slurs
against Hispanics, in general, and Mexicans, in particular.

20.

Mr. Ashenoff   objected to the ethnic and racial themes and
the degrading stereotypes that TNA used on a regular basis.   Mr.
Ashenoff's objections and concerns were completely ignored by
TNA.

21.

Additionally, TNA paid Mr. Ashenoff substantially less than other similarly situated non-minority performers, and TNA paid all or virtually all minority wrestlers less than the average amount paid to Caucasian wrestlers.

22.

Throughout Mr. Ashenoff's tenure with TNA, TNA's management personnel, bookers and agents routinely made derogatory racial and ethnic jokes and remarks in the work environment. TNA's management referred to all Hispanics as Mexicans, "brownies," "drunken Puerto Ricans," and the like. TNA's management referred to African-Americans as "niggers" and, whenever they stood up for themselves, "uppity negroes."

23.

TNA has taken no steps to ensure that its management team is free of racism and racists. Further, TNA has not exercised reasonable care to prevent and correct illegal harassment.

24.

Defendant Jarrett is the Vice President of TNA. Defendant Jarrett formerly worked with a wrestling entity known as World Championship Wrestling or WCW.

25.

WCW was sued by over a dozen minority wrestlers from 2000 through 2003 (the "WCW Litigation").

26.

During the WCW Litigation, two WCW bookers, Vince Russo and Defendant Taylor, were identified by multiple witnesses as racists who frequently used racially offensive language, such as the word "nigger," and who regularly displayed hostility to members of minority groups.

27.

In or about September 1999, Vince Russo, then a booker and writer for the Worldwide Wrestling Federation ("WWF"), made the following comments regarding Japanese, Mexican and other "non-American" wrestlers in an interview published over the Internet:

> I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this-it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

A true and correct copy of a printed version of said interview is attached hereto as Exhibit "B".

28.

Had TNA investigated Defendant Taylor or Vince Russo's background and public declarations, it would have easily discovered their conspicuous animus toward members of minority groups.

29.

Despite Defendant Taylor and Vince Russo's racist comments, TNA hired them as bookers for TNA events. In that capacity, they decided which wrestlers would receive television exposure and which ones would not.

30.

TNA knew, or in the exercise of reasonable care should have known, of Defendant Taylor and Vince Russo's racist pasts and charges of racism that had been leveled against them.

31.

During the waning days of his relationship with TNA, Mr. Ashenoff began to complain more vigorously about the rampant racism he experienced at TNA. Ultimately, the conditions and environment became so intolerable, Mr. Ashenoff asked for his release.

32.

On or about June 21, 2007, Mr. Ashenoff received an e-mail from TNA management advising him that TNA was terminating his contract with the Company.   A true and correct copy of said e-mail is attached hereto as Exhibit "C."

33.

On July 31, 2007, Mr. Ashenoff advised TNA management of his intention "to file a racial discrimination lawsuit" against TNA.

34.

Eventually, and in retaliation for his complaints of racial and ethnic discrimination, rather than give him his release, the management at TNA decided to indefinitely suspend Mr. Ashenoff so that he would continue to be bound by the terms of his agreement, particularly the non-competition provisions, while he was getting no work from TNA.   A true and correct copy of the suspension letter is attached hereto as Exhibit "D."

35.

The decision to terminate, and later to suspend, Mr. Ashenoff was made by Defendant Jarrett in his capacity as an agent of TNA.   Defendant Jarrett suspended Mr. Ashenoff in retaliation for Mr. Ashenoff's protected conduct, including his complaints about the rampant racism and discrimination at TNA.

{A0202427_1}

11

36.

Mr. Ashenoff performed his duties as a TNA personality and wrestler in a manner consistent with TNA's expectations, and TNA never criticized Mr. Ashenoff's performance.

37.

In fact, on or about August 26, 2006, Defendant Carter, the President of TNA, wrote the following to Mr. Ashenoff in an e-mail: "THANK YOU for your great work, attitude and patience in us getting here…You are doing a great job, you always have, but you seem to have hit a stride." A true and correct copy of said e-mail is attached hereto as Exhibit "E."

