# Exhibit G

03/12/2008 11:00 IFAX lafax@davisshapiro.com → G Blake ☒001/011

**ADORNO & YOSS**
A LIMITED LIABILITY CORPORATION
1349 W. PEACHTREE STREET, NE, SUITE 1500
ATLANTA, GA 30309
PHONE: (404) 347-8300, FAX: (404) 347-8395
WWW.ADORNO.COM


RECEIVED
MAR 1 2 2008
By_____

CARY ICHTER

DIRECT LINE: (404) 347-8486
DIRECT FAX: (404) 601-5897
EMAIL: CICHTER@ADORNO.COM

March 11, 2008

<u>VIA UPS</u>

Guy S. Blake, Esq.
Davis, Shapiro, Lewit & Hayes, LLP
150 South Rodeo Drive
Suite 200
Beverly Hills, CA 90212

  Re: <u>Ashenoff v. TNA Entertainment, LLC, Panda Energy International, Inc., Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor, III, and Wayne Cowan</u>

Dear Mr. Blake:

  The undersigned represents Charles "Carlos" Ashenoff, professionally known as "Konnan." It is my understanding that you represent TNA Entertainment, LLC ("TNA"). If I am incorrect, please notify me immediately so that I may forward this correspondence to the appropriate party. Additionally, please let me know if you do not represent Panda Energy International, Inc. ("Panda"), Jeffrey L. Jarrett, Dixie Carter, Paul W. Taylor (referred to herein by his professional name, "Terry Taylor") or Wayne Cowan (referred to herein by his professional name, "Dutch Mantel") (collectively, with TNA, referred to herein as "Defendants"). For reasons that will become obvious as you read this letter, I want to give each Defendant notice of this communication. That said, I am also forwarding a copy of this letter to L. Stephen Rizzieri, Esq., who I understand is the Chief Legal Officer and General Counsel to Panda.

### Introduction

  Mr. Ashenoff began wrestling for TNA in 2002. Initially, he worked without a written agreement with TNA. Ultimately, in or about January 2004 and August 2005, Mr. Ashenoff entered into two agreements with TNA (collectively the "Agreement"). The Agreement provided in pertinent part that Mr. Ashenoff was to perform wrestling services for TNA, and TNA was to compensate him for his efforts. <u>See</u>

{A0203106_1}

CALIFORNIA FLORIDA GEORGIA ILLINOIS MASSACHUSETTS NEW JERSEY [WASHING]TON, D.C.


Exhibit "G"

Guy S. Blake, Esq.
March 11, 2008
Page 2

TAB "A."[1]  The purpose of this letter is to inform you of various claims Mr. Ashenoff has arising out of his relationship with TNA, and to advise you of Mr. Ashenoff's intention to initiate litigation against the Defendants unless we are able to reach a prompt resolution of his claims.

This letter is organized by the primary claims Mr. Ashenoff intends to assert against the Defendants. For the purpose of brevity, this letter will not address all of Mr. Ashenoff's claims, but instead will focus on the two central claims we intend to assert: (1) a claim for permanent bodily injury Mr. Ashenoff has sustained from the consumption of un-prescribed medications that agents of TNA supplied to him and that he was encouraged to take by TNA; and (2) a claim of racial discrimination against TNA. The omission in this letter of various other claims set forth in the Complaint should not be taken to suggest that we are not serious about those additional claims or that we will not vigorously pursue them. Mr. Ashenoff is prepared, however, to settle those and any other claims he may have if, and only if, he can reach a satisfactory settlement with the Defendants.

### Bodily Injury Claim

Approximately five (5) years ago, Mr. Ashenoff joined TNA. At the time he joined, Mr. Ashenoff had a bothersome hip injury that caused him occasional discomfort. As he wrestled with TNA, that bothersome injury became a nagging injury, then a chronic problem, and eventually a dislocated hip and an unbearable source of pain for Mr. Ashenoff.

Despite the problems Mr. Ashenoff was having with his hip, TNA continued to book him for matches that included moves and maneuvers that aggravated his condition. TNA knew, or in the exercise of ordinary care should have known, that Mr. Ashenoff's condition was deteriorating as he continued to wrestle. Reflecting the caliber of care with which it treated its wrestlers, TNA had no doctors, trainers or otherwise medically competent personnel on staff or under contract who could provide even the most rudimentary medical or physical counseling or advice to wrestlers. Further, TNA knew, or in the exercise of ordinary care should have known, that Mr. Ashenoff, like many of the wrestlers it had under contract, was financially unable to secure health insurance and lacked the resources with which to obtain even basic medical care.