38.

After Mr. Ashenoff received notice of his suspension, Mr. Ashenoff wrote an e-mail to Defendant Carter to advise her of the hostile racial environment and the rampant discrimination at TNA. A true and correct copy of said e-mail is attached hereto as Exhibit "F." In that e-mail, Mr. Ashenoff made it plain to Defendant Carter that he "want[ed] to retire at TNA" but felt he could not stay because of the pervasive racial hostility in the company.

{A0202427_1}

### The TNA Drug Culture

39.

Notwithstanding the staged nature of wrestling events, professional wrestlers endure considerable wear and tear on their bodies. This wear and tear is aggravated by the nature of the wrestling business. Specifically, there is no off season in wrestling that affords wrestlers time to obtain major medical attention and heal. Additionally, wrestling organizations can have multiple events in a single week, leaving little time for even minor injuries to heal.

40.

As a consequence of the wrestling industry's scheduling challenges and the physical injuries, major and minor, that are a part of a wrestler's job, wrestling organizations often make un-prescribed pain killers and muscle relaxants, as well as other prescription drugs, available to wrestlers.

41.

Wrestlers presented with illicit drugs, including un-prescribed pain killers, have few options. Wrestling organizations in general, and TNA in particular, provide no health insurance to their wrestlers. Therefore, wrestlers at the lower end of the compensation scale cannot afford doctor

visits or prescription medicines.   On the other hand, without medication, they often cannot work because of nagging injuries.

42.

When Mr. Ashenoff came to work at TNA, he had a chronic hip injury that caused him pain and physical distress whenever he wrestled.

43.

To facilitate his ability to perform despite his hip injury, agents of TNA, including Defendant Taylor, provided un-prescribed pain killers and muscle relaxants to Mr. Ashenoff.

44.

Ultimately, Mr. Ashenoff was required to undergo hip replacement surgery.

45.

Representatives of TNA promised Mr. Ashenoff that TNA would assist him by paying for his hip replacement surgery.   TNA reneged on that promise.

46.

Following his hip replacement surgery, while still in a wheelchair, and later on crutches, TNA's bookers insisted that Mr. Ashenoff perform at TNA events.   Again, to facilitate his participation in the events, TNA bookers supplied un-prescribed pain killers to Mr. Ashenoff.

{A0202427_1}

14

47.

Agents of TNA provided un-prescribed prescription drugs, including pain killers and muscle relaxants, to various TNA performers, knowing that those drugs would be shared among the community of performers at TNA. Mr. Ashenoff also received pain killers from other TNA performers as well.

48.

Ultimately, as a consequence of the use of un-prescribed pain killers supplied to him by TNA agents and performers, one of Mr. Ashenoff's kidneys failed and had to be replaced. Mr. Ashenoff underwent a kidney transplant in July of 2007.

49.

Drug abuse is rampant at TNA. Members of management, including Defendant Jarrett, and members of the booking committee, regularly indulge in the use of cocaine while on the job and share, or offer to share, illegal drugs with TNA wrestlers and employees.

**Copyright and Trademark Infringement**

50.

In or around August 2005, Mr. Ashenoff created a brand to identify himself and a group of fellow Latino wrestlers: "LAX," which is an abbreviation of "Latin American Xchange." ("LAX"). LAX was conceived solely by Mr. Ashenoff, who also created the

{A0202427_1}

15

LAX logo (an exemplar of which is attached hereto as Exhibit "-") (the "LAX Logo"), catch-phrases, and identifying characteristics. The members of LAX were all Latino, and LAX members regularly and publicly addressed matters of racism in wrestling and society.

51.

Mr. Ashenoff has applied for a copyright to the LAX Logo.

52.

LAX appeared in numerous nationwide broadcasts through SpikeTV, as well as in Mexico and Puerto Rico. LAX appeared in TNA promoted events. Because of its growing popularity, TNA began producing T-shirts, DVDs, and other promotional and branded products bearing or containing the LAX name and logo.