When Mr. Ashenoff made TNA aware of his injuries and the effect they were having on his ability to perform, he was told that if he did not work he would not be

---

[1] I have enclosed herewith a notebook of various exhibits, including our proposed Complaint and first round of written discovery. The "TAB" references herein correspond to the TABs in the notebook.

CALIFORNIA   FLORIDA   GEORGIA   ILLINOIS   MASSACHUSETTS   NEW JERSEY   NEW YORK   TEXAS   WASHINGTON, D.C.

APP-22

03/12/2008 11:00 IFAX lafax@davisshapiro.com → G Blake ☒003/011

Guy S. Blake, Esq.
March 11, 2008
Page 3

paid, and he would eventually be released. Mr. Ashenoff was aware that TNA had released other performers who were rendered unable to work by injuries they sustained while performing.

Early in his relationship with TNA, Terry Taylor and Dutch Mantel, acting in their capacity as agents and representatives of TNA, provided a solution to Mr. Ashenoff that would allow him to keep his job and wrestle: pain killers. Specifically, soon after Mr. Ashenoff arrived at TNA, Messrs. Taylor and Mantel supplied Mr. Ashenoff with Vicodin and Somalgesics ("Somas") in large quantities. Additionally, TNA not only created an environment in which wrestlers were actively encouraged to use large quantities of pain killers, but TNA operated its business in a manner that virtually forced wrestlers who wanted to remain employed to use these drugs, and then TNA conveniently supplied the drugs. For nearly five (5) years, Messrs. Taylor and Mantel, acting as agents of TNA, were a regular source of un-prescribed pain killers for Mr. Ashenoff.

As a consequence of the work he did for TNA, Mr. Ashenoff eventually had to undergo a hip replacement surgery. Remarkably, even after this surgery, while he was still in a wheelchair and later on crutches, TNA's bookers made it clear to Mr. Ashenoff that he was required to perform at TNA events. In order to facilitate these performances, TNA again provided Mr. Ashenoff with large quantities of un-prescribed pain killers.

The link between kidney disease and the use of Vicodin and Soma (carisoprodol) is well established. Vicodin contains two active ingredients: hydrocodone bitartrate ("hydrocodone") and acetaminophen.[2] Each Vicodin tablet contains 660 mg of acetaminophen. Acetaminophen is a dose-related hepatotoxin.[3] Toxicity begins in adults at 10 mg acetaminophen. Compared with those who abstain from the drug, chronic users of phenacetin-based painkillers are 12.5 times more likely to die from renal disease.[4] Acetaminophen, taken in large doses over a prolonged period, causes a specific form of kidney disease, characterized by papillary necrosis and interstitial scarring.

---

[2] http://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?id=4164&type=display

[3] CJ McClain, S. Price, S. Barve, R. Devalarja, S. Shedlofsky, *Acetaminophen hepatotoxicity: An Update*, Curr. Gastroenterol Rep. 1999-Feb-Mar;(1):42-9.

[4] J. Raloff, *New Worries over Non-Aspirin Analgesics*, Science News, Vol. 139, No. 3., Jan. 19, 1991, p. 39.

CALIFORNIA   FLORIDA   GEORGIA   ILLINOIS   MASSACHUSETTS   NEW JERSEY   NEW YORK   TEXAS   WASHINGTON, D.C.

**APP-23**

Guy S. Blake, Esq.
March 11, 2008
Page 4

In acetaminophen overdosage, serious sides effects are numerous, including fatal hepatic necrosis,[5] renal tubular necrosis, acute renal failure.[6] Side effects are not limited to victims of overdose. Acute renal failure has been evidenced after administration of therapeutic doses as well.[7] The relative risk of chronic renal failure rises with increasing cumulative lifetime dosages of acetaminophen.[8]

Somalgesic is a centrally-acting skeletal muscle relaxant with two active ingredients: carisoprodol and Naproxen. Use of Naproxen comes with serious side-effects that increase proportionally with the dosage.[9] Naproxen can cause serious kidney problems, including sudden kidney failure.[10] Naproxen has also been shown to cause acute hepatic injury.[11]

Naproxen belongs to the category of drugs known as Nonsteroidal anti-inflammatory drugs ("NSAIDs"), whose adverse reaction profile includes, gastrointestinal toxicity, renal dysfunction, and nephrotoxicity.[12] The risk of these adverse reactions increases when NSAIDs are combined with other hepatotoxic drugs.[13] Taken in large doses over a prolonged period, NSAIDs cause a specific form

---

[5] JE Lane, MG Belson, DK Brown, and A. Scheetz, *Chronic Acetaminophen Toxicity: a case report and review of the literature*, J Emerg Med. 2002 Oct;23(3):253-6.