53.

TNA has never paid Mr. Ashenoff any money to obtain the right to use the LAX name, the LAX logo, or any LAX-related branding on any TNA merchandise or promotions.

54.

TNA continues to use the LAX brand and the LAX Logo without the permission of Mr. Ashenoff, despite demands that TNA cease and desist from same.

## COUNT I

## Discrimination and Retaliation in Violation of § 1981

55.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 54 as if fully stated herein.

56.

Defendants' conduct as described herein constitutes unlawful, intentional discrimination and retaliation against Mr. Ashenoff because of his race. By engaging in the unlawful conduct described herein, Defendants acted intentionally, willfully and with malice or reckless indifference to Mr. Ashenoff's federally protected civil rights.

57.

Defendants have continually refused and failed to engage in good faith efforts to comply with federal law.

58.

In violation of 42 U.S.C. § 1981, because of his race, Defendants intentionally refused to provide Mr. Ashenoff with opportunities for advancement commensurate with the opportunities Defendants provided to similarly situated Caucasian wrestlers.

{A0202427_1}

17

59.

In violation of 42 U.S.C. § 1981, Defendants fostered and encouraged a hostile work environment wherein Mr. Ashenoff and other minorities suffered severe and pervasive hostility in the form of racial slurs, jokes and other sanctioned debasement.

60.

As a direct and proximate result of Defendants' intentional discrimination in the performance, proposed modification, termination and the enjoyment of all benefits, privileges, terms and conditions of Mr. Ashenoff's contractual relationship with Defendants, Mr. Ashenoff has suffered and is continuing to suffer serious injury, including, but not limited to, economic losses, humiliation, embarrassment, emotional distress and deprivation of his statutorily protected civil rights.

61.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from Defendants.

## COUNT II

### Intentional Infliction of Emotional Distress

62.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 61 as if fully stated herein.

{A0202427_1}

18

63.

Defendants' conduct described herein occurred within the context of a special relationship between Defendants and Mr. Ashenoff wherein Defendants exercised significant control over Mr. Ashenoff. In the context of that special relationship, Defendants' conduct was intentional or reckless, extreme and outrageous, and such conduct directly and proximately caused Mr. Ashenoff humiliation, embarrassment, worry, and emotional distress that no reasonable person should be expected to endure.

64.

Accordingly, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from Defendants.

## COUNT III

### Negligent Hiring, Training and/or Supervision

65.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 64 as if fully stated herein.

66.

Defendants had a duty to provide Mr. Ashenoff with a working environment free from discrimination and harassment.

{A0202427_1}

19

67.

Based on their history and reputations within the wrestling industry, Defendants knew, or in the exercise of ordinary care should have known, that hiring Defendant Jarrett, Defendant Taylor and Vince Russo created a real risk of harassment and discrimination at TNA.

68.

In hiring Defendant Jarrett, Defendant Taylor and Vince Russo and failing to supervise them, Defendants breached their duty to Mr. Ashenoff.

69.

As a direct result of hiring Defendant Jarrett, Defendant Taylor and Vince Russo and failing to supervise them, Mr. Ashenoff and other wrestlers were subjected to a harassing and discriminating environment in violation of 42 U.S.C. § 1981.

70.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from Defendants.

## COUNT IV

### Prospective Relief

71.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 70 as if fully stated herein.

72.

The conduct of Defendants as set forth herein is illegal, improper and in violation of Mr. Ashenoff's federally protected statutory civil rights.

73.

The continuation of Defendants' conduct as set forth herein shall cause Mr. Ashenoff and other minorities irreparable harm.

74.

Unless Defendants' discriminatory policies and practices are stopped, Mr. Ashenoff and other minorities will continue to suffer serious and grievous harm for which Mr. Ashenoff has no plain or adequate remedy at law. Therefore, Mr. Ashenoff requests equitable relief as described below in his Prayer for Relief.