[6] B. Satirapoj, P. Lohachit, T. Ruamvang, *Therapeutic dose of acetaminophen with fetal hepatic necrosis and acute renal failure*, J Med Assoc Thai, 2007 Jun; 90(6): 1244-7.

[7] *Id.*

[8] *Id.*

[9] M. Hamera-Slynarska, K. Slynarski, *Ortop Traumatol Rehabil*, Mar. 30, 2001; 30(3): 126-8.

[10] Harry A. Guess, *How Should Acute Hepatic Drug Effects Be Studied Epidemiologically?*, Epidemiology, Vol. 4, No. 6, Nov. 1993, pp. 487-489.

[11] M. Lapeyre-mestre, Am de Castro, MP Bareille, JG Del Pazo, AA Requejo, LM Arias, JL Montrastruc, A. Carvajal, *Non-steroidal anti-inflammatory drug-related hepatic damage in France and Spain: analysis from national spontaneous reporting*, Fundam Clin Pharmacol., Aug. 20, 2006; 20(4):391-5.

[12] Suzanne Perex Gutthan, Luis A, Garcia Rodriquez, *The Increased Risk of Hospitalizations for Acute Liver Injury in a Population with Exposure to Multiple Drugs*, Epidemiology, Vol. 4. No. 6., Nov. 1993, pp. 496-501. HF Cheng, RC Harris, *Renal effects of non-steroidal anti-inflammatory drugs and selective cyclooxygenase-2 inhibitors*, Curr Pharm Des. 2005; 11(14): 1795-804.

[13] *Id.*

CALIFORNIA   FLORIDA   GEORGIA   ILLINOIS   MASSACHUSETTS   NEW JERSEY   NEW YORK   TEXAS   WASHINGTON, D.C.

APP-24

Guy S. Blake, Esq.
March 11, 2008
Page 5

of kidney disease characterized by papillary necrosis and interstitial scarring.[14] Patients have progressive chronic renal failure and are susceptible to the subsequent development of uroepithelial tumors.[15]

Most patients who use pain killers do not experience permanent kidney damage because they have doctors overseeing their care and the administration of pharmaceuticals. Mr. Ashenoff did not have the benefit of a doctor's care because the drugs were illegally provided to him and because TNA is more interested in putting on wrestling events than it is in the health and well being of its wrestlers.

While it is possible to experience kidney disease without the consumption of pain killers, the incidence of end-stage renal disease ("ESRD") in Mr. Ashenoff's age cohort is extremely rare. According to information from the United States Renal Data System ("USRDS") web site, roughly 130 out of every one million people develop ESRD.[16] According to Dr. Roland Blantz, Head of the Nephrology-Hypertension Division of the University of California, San Diego hospital where Mr. Ashenoff was treated, the most likely explanation for Mr. Ashenoff's rapid progression to ESRD was his consumption of un-prescribed pain killers supplied by TNA. See Statement of Dr. Roland Blantz, Tab "B."

As a result, Mr. Ashenoff was diagnosed with ESRD in 2006, a condition that required him first to endure kidney dialysis and later undergo a kidney transplant on July 31, 2007. Mr. Ashenoff's transplant was complicated by rejection issues he initially had, which will diminish the long-term viability of the kidney transplant.

A kidney transplant is a major surgery with serious short and long-term consequences. In addition to the several months it takes to recover from such a procedure, patients must adhere to a strict regimen of immuno-suppressant drugs and incur a host of other medical costs that on average, according to USRDS statistics, cost $15,783 per year for patients in Mr. Ashenoff's age cohort. See USRDS

---

[14] GM Rocha, LF Michea, EM Peters, M Kirby, Y Xu, DR Ferguson, MB Burg, *Direct toxicity of nonsteroidal antiinflammatory drugs for renal medullary cells*, Proc Natl Acad Sci USA, Apr. 24, 2001; 98(9): 5317-22.

[15] *Id*

[16] The United States Renal Data System (USRDS) is a national data system that collects, analyzes, and distributes information about end-stage renal disease (ESRD) in the United States. The USRDS is funded directly by the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) in conjunction with the Centers for Medicare & Medicaid Services (CMS, formerly HCFA). USRDS staff collaborates with members of CMS, the United Network for Organ Sharing (UNOS), and the ESRD networks, sharing datasets to improve the accuracy of ESRD patient information.