{A0202427_1}

## COUNT V

### Bodily Injury

75.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 74 as if fully stated herein.

76.

Defendants Taylor and Mantel, acting in their capacity as agents of TNA, illegally provided un-prescribed medications, including pain killers and muscle relaxants, to Mr. Ashenoff to facilitate his participation in TNA events.

77.

As a consequence of his consumption of said un-prescribed medications, Mr. Ashenoff suffered from kidney failure and was required to undergo a kidney transplant.

78.

Mr. Ashenoff's kidney failure and subsequent transplant was directly and proximately caused by the consumption of un-prescribed pain killers provided by TNA management.

79.

Due to his kidney transplant, Mr. Ashenoff has a reduced life expectancy, has sustained a permanent, partial disability, will be required to take various expensive pharmaceuticals for

{A0202427_1}

22

the rest of his life, will always be faced with the possibility of latent organ rejection, and has and will have a diminished quality of life.

80.

Consequently, Mr. Ashenoff is entitled to actual, compensatory, and punitive damages from Defendants.

## COUNT VI

### Negligent Hiring, Training and/or Supervision

81.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 80 as if fully stated herein.

82.

Defendants had a duty to provide Mr. Ashenoff with a safe working environment, including properly supervising their employees and independent contractors.

83.

Based on the rampant distribution and use of prescription medications and illegal substances, Defendants knew, or in the exercise of ordinary care should have known, that drug use was rampant at TNA.

{A0202427_1}

23

84.

By failing to properly supervise their employees and fostering a climate of illegal drug use, Defendants breached their duty to Mr. Ashenoff.

85.

As a direct result of the illegal drug use at 'NA, Mr. Ashenoff suffered bodily harm.

86.

Consequently, Mr. Ashenoff is entitled to actual, compensatory and punitive damages from Defendants.

### COUNT VII:

### Liability Under the Drug Dealer Liability Act

87.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 86 as if fully stated herein.

88.

A large quantity of the un-prescribed pain killers delivered to Mr. Ashenoff by Defendants were delivered to Mr. Ashenoff in the State of Florida.

{A0202427_1}

24

89.

Defendants' conduct in providing un-prescribed pain killers to Mr. Ashenoff constituted a violation of Fla. Stat. § 893.135(1)(c).

90.

Mr. Ashenoff sustained serious bodily injuries as a consequence of Defendants' violations of Fla. Stat. § 893.135(1)(c).

91.

Pursuant to the Drug Dealer Liability Act, Fla. Stat. § 772.12(2), Defendants are liable to Mr. Ashenoff for "threefold the actual damages sustained" as a consequence of said injuries and said violations of the law.

92.

Pursuant to the Drug Dealer Liability Act, Fla. Stat. § 772.12(5), Defendants are liable to Mr. Ashenoff for his reasonable attorney's fees and court costs.

{A0202427_1}

25

COUNT VIII:

## Liability Under the Civil Remedies for Criminal Practices Act ("CRCPA")

93.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 92 as if fully stated herein.

94.

A large quantity of the un-prescribed pain killers sold and distributed to Mr. Ashenoff and other wrestlers by Defendants were delivered to Mr. Ashenoff in the State of Florida.

95.

In addition to providing pain killers to Mr. Ashenoff, Defendants regularly sold and distributed un-prescribed pain killers to performers who worked for TNA.

96.

Defendants' conduct in providing un-prescribed pain killers to Mr. Ashenoff constituted a violation of Fla. Stat. § 893.135(1)(c).

97.

By providing un-prescribed pain killers to Mr. Ashenoff on repeated occasions, Defendants engaged in a pattern of

{A0202427_1}

26

racketeering activity, as that term is defined in Fla. Stat. Ann. § 895.02(4).

98.

Defendants engaged and participated in said pattern of racketeering activity through an enterprise consisting of TNA, the individual Defendants, and various independent contractors with whom TNA had or has contractual relationships.

99.

In addition to Defendants Taylor and Mantel, certain independent contractors under contract with TNA would distribute un-prescribed pain killers and other illicit drugs to performers for TNA, in violation of Fla. Stat. Ann. § 895.03(3).