CALIFORNIA    FLORIDA    GEORGIA    ILLINOIS    MASSACHUSETTS    NEW JERSEY    NEW YORK    TEXAS    WASHINGTON, D.C.

**APP-25**

Guy S. Blake, Esq.
March 11, 2008
Page 6

Economic Costs of ESRD, p. 323, TAB "C." Those costs will increase as Mr. Ashenoff ages and as medical costs increase.

Additionally, a transplanted kidney donated by a live donor is expected to last for 15 years, meaning that Mr. Ashenoff will either require another transplant in 14 years or have to go back on dialysis. The cost of a transplant in 14 years is anyone's guess, but it undoubtedly will be enormously expensive.

Most importantly, Mr. Ashenoff's life expectancy has been substantially reduced as a consequence of his ESRD and the kidney transplant. The USRDS web site indicates that on average, the future life expectancy of a male age 40 to 44 is 35.4 additional years. The average life expectancy of a male transplant patient in the same age cohort is 22.6 years. See USRDS Mortality and Causes of Death, p. 236, TAB "D." This is in part because Mr. Ashenoff's new kidney can only operate at approximately 50 percent (50%) functionality because of ancillary issues that transplant patients present, and because additional transplant operations will present new physical dangers, including the new threat of rejection. Whatever the complications, the bottom line remains the same: Mr. Ashenoff is looking forward to a life shortened by nearly thirteen (13) years.

### Racial Discrimination at TNA

Pursuant to his Agreement with TNA, Mr. Ashenoff was subject to TNA's direction and control. TNA controlled not only the choreography of matches and the storylines to be followed, but it also defined the nature of the character Mr. Ashenoff was to play. In so doing, TNA directed Mr. Ashenoff to perform in a manner that was a clear amalgamation of Hispanic stereotypes. Specifically, TNA directed Mr. Ashenoff to: (1) speak in Spanish slang or with a Spanish accent; (2) dress as and adopt stereotypical characteristics of members of a Latino street gang; (3) use racially charged language when referring to and addressing a Caucasian wrestler; and (4) strike another wrestler with a tequila bottle, suggesting that Hispanics always have a bottle of tequila readily available. In short, TNA used Mr. Ashenoff and his character, Konnan, as the embodiment and personification of a racial slur against Hispanics.

Even more troubling than TNA's use of Mr. Ashenoff to perpetuate racial and ethnic stereotypes was the fact that this activity occurred against the backdrop of TNA's openly racist culture. Each time Mr. Ashenoff objected to the ethnic and racial themes and degrading stereotypes perpetuated by TNA, his concerns were completely ignored by TNA. TNA's management personnel, bookers and agents frequently referred to all Hispanics as Mexicans, "brownies," "drunken Puerto Ricans," and the like. TNA's management would also refer to African-Americans as

CALIFORNIA    FLORIDA    GEORGIA    ILLINOIS    MASSACHUSETTS    NEW JERSEY    NEW YORK    TEXAS    WASHINGTON, D.C.

APP-26

Guy S. Blake, Esq.
March 11, 2008
Page 7

"niggers" and, whenever African-Americans objected to their treatment, they were referred to as "uppity negroes."

Moreover, during the time Mr. Ashenoff worked with TNA, TNA paid virtually all minority performers, including Mr. Ashenoff, substantially less for their services than other similarly situated non-minority performers. We are confident that we will be able to develop considerable evidence to support this position through the discovery process if we are forced to pursue litigation.

Suffice it to say that TNA took no steps to ensure that its management and culture were free of racism. Indeed, it appears TNA went out of its way to hire management personnel with a history of blatant racism in the wrestling profession. Specifically, Terry Taylor and Vince Russo, who were both formerly employed by World Championship Wrestling ("WCW"), were central figures in a discrimination lawsuit filed by twelve (12) minority wrestlers against WCW in or about 2000 (the "WCW Litigation").

During the course of the WCW Litigation, a substantial volume of evidence was gathered and made part of the public record that reflected upon the bigoted attitudes of Terry Taylor and Vince Russo. Mr. Taylor, whom I deposed during the course of that litigation, testified that he was on the Booking Committee at WCW and involved in recruiting and talent relations. In the course of the WCW Litigation, no fewer than nine (9) witnesses testified that they heard Mr. Taylor refer to African Americans as "niggers" at various times. Of those nine, *only two were parties to the litigation.* I have enclosed herewith Plaintiff's Statement of Material Facts to Which There Exist Genuine Issues to be Tried from the WCW Litigation at TAB "E." At pages 7-16, you will find quoted materials from sworn affidavits and deposition testimony regarding Mr. Taylor's use of racist language that reflect upon his racist thinking.