100.

Defendants Jarrett, Taylor, Mantel, and certain independent contractors under contract with TNA who sold and distributed the illegal drugs referred to herein constituted an "enterprise," as defined by Fla. Stat. Ann. § 895.02(3).

101.

In addition to selling and distributing un-prescribed pain killers to TNA performers, Defendant Jarrett regularly personally used and shared with TNA performers and managers a variety of illegal drugs, including cocaine.

{A0202427_1}

27

102.

Mr. Ashenoff sustained serious bodily injuries as a consequence of Defendants' conduct as described herein.

103.

As a consequence of Defendants' conduct as described herein, Defendants are subject to the following civil remedies, among others:

(a) divestiture of any interest in or dissolution of the "enterprise";

(b) an Order suspending or revoking any license, permit or prior approval granted by any agency of the state;

(c) an Order requiring forfeiture of the corporate charter of any liable entity;

(d) forfeiture of all property, real or personal, including money, used in the course of, or intended for use in the course of, a violation of Fla. Stat. Ann. § 895.01-895.05; and

(e) threefold Mr. Ashenoff's actual damages and attorneys' fees, at the trial and appellate court levels as well as all investigation and litigation costs.

## COUNT IX:

## Trademark and Copyright Infringement

### 104.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 103 as if fully stated herein.

### 105.

Mr. Ashenoff is the owner of all right, title, and interest in and to the LAX name, the LAX Logo, and the image of LAX.

### 106.

TNA has no right to use the LAX name, the LAX Logo, or any use of the LAX brand in any fashion.

### 107.

TNA has used and continues to affix and employ the LAX name, brand and LAX Logo upon TNA marketing materials and products, thereby infringing Mr. Ashenoff's copyright and trademark rights pursuant to the United States Copyright Act of 1976 and Section 43 of the Federal Lanham Act.

### 108.

TNA's use of the LAX Logo is a copy of the LAX Logo owned by Mr. Ashenoff, or is so substantially similar thereto as to constitute infringement by copying under the Copyright Act.

{A0202427_1}

109.

TNA's use of the LAX name, brand, and identity has caused, and continues to cause, confusion in the marketplace as to the source, origin and sponsorship of the goods and services marketed and sold by TNA, as Mr. Ashenoff, the owner of the LAX marks, does not sponsor or otherwise permit TNA's uses thereof.

110.

Mr. Ashenoff is entitled to statutory damages and his attorneys' fees for TNA's willful infringement of Mr. Ashenoff's copyright, in an amount to be determined at trial.

111.

Mr. Ashenoff has been damaged by TNA's infringement of his trademark in the LAX name, brand and indicia of identity, in an amount to be proven at trial, and is entitled to recovery of his attorneys' fees in light of TNA's willful infringement of same.

112.

Mr. Ashenoff is entitled to an injunction *pendente lite* and a permanent injunction to arrest the willful infringements of his copyright and trademark rights.

{A0202427_1}

## COUNT X:

## Panda's Alter Ego Liability

113.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 112 as if fully stated herein.

114.

Panda owns one-hundred percent (100%) of the issued and outstanding stock of TNA.

115.

Panda dominates and controls all of the business decisions of TNA and TNA is used by Panda as a mere instrumentality for the purposes of operating a wrestling enterprise without exposing its assets to liability.

116.

Mr. Ashenoff alleges on information and belief that Panda controls and directly manages the assets of TNA such that TNA's management has no real discretion to make financial decisions.

117.

Mr. Ashenoff alleges on information and belief that Defendants Panda and TNA have overlapping officers and directors.

{A0202427_1}

31

118.

Mr. Ashenoff alleges on information and belief that Panda has commingled its assets with those of TNA.

119.

Mr. Ashenoff alleges on information and belief that Panda has abused the corporate form of business enterprise for the purpose of evading responsibility for the wrongdoing of its agents. Hence, to observe the corporate form in connection with Panda's liability for TNA's wrongdoing would be to promote injustice.