In the same document, at pages 21-25, you will find sworn testimony concerning the racist attitudes of Mr. Russo and how those attitudes manifested themselves at WCW. No fewer than three (3) witnesses testified to hearing Mr. Russo use the word "nigger" at various times. See p. 22, para. 90. Mr. Russo referred to African-Americans as "Moolions," which he apparently believed to be the name of a tribe indigenous to Africa. One witness testified that Mr. Russo expressed the opinion that "whites ruled wrestling." See p. 23, para. 95. Additionally, Mr. Russo was quoted by one witness as saying that WCW was going to have a white champion because "that is the way I want it." See p. 25, para. 101. All of the testimony quoted herein came from non-parties.

CALIFORNIA    FLORIDA    GEORGIA    ILLINOIS    MASSACHUSETTS    NEW JERSEY    NEW YORK    TEXAS    WASHINGTON, D.C.

APP-27

Guy S. Blake, Esq.
March 11, 2008
Page 8

Mr. Russo went so far as to admit to and attempt to justify his discriminatory practices in an interview published over the Internet in or about September 1999. In this interview, Mr. Russo is quoted as follows:

> I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this-it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American,... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

For your reference, a true and correct copy of a printed version of Mr. Russo's interview in included in the notebook enclosed with this letter at TAB "F." Shockingly, Mr. Russo now works at TNA as a booker, and in that capacity determines which wrestlers get a "push" and which ones do not.

TNA is a racist organization because it has hired racists. TNA has hired racists because it did nothing to investigate the public record concerning the racist attitudes of, among others, Messrs. Russo and Taylor. The WCW Litigation was well known, not only within WCW, but in the wrestling world as well. See TAB "G" for a collection of internet postings mentioning the WCW Litigation. You will note that one post even quotes Mr. Russo's bigoted rant from above, calling it one of the "50 Dumbest Wrestling Moments Ever."

Mr. Jarrett was still with WCW when the WCW Litigation was filed. The fact that WCW was being sued for discrimination was well known in the wrestling business. The notion that Mr. Jarrett and others within TNA did not know about the litigation or Messrs. Taylor and Russo's involvement in it strains credulity.

During the waning days of his relationship with TNA, Mr. Ashenoff began to complain more vigorously about the racist environment at TNA. Ultimately, the conditions became so unbearable that Mr. Ashenoff asked to be released from his Agreement with TNA. In retaliation for his complaints of racial and ethnic discrimination, rather than give him a release, TNA decided to indefinitely suspend Mr. Ashenoff so that he would continue to be bound by the terms of the Agreement, including the non-competition provisions. For your reference, a true and correct

CALIFORNIA   FLORIDA   GEORGIA   ILLINOIS   MASSACHUSETTS   NEW JERSEY   NEW YORK   TEXAS   WASHINGTON, D.C.

APP-28

Guy S. Blake, Esq.
March 11, 2008
Page 9

copy of the letter Mr. Ashenoff received from TNA suspending him is included in the notebook enclosed with this letter at TAB "H."

Mr. Ashenoff performed his duties as a TNA personality and wrestler in a manner consistent with TNA's expectations, and TNA never criticized Mr. Ashenoff's performance. In fact, on or about August 26, 2006, Ms. Carter, the President of TNA, wrote the following to Mr. Ashenoff in an e-mail: "THANK YOU for your great work, attitude and patience in us getting here...You are doing a great job, you always have, but you seem to have hit a stride." A true and correct copy of said e-mail is attached hereto at TAB "I."

I am also enclosing a copy of a Complaint prepared for Mr. Ashenoff to be filed in federal district court and a Charge of Discrimination that was filed with the EEOC on December 18, 2007[17]. See TABs "J" and "K." I have included a copy of Mr. Ashenoff's First Interrogatories and Requests for Production of Documents, which will accompany his Complaint should he be forced to file suit. See TAB "L."

The Complaint also sets forth claims arising under the Drug Dealer Liability Act. Many states have passed these law which make a "drug dealer" liable for injuries his illegal conduct causes. We cited the Florida law because most of the pain killers supplied to Mr. Ashenoff by TNA agents were delivered in Florida while TNA was taping there.