120.

The corporate separateness of Panda and TNA should be disregarded by the Court, and the Court should hold Panda liable for the wrongdoing of TNA and its agents.

## COUNT XI:

### Attorneys' Fees

121.

Mr. Ashenoff hereby incorporates and realleges each and every allegation contained in Paragraphs 1 through 120 as if fully stated herein.

122.

As a result of the Defendants' violation of Mr. Ashenoff's federally protected civil rights, Mr. Ashenoff is entitled to

{A0202427_1}

collect attorneys' fees pursuant to 42 U.S.C. § 1981 and U.S.C.
§ 1132 in an amount to be determined.

**WHEREFORE,** Mr. Ashenoff demands that:

A.   Defendants be served with a copy of the Summons and
     Complaint in this action;

B.   He shall have a trial by jury;

C.   He shall recover from Defendants actual, compensatory
     and punitive damages stemming from Count I of this
     Complaint in an amount to be determined at trial;

D.   He shall recover from Defendants actual, compensatory
     and punitive damages stemming from Count II of this
     Complaint in an amount to be determined at trial;

E.   He shall recover from Defendants actual, compensatory
     and punitive damages stemming from Count III of this
     Complaint in an amount to be determined at trial;

F.   He shall have the following relief against the
     Defendants stemming from Count IV of this Complaint,
     in addition to the relief requested throughout this
     Complaint:

     (1)   A declaratory judgment that the wrongs complained
           of herein violate the rights of Mr. Ashenoff as
           guaranteed by 42 U.S.C. §1981; and

     (2)   A permanent injunction enjoining Defendants from

{ A0202427_1}

33

maintaining or continuing any practices or actions which operate to discriminate on the basis of race and national origin.

G.   He shall recover from Defendants actual, compensatory and punitive damages stemming from Count V of this Complaint in an amount to be determined at trial;

H.   He shall recover from Defendants actual, compensatory and punitive damages stemming from Count VI of this Complaint in an amount to be determined at trial;

I.   He shall recover from TNA "threefold the actual damages" he sustained stemming from Count VII of this Complaint in an amount to be determined at trial;

J.   He shall recover attorneys' fees pursuant to Fla. Stat. § 772.12(5), as set forth in Count VII of this Complaint in an amount to be determined at trial;

K.   As a consequence of Defendants conduct as described in Count VIII, Defendants are subject to the following civil remedies, among others:

(1)   divestiture of any interest in or dissolution of the "enterprise";

(2)   an Order suspending or revoking any license, permit or prior approval granted by any agency of the state;

{A0202427_1}

34

     (3)   an Order requiring forfeiture of the corporate charter of any liability entity;

     (4)   forfeiture of all property, real or personal, including money, used in the course of, or intended for use in the course of, a violation of Fla. Stat. § 895.01-895.05; and

     (5)   threefold Mr. Ashenoff's actual damages and attorneys' fees, at the trial and appellate court levels, as well as all investigation and litigation costs.

M.   He shall recover his statutory damages and his attorneys' fees stemming from Count IX of this Complaint;

N.   Mr. Ashenoff shall have an injunction *pendente lite* and permanent injunction prohibiting Defendants' willful infringements of Mr. Ashenoffs' copyright and trademark rights, as set forth in Count IX of this Complaint;

O.   He shall recover his attorneys' fees pursuant to 42 U.S.C. § 1981 and § 1132 and his costs of litigation in an amount to be determined at trial; and;

P.   He shall recover any such other and further relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted this 16th day of April, 2008.

_____
Cary Ichter
Georgia Bar No. 382515
Adriana Midence
Georgia Bar No. 142298

ADORNO & YOSS, LLP
Two Midtown Plaza, Suite 1500
1349 W. Peachtree Street, N.W.
Atlanta, Georgia 30309
T: 404-347-8300
F: 404-347-8395

ATTORNEYS FOR PLAINTIFF
CHARLES ASHENOFF