Pursuant to the Drug Dealer Liability Act, Fla. Stat. § 772.12(2), Defendants would be liable to Mr. Ashenoff for "threefold the actual damages [he] sustained" as a consequence of his injuries. Given the nature of Mr. Ashenoff's damages, that number would, no doubt, be enormous. Defendants would also be liable to Mr. Ashenoff for his reasonable attorneys' fees and court costs under that statute.

The Complaint also makes claims pursuant to the Florida Racketeer Influenced and Corrupt Organizations Act ("RICO"), Fla. Stat. Ann. § 895. Damages recoverable under this law also include treble damages and costs of litigation. Additionally, if TNA and/or Panda are found liable under either of these statutes, they could lose any state granted charters, permits or licenses, and would be subject to dissolution by a court of competent jurisdiction.

---

[17] I realize that it is unusual to file a Complaint and a Charge of Discrimination at the same time, but we would file the Complaint accepting TNA's contractual position that Mr. Ashenoff was an independent contractor. The EEOC charge was as a precautionary measure in case TNA changed its position and claimed Mr. Ashenoff was an employee. If TNA confirms by way of an admission *in judicio* that Mr. Ashenoff was an independent contractor, we will likely abandon the EEOC Charge of Discrimination.

CALIFORNIA    FLORIDA    GEORGIA    ILLINOIS    MASSACHUSETTS    NEW JERSEY    NEW YORK    TEXAS    WASHINGTON, D.C.

APP-29

Guy S. Blake, Esq.
March 11, 2008
Page 10

The discrimination claims set forth in the Complaint are made under 42 U.S.C. § 1981, not Title VII because, according to his contract, Mr. Ashenoff was an independent contractor, not an employee. Mr. Ashenoff is entitled to recover his actual damages in the form of back pay, front pay, compensation for emotional injury, punitive damages and costs of litigation pursuant to those claims. The damage caps that apply to Title VII claims do not apply to Section 1981 claims.

The current legal and political climate is not good for professional wrestling. The media has focused on the unseemly underside of the industry, and the public's apparent appetite for stories regarding the dark side of professional wrestling appears to be all but insatiable. No doubt, this controversy would only add fuel to the fire.

Similarly, this dispute would undoubtedly draw the attention of opportunistic politicians who wish to crusade against easy targets like professional wrestling. The high-profile filing of a claim against TNA—a claim that details, among other things, the criminal activities of TNA's management—at the very time that Congress is set to hold hearings to investigate the industry can only cause TNA and the wrestling industry more headaches and heighten the possibility that the Federal government will undertake to regulate the industry.

Clearly, litigation involving these issues is not in TNA's best interest. Mr. Ashenoff would prefer to settle this matter quickly and quietly as well. Therefore, Mr. Ashenoff is willing to settle any and all claims he has against all Defendants in exchange for a one time payment of $7,000,000.00.

While it would be easy to doubt our sincerity about these claims, I would urge you to consider history. WCW doubted we would file suit, but we did. WCW thought they could outlast the plaintiffs, but they did not. We maintained the suit for over two (2) years; we took dozens of depositions; we fought all the procedural fights. Ultimately, WCW settled. I would be happy to tell you how much WCW paid, but WCW insisted upon an iron-clad confidentiality provision. (That should tell you something.) Between filing and settling, I am sure WCW spent millions. We did, but it was money very well spent.

We are prepared to meet with representatives of the proposed Defendants to discuss this situation. If TNA will not agree to these terms or negotiate in good faith, Mr. Ashenoff has authorized me to file the enclosed. In that event, Mr. Ashenoff will seek all the relief described therein, including punitive damages and his reasonable attorneys' fees.

CALIFORNIA    FLORIDA    GEORGIA    ILLINOIS    MASSACHUSETTS    NEW JERSEY    NEW YORK    TEXAS    WASHINGTON, D.C.

APP-30

03/12/2008 11:01 IFAX lafax@davisshapiro.com → G Blake 011/011

Guy S. Blake, Esq.
March 11, 2008
Page 11

    I look forward to hearing from you with respect to this matter by April 15, 2008.

Sincerely,

ADORNO & YOSS, LLP

Cary Ichter

cc:    Mr. Charles Ashenoff
        Adriana Midence, Esq.
        L. Stephen Rizzieri, Esq.

CALIFORNIA   FLORIDA   GEORGIA   ILLINOIS   MASSACHUSETTS   NEW JERSEY   NEW YORK   TEXAS   WASHINGTON, D.C.

**APP-31